UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| WALTER PHILLIPS, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MOLSON COORS BREWING COMPANY, PETER H. COORS, W. LEO KIELY III, CHARLES M. HERINGTON, FRANKLIN W. HOBBS, RANDALL OLIPHANT, PAMELA PATSLEY, WAYNE SANDERS, ALBERT C. YATES, and JOHN DOES 1-30,<br><br>Defendants. | **CIVIL ACTION NO.:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYER RETIREMENT INCOME SECURITY ACT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Walter Phillips ("Plaintiff"), on behalf of himself and the Molson Coors Brewing Company Coors 401(k) Savings Plan (the "Plan"), and a class of similarly situated participants and beneficiaries of the Plan (the "Participants"), by his attorneys, alleges the following for his Complaint (the "Complaint"):

**NATURE OF THE ACTION AND SUMMARY OF CLAIMS**

1. Plaintiff, a participant in the Plan, brings this action against Molson Coors Brewing Company ("Molson Coors" or the "Company") and others for Plan-wide relief on behalf of the Plan, and on behalf of a class of Participants in the Plan for whose individual accounts the Plan held an interest in the common stock of Molson Coors between July 22, 2004 to the present (the "Class Period"). Plaintiff brings this action on behalf of the Plan and the Participants pursuant to § 502(a)(2) and (3) of the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)and (3).

2. As more fully set forth below, Defendants breached their fiduciary duties owed to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550. As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are liable to make good to the Plan the losses resulting from each such breach of fiduciary duty. Plaintiff also seeks equitable relief.

3. During the Class Period, the Company and its senior executives engaged in a fraudulent scheme intended to artificially inflate the price of Molson Coors common stock.

4. Plaintiff alleges that it was imprudent for the Plan to invest in Molson Coors common stock because the common stock was too risky for a retirement plan investment in that the price of common stock was artificially inflated. Plaintiff also alleges that Defendants breached their fiduciary duties by negligently failing to disclose material information necessary for Participants to make informed decisions concerning the Plan's assets and benefits and investing in Molson Coors common stock.

**JURISDICTION AND VENUE**

5. Plaintiff's claims arise under ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).

6. This Court has jurisdiction over this action pursuant to ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).

7. Venue is proper in this District because the Company is incorporated under the laws of Delaware and has enjoyed the benefits and protections of incorporation in Delaware.

**THE PARTIES**

**Plaintiff**

8. Plaintiff Walter Phillips is a resident of the State of Tennessee. At various times, Plaintiff's individual account in the Plan included Molson Coors Company common stock as an investment option under the Plan.

**Defendants**

9. Defendant Molson Coors Company is a corporation organized under the laws of the state of Delaware with its principal place of business located at 311 Tenth Street, Golden, Colorado, and with its Canadian executive offices located at 1555 Notre Dame Street East, Montreal, Quebec, Canada. Molson Coors Brewing Company, formerly Adolph Coors Company, is a holding company engaged in the manufacturing, marketing and selling of malt beverage products through its principal subsidiaries, Coors Brewing Company, operating in the United States, and Coors Brewers Limited, operating in the United Kingdom. On February 9, 2005, Adolph Coors Company merged with Molson Inc. In connection with the Merger, Adolph Coors Company became the parent of the merged company and

changed its name to Molson Coors Brewing Company. Molson sells its beer in Canada, Brazil and the United States. Molson has five breweries in Canada and eight breweries in Brazil, and distributes over 75 owned or licensed brands of beer and alcohol products. Molson Coors is the Plan's sponsor. Molson Coors exercised discretionary authority over the Plan.

10. Defendant Peter H. Coors ("P. Coors") was, during the Class Period, Chairman of the board of directors of Coors. Defendant P. Coors was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan. Upon information and belief, Defendant P. Coors was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

11. Defendant W. Leo Kiely III ("Kiely") was, during the Class Period, President, Chief Executive Officer and a member of the board of directors of Coors. Defendant Kiely was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan. Upon information and belief, Defendant Kiely was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

12. Defendant Charles M. Herington ("Herington") was, during

the Class Period, a member of the board of directors of Coors. Defendant Herington was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan. Upon information and belief, Defendant Herington was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

13. Defendant Franklin W. Hobbs ("Hobbs") was, during the Class Period, a member of the board of directors of Coors. Defendant Hobbs was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan. Upon information and belief, Defendant Hobbs was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

14. Defendant Randall Oliphant ("Oliphant") was, during the Class Period, a member of the board of directors of Coors. Defendant Oliphant was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan. Upon information and belief, Defendant Oliphant was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

15. Defendant Pamela Patsley ("Patsley") was, during the

Class Period, a member of the board of directors of Coors. Defendant Patsely was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan. Upon information and belief, Defendant Patsely was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

16. Defendant Wayne Sanders ("Sanders") was, during the Class Period, a member of the board of directors of Coors. Defendant Sanders was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan. Upon information and belief, Defendant Sanders was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

17. Defendant Albert C. Yates ("Yates") was, during the Class Period, a member of the board of directors of Coors. Defendant Yates was at certain times relevant to this Complaint a Plan fiduciary with respect to the Plan. Upon information and belief, Defendant Yates was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

18. Defendants P. Coors, Kiely, Herington, Hobbs, Oliphant,

Patsley, Sanders, and Yates are herein referred to as the "Director Defendants."

19. The Director Defendants appointed the members of the Committee and exercised discretionary authority over the Plan.

20. Defendant John Does 1-30 are fiduciaries of the Plan and/or exercised discretionary authority over the Plan.

**CLASS ACTION ALLEGATIONS**

21. Plaintiff brings this action on his own behalf and, pursuant to Rules 23(a),(b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all current and former participants in the Plan at any time from January 24, 2002 to the present. Excluded from the Class are Defendants herein, officers and directors of Defendant Molson Coors, members of individual Defendants' immediate families, and the heirs, successors or assigns of any of the foregoing.

22. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there were hundreds, if not thousands, of present and former employees of Molson Coors who held shares of Molson Coors common stock in their individual accounts under the Plan.

23. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely

individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants were fiduciaries;

(b) Whether Defendants breached their fiduciary duties;

(c) Whether the Plan and the Participants were injured by such breaches; and

(d) Whether the Class is entitled to damages and injunctive relief.

24. Plaintiff's claims are typical of the claims of the other members of the Class as Plaintiff and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

25. Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with experience in ERISA class action litigation. The interests of Plaintiff are coincident with and not antagonistic to the interests of the other Class members.

26. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants. In addition, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other

members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

27. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**DESCRIPTION OF THE PLAN**

28. The Molson Coors Company Plan is an employee benefit Plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

29. The Plan is "defined contribution" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

30. The Plan is a voluntary contribution Plan whereby

Participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by the Defendants which are then allocated to Participants' individual accounts.

**ADMINISTRATION OF THE PLAN**

31. At all times relevant to this Complaint, all defendants were fiduciaries of the Plan as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management, disposition of assets and had discretionary authority or responsibility in the administration of the Plan.

32. Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA Section 405, 29 U.S.C. § 1105.

**FIDUCIARY DUTIES UNDER ERISA**

33. **The Statutory Requirements:** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying

> the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

34. **The Duty of Loyalty:** ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ."

35. The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

36. **The Duty of Prudence:** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

37. **The Duty to Inform:** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (i)

a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

38. Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires that fiduciaries furnish a SPD to Participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD must apprise Participants of their rights under the Plan. The SPD and all information contained or incorporated therein constitutes a representation in a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized

> in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

39. **The Duty to Investigate and Monitor Investment Alternatives:** With respect to a pension plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan.

40. **The Duty to Monitor Appointed Fiduciaries.** Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries. In a 401(k) plan such as the Plan, the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

(a) possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their

duties;

(b) are knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan's participants;

(c) are provided with adequate financial resources to do their jobs;

(d) have adequate information to do their jobs of overseeing the Plan investments with respect to company stock;

(e) have access to outside, impartial advisors when needed;

(f) maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

(g) report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

41. **The Duty Sometimes to Disregard Plan Documents.** A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

42. **Co-Fiduciary Liability.** A fiduciary is liable not only

for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

43. **Non-Fiduciary Liability.** Under ERISA non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

**PARTICIPANTS ARE NOT RESPONSIBLE FOR IMPRUDENT PLAN INVESTMENTS**

44. The fact that Participants selected investments from options pre-selected by Defendants is no defense in this case. Fiduciaries can shift liability for imprudent investments to

Participants under ERISA § 404(c), 29 U.S.C. § 1104(c) only if, among other things, they meet five specific requirements:

(a) they disclose in advance the intent to shift liability to Participants;

(b) they designate the Plan as "404(c) Plan" and adequately communicate this to Participants;

(c) they ensure that Participants are not subject to undue influence;

(d) they provide an adequate description of the investment objectives and risk and return characteristics of each investment option; and

(e) they disclose to Participants all material information necessary for Participants to make investment decisions that they are not precluded from disclosing under other applicable law. In this regard, fiduciaries have a choice B they can disclose all material information to Participants, including information that they are not required to disclose under the securities laws, and shift liability to Participants, or they can comply with the more limited disclosure requirement under the securities laws but remain liable for imprudent investments.

29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii).

45. Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c) because they failed to comply with the relevant regulations.

SUBSTANTIVE ALLEGATIONS

46. **Background: The Pre-Merger Companies - Molson Inc.** Prior to the Merger, Molson was Canada's largest brewer and one of the world's leading brewers of beer, with operations in Canada, Brazil

and the United States. Founded in 1786, Molson also was North America's oldest beer company, and one of its largest, with (Cdn.) $3.5 billion in gross sales for the fiscal year ended March 31, 2004. Molson products include a portfolio of beers including Molson Canadian, Molson Export, Molson Dry, Richard's, A. Marca Bavaria, Kaiser and Bavaria. Prior to the Merger, Molson was also a licensed authorized brewer and distributor of Coors brands in Canada under agreements between Molson and Coors. One of Molson's most profitable products was the Coors Light brand, which it manufactured and marketed throughout Canada.

47. **Background: The Pre-Merger Companies- The Adolph Coors Company.** Prior to the Merger, Coors was the third-largest brewer in the United States and the second largest brewer in the United Kingdom. Founded in 1873, Coors manufactured and marketed a portfolio of beer brands designed to reach several tastes, styles and price points. At fiscal year end December 28, 2003, Coors had US $5.4 billion in sales. In the United States, Coors owns and/or licenses such brands as: Coors Light, Coors Original, Coors Edge, Coors Non-Alcoholic, Aspen Edge, Extra Gold, Zima, George Killian's Irish Red Lager, Keystone, Keystone Light, Keystone Ice, Blue Moon Belgian White Ale and Mexicali. Coors also sells the Molson family of brands in the United States through a joint venture. Outside of the United States, Coors sells Carling, Worthington, Cafiey's, Reef, Screamers, Stones and, through a United Kingdom joint

venture, Grolsch.

48. **Business of Molson Prior to the Merger.** The same day the respective companies announced that they had entered into a definitive Merger Agreement, Molson revealed that it was operating well-below plan. Specifically, Molson published its results for 1st quarter of fiscal 2005, the three months ended June 30, 2004, and informed investors of the following:

> Excluding certain one-time "rationalization costs," Molson's consolidated EBIT was down (14.5%).
>
> Excluding certain one-time "rationalization costs," Molson's net earnings decreased (19.4%).
>
> Excluding certain one-time "rationalization costs," Molson's net earnings per share decreased (19.4%) - to $0.54 per share, versus consensus EPS estimates of $0.70 per share.
>
> Total Molson beer volume was down (3.4%) and volume in Canada was down (2.8%).
>
> Management in Canada and Brazil was replaced as part of Molson's "Regaining Momentum'' strategy, as outlined in Molson's annual report.
>
> Molson's long-term goal of 10% EBIT growth remained, however, "lower Q1 performance will make this challenging in the current fiscal year." (Brian Burden, CFO Molson).

49. Later, in the period prior to the Merger, Molson disclosed that it did not, and would not in the foreseeable future, achieve 10% growth in earnings before interest and taxes ("EBIT"). On September 30, 2004, Molson published a release that warned

investors that it was experiencing below-plan sales in Canada and weakening profits in Brazil. This release stated, in part, the following:

> Molson Forecasts Lower Than Expected Second Quarter Earnings.
>
> Molson Inc. announced today that, on the basis of preliminary results compiled for the second quarter ending September 30, 2004, earnings before non-recurring items, such as the charges related to the proposed merger with Coors, will be below the current range of estimates published by financial analysts. Molson is making an early announcement as part of its reporting obligation to inform shareholders of this earnings shortfall.
>
> This unfavorable variance was driven by lower profitability in Brazil and lower volumes in Canada. In Brazil, estimated volume was approximately 10% lower than a year ago and compounded by the high cost structure associated with the sales centers put in place over the last nine months. In Canada, a much cooler summer season in most regions across the country and the continued strength of the value segment in certain regional markets led to industry and market share declines.
>
> "From an EBIT standpoint, we expect results in Brazil to be slightly below Q1 levels, while the volume shortfall in Canada points to a mid single-digit percentage decrease in domestic EBIT", indicated Brian Burden, Chief Financial Officer of Molson Inc.
>
> In light of the continuing challenge presented by the Brazilian beer market, Molson is performing an impairment test of assets in the region. Though the impairment test is not completed, preliminary findings could justify a write down of approximately CA$200 million. In addition, Molson is re-evaluating the business model in an effort to drive sustainable profitability in Brazil and

> specific cost reduction initiatives are being implemented.
>
> Last July, Molson indicated that the lower first quarter performance would make the attainment of the annual 10% EBIT growth target a challenge. Current quarter performance has confirmed that this will not be achieved in Fiscal 2005. Molson will provide more detail when it issues second quarter results which have been rescheduled for Thursday, October 28, 2004.

50. Additional facts about Molson's financial and operational condition were known to investors and analysts prior to the consummation of the Merger. That same day, September 30, 2004, *Canada Press Newswire* reported, in part, the following:

> Molson issues earnings warning: slow sales in Canada, weak profit in Brazil
>
> MONTREAL (CP) - Molson Inc. has served up a warning of disappointing summer-quarter earnings, saying sales have been slow in Canada and profitability continues to be squeezed in Brazil.
>
> The brewer also disclosed Thursday evening that it is considering a $200-million write-down on its Brazilian assets.
>
> The operations in Brazil are currently valued on the company's books at about $700 million. Molson paid more than $1 billion in 2002 to acquire Kaiser, the second-largest brewer in the South American country, but the Brazilian adventure has become a quagmire: Kaiser's market share was estimated at 10.7 per cent in August, down from 13.1 per cent a year earlier.
>
> In addition to the "preliminary" finding that a $200-million write down might be warranted, Molson said it is "re-evaluating the business model in an effort to drive sustainable

> profitability in Brazil, and specific cost-reduction initiatives are being implemented."
>
> Molson said July-September earnings in Canada are significantly below the previous quarter, and it confirmed that it will not meet its target of a 10 per cent increase in annual operating profit.
>
> * * *
>
> A Coors spokeswoman, Laura Sankey, said Thursday's news does not affect the U.S. brewery's position on the combination.
>
> "We continue to believe that the merger of Coors and Molson is a great transaction that will create a stronger global competitor," Sankey said, adding that Coors was not surprised by Molson 's tepid results.
>
> * * *
>
> For analysts surveyed by Thomson One Analytics, this is the second consecutive unpleasant quarterly surprise from Molson. Their consensus estimate was for July-September earnings of 70cents per share, the same as they had predicted for the previous quarter, when Molson came in at 53 cents.
>
> In that quarterly report issued July 22 - the same day the Coors merger plan was announced - Molson said earnings excluding restructuring charges and other one-time items fell 19 per cent from a year earlier to $68.3 million, as beer volumes were down 2.8 per cent in Canada and 4.2 per cent in Brazil.

51. **Business of Coors Prior to the Merger.** During the pre-Merger period, Coors portrayed itself as a company that was experiencing above-consensus growth and profitability and was outperforming the market. Just as Molson had published an earnings

release the day the Coors-Molson Merger was announced, the same day, Coors too issued a release announcing its results for the second quarter of 2004, the thirteen-week period ended June 27, 2004, only unlike Molson; Coors reported positive results:

> Consolidated net sales of $1.1 5 billion at Coors increased 4.6% over net sales reported by Coors in 2Q:03.
>
> Operating Income for Coors 2Q:04 increased 6.9% to $125.6 million, over operating income reported by Coors in 2Q:03.
>
> "Overall, second quarter results for Coors Brewing Company showed improved trends in several key areas of the business." (Leo Kiley, President and CEO).
>
> To the extent some sectors of business were negatively impacted, such adverse events were caused by "largely temporary, factors" and "unique local issues."

52. Similarly, in the period prior to the Merger, Coors stated that the company was operating at or above plan, and that the proposed Merger would provide Molson shareholders with significantly added strength and near-term profitability. For example, when defendants published a release on October 28, 2004, which announced financial results for the fiscal third quarter of 2004, incorporated by reference into the Proxy/Prospectus, defendants stated, in part, the following:

> HEADLINE: Coors Reports 2004 Third Quarter Results
>
> GOLDEN, Colo., Oct. 28 *RRNewswire* - Firstcall – Adolph Coors Company (NYSE:RKY) today announced higher consolidated net sales and

net income on lower consolidated sales volume for the third quarter of 2004.

For the 13-week quarter ended September 26, 2004, the company achieved consolidated net sales of $1.10 billion, a 5.3 percent increase from third quarter 2003. Third quarter 2004 sales volume totaled 8,559,000 US. barrels, or 10,043,650 hectoliters (HLs), a 2.4 percent decrease from 2003. Third quarter operating income was $103.9 million, down 5.0 percent from the same period a year ago. Consolidated third quarter 2004 net income was $64.1 million, up 4.4 percent from third quarter 2003, and earnings per share were $1.68, equal to the third quarter last year.

Leo Kiely, Coors Brewing Company (CBC) president and chief executive officer, said, overall, the third quarter was a tough volume quarter for Coors Brewing Company, with weak trends in both our Americas and Europe segments. Nonetheless, our net income was higher due to improved beer pricing, one-time nonoperating income, a lower effective tax rate and favorable exchange rates compared to the third quarter of last year.

* * *

"For the balance of 2004, we are focused on achieving a strong finish to the year. In the U.S., we will be lapping significant volume declines and additional costs related to our supply-chain disruptions in the fourth quarter of last year. Our new systems are now running smoothly and have resulted in substantially improved service to our distributors. In the U.K., in addition to our expectations that positive on-trade pricing will continue, we believe volume trends will improve from a difficult summer. On the other hand, if foreign exchange rates remain at today's levels, we anticipate less currency benefit to our U.K. financial results in the fourth quarter.

"We also continue to work toward closing our

> merger of equals with Molson. The transaction has received U.S. and Canadian anti-trust clearance, and we have filed a preliminary proxy statement for SEC review. This transaction will build on the strengths of both companies, make us more competitive in the consolidating global beer market and increase profits, cash flow and shareholder value substantially in both the short and long term."

53. **Merger Announcement/Synergies.** As set forth above, Molson investors who voted for the Merger did so in reliance on Coors' representations that it was operating according to plan and, therefore, would provide the combined Company with a strong financial base and greater earnings per share. This is evidenced by, among other things, the release that defendants published on July 22, 2004, announcing that the boards of directors of both Coors and Molson had entered into a definitive Merger Agreement:

> The combination of Coors and Molson is expected to "deliver substantial value ton shareholders".
>
> The combination expected to deliver US$175 million in pre-identified synergies and cost savings, annually, by 2007 - half of which would be achieved within 18 months of the completion of the Merger.
>
> The transaction was expected to be accretive to earnings to the shareholders of both companies within the first year of combined operations.
>
> "Th[e] transaction allows us to create a stronger company in a consolidating global industry. . ." (Eric Molson, Chairman Molson Inc.).
>
> That "Together, Molson and Coors will become

> the world's fifth largest brewer, with the market and financial strength necessary to drive organic growth and compete more effectively in today's increasingly challenging global market." (Leo Kiely, CEO Coors).

54. Defendants also represented that the combined Company would realize at least $175 million in cost savings and synergies annually, in part, because defendants had created a special "Office of Synergies," chaired by Daniel J. O'Neill, the former Chief Executive Officer of Molson:

> Synergies and Cost Savings
>
> The companies intend to establish an Office of Synergies and Integration to facilitate the development and implementation of Plan to achieve the expected benefits of the transaction. This Office will be responsible for the realization of cost savings and other synergies, including the alignment of related capital expenditures, by applying best practices and global bench marking.
>
> The Office will be chaired by Daniel J. O'Neill and will also include Eric-Molson and Leo Kiely.
>
> "In my new role, my responsibility will be to deliver the identified synergies, unlock additional opportunities and lead the teams that have the most past experience in making this happen. The merger represents a transaction that will be difficult to match given the large value of synergies and the ability to reinvest additional synergies above the US$175 million to drive top-line sales growth," said Daniel J. O'Neill, president and chief executive officer of Molson Inc. "In addition, a merger with Coors allows our Canadian unit to secure the rights to sell and distribute the Coors Light brand, which might not be the case in an alternative

transaction."

> The combined company expects to achieve annualized synergies of approximately US175 million by 2007. The principal sources of these synergies include the optimization of brewery networks, increased procurement efficiencies, streamlined organizational design, consolidated administrative functions and greater tax efficiencies. The companies expect to identify additional synergy opportunities between now and closing. These synergies are in addition to cost saving initiatives already underway at both companies.

55. **Merger Agreement.** In connection with the Merger defendants prepared, ratified and filed with the SEC a Combination Agreement by and Among Aldoph Coors Company, Coors Canada, Inc. and Molson Inc., dated July 21, 2004 (the "Merger Agreement"). The Merger Agreement contained the following representations, warranties and conditions:

> **ARTICLE IV**
> **REPRESENTATIONS AND WARRANTIES OF COORS**
>
> 4.9 Absence of Certain Changes or Events. Since December 28,2003, the business of Coors and its Subsidiaries has been conducted in the ordinary course consistent with past practices and there has not been (i) any event, occurrence or development of a state of circumstances or facts which has had or would, individually or in the aggregate, reasonably be expected to have any Material Adverse Effect on Coors, (ii) any material revaluation by Coors of any of its assets, including, without limitation, writing down the value of capitalized inventory or writing off notes or accounts receivable or any material sale of assets of Coors other than in the ordinary course of business, (iii) any material damage, destruction or loss (whether or not covered by

insurance) with respect to any material assets of Coors or its Subsidiaries, (iv) any material Contract cancelled, terminated, or materially adversely modified or (v) any event or action that if taken after the date hereof would be prohibited by Section 5.2 hereof.

**ARTICLE VII**
**CONDITIONS**

7.2 Additional Conditions to Obligations of Molson. The obligation of Molson to consummate and effect the Arrangement shall be subject to the satisfaction at or prior to the Effective Time of each of the following conditions, any of which may be waived, in writing, exclusively by Molson:

(a) Representations and Warranties. The representations and warranties of each of Coors and Exchange contained in the Agreement (without giving effect to any material (including the word "material" or "Material Adverse Effect" qualification) shall be true and correct as of the Closing Date with the same effect as if made at and as of the Closing Date (other than such representations that are made as of a specified date, which shall be true and correct as of such date), except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Coors or Exchangeco, as applicable. Molson shall have received a certificate with respect to the foregoing signed on behalf of Coors and Exchange by an authorized officer of Coors and Exchangeco.

(b) Agreements and Covenants. Coors shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and Molson shall have received a certificate to such effect signed on behalf of Coors by an authorized officer of Coors.

(c) No Material Adverse Change. Since the

date hereof, there shall not have occurred any fact, event, change, development, circumstance or effect which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect on Coors.

56. It is clear from the foregoing that the Merger Agreement required defendants to report any material adverse change in Coors's business, operations and/or financial performance in the pre-Merger period. In addition, the Merger Agreement provided that if a rival bid for Molson were successful, Coors would end its licensing agreement with Molson in Canada, which would be detrimental to the combined entity.

57. **The December 10, 2004 Proxy Statement.** On or about December 10, 2004, defendants filed a proxy statement with the SEC, pursuant to Schedule 14A, which reaffirmed these disclosure requirements, in part, as follows:

> Each party's obligation to complete the merger transaction is subject to the satisfaction of the following additional conditions by the other party:
>
> the material truth of representations and warranties and material compliance with covenants by the other party;
>
> the absence of events or changes that have or would reasonably be expected to have a material adverse effect on the other party;
>
> * * *
>
> **Representations and Warranties**
> The combination agreement contains a number of customary representations and warranties of Molson and Coors relating to, among other

things:

* * *

> the accuracy of reports required to be filed with Canadian securities regulatory authorities and the Toronto Stock Exchange, in the case of Molson, and with the SEC and the New York Stock Exchange, in the case of Coors, since January 1, 2002 and the accuracy of the financial statements included in those reports;
>
> absence of undisclosed liabilities;
>
> absence of any material adverse effect and certain other changes or events since the date of the last audited financial statements.

58. **Factors Considered by the Molson Independent Committee.** The December 2004 Proxy Statement also reported on the specific factors considered and purportedly relied upon by Molson's Independent Committee, prior to ratifying the Merger Agreement and prior to advising Molson shareholders to vote in favor of the Merger:

> **Factors Considered by the Molson Independent Committee**
>
> On July 21, 2004, Molson's independent committee, after an extensive review and thorough discussion of all facts and issues it considered relevant with respect to the proposed merger transaction, concluded unanimously that the proposed merger transaction is fair to, and in the best interests of, the shareholders of Molson, other than Pentland and Eric H. Molson, from a financial and non-financial point of view. The Molson independent committee subsequently proposed that Molson's full board of directors authorize Molson to enter into the proposed combination agreement and recommend to

shareholders of Molson that they vote in favor of the Molson shareholders resolution. On November 10,2004, the Molson independent committee reaffirmed the conclusions reached on July 21,2004 as well as the recommendations to Molson's full board of directors regarding the proposed combination agreement, as amended, and the Molson shareholders special resolution.

In reaching their conclusion and making their recommendation, the members of the Molson independent committee relied on their personal knowledge of Molson and the industry in which it is involved and on the advice of its legal and financial advisors. The Molson independent committee also reviewed the information provided by Molson and its advisors. The Molson independent committee considered numerous factors to be in favor of the merger, including among other things, the following:

the current economic, industry and market trends affecting each of Molson and Coors in their respective markets, including those which favor the concentration of business in the hands of a small number of large companies;

the significant opportunities for the combined company to realize the estimated annual cost savings resulting from the merger of approximately U.S.$50 million and $90 million, respectively, in the first two years following the merger and U.S.$175 million in annual cost savings thereafter;

the ability of the shareholders of Molson to continue to participate in future earnings and growth of the combined company after completion of the merger transaction through their ownership of shares of the combined company's stock or exchangeable shares of Molson Coors Exchangeco.

59. **Preliminary Proxy-Prospectus**. On or about September 17,

2004, when defendants first filed the Preliminary Proxy Statement with the SEC, Coors issued a release which highlighted the purported benefits of the Merger, Molson's reasons for the Merger, and again quoted defendants, in part, as follows:

> The combination is expected to unlock significant value for shareholders. From the outset, value creation will come from both the ability to focus marketing investments on core brands to grow revenues and the ability to capture an expected US$175 million in annualized synergies, half of which are expected to be realized within the first 18 months following completion of the merger. Secondly, a stronger overall financial platform will lead to deeper support of core bran& and key markets to drive revenue, share and volume growth. Finally, the merger will create the scale and balance sheet strength to allow Molson Coors Brewing Company to compete more effectively in the increasingly global and highly dynamic brewing industry long-term.
>
> Leo Kiely, chief executive officer of Coors, stated, "Today's filing of the preliminary proxy is an important step in the merger process. We look forward to continuing to demonstrate to our shareholders the compelling nature of this transaction, notably it3 ability to create shareholder value on a sustained basis. I'm confident in our ability to achieve our goals for the new organization, and I am excited to work with a strong management team that represents a balanced combination of talent from both organizations."
>
> Daniel J. O'Neill, chief executive officer of Molson, stated, "Through the capture of US$175 million in synergies, all of which will be taken to the bottom line in the first three years, this transaction will result in a 24 percent increase in pro forma profitability above current base-line trends. Given the combined company's significant cash flow and

> strong balance sheet with relatively low debt levels, we will also have the financial resources to make the investments necessary to ensure the ongoing strength of our brands."

60. **Final Prospectus: The Merger Transaction.** The foregoing statements were also reproduced and/or incorporated by reference into the Company's Proxy/Prospectus, which described the final terms of the Merger, in part, as follows:

> The Merger Transaction
> The merger transaction featured the following steps:
>
> Adolph Coors Company changed its name to "Molson Coors Brewing Company" and amended its certificate of incorporation and bylaws to implement the merger transaction.
>
> Molson paid a special dividend in the amount of Cdn.$5.44 per share, or a total of approximately Cdn.$652 million (U.S.$5 19 million, based on exchange rates as of February 7,2005) in connection with the plan of arrangement to Molson Class A non voting and Class B common shareholders of record at the close of business on the last trading day immediately prior to the date of closing the merger transaction, excluding Pentland Securities (1981) Inc. and its subsidiaries (referred to collectively in this prospectus as "Pentland"). In the interest of demonstrating its support for the merger transaction, Pentland waived any participation in the special dividend.
>
> All of Molson's shares (other than shares of dissenting holders) were exchanged, through a series of exchanges, for shares of Molson Coors common stock and/or exchangeable shares of Molson Coors Exchangeco. The stockholders of Coors retained their shares, which remained outstanding as shares of Molson Coors. The combination was carried out in accordance with a combination agreement, dated as of July 21,

> 2004, as amended, by and among Molson, Coors and Molson Coors Exchangeco, and the documents referred to in that agreement. Upon completion of the merger transaction:
>
> Each holder of Molson Class A non-voting shares who was a Canadian resident for Canadian income tax purposes received, for each of those shares, either (i) 0.360 of a Class B exchangeable share of Molson Coors Exchangeco (and certain ancillary rights), (ii) through a series of exchanges, 0.360 of a share of Class B common stock of Molson Coors, or (iii) an equivalent combination of Class B exchangeable shares (and certain ancillary rights) and, through a series of exchanges, Class B common stock of Molson Coors.
>
> Each holder of Molson Class .A non-voting shares who was not a Canadian resident received, through a series of exchanges, for each of those shares, 0.360 of a share of Class B common stock of Molson Coors. Each holder of Molson Class B common shares who was a Canadian resident for Canadian income tax purposes received, for each of those shares, either (i) 0.126 of a Class A exchangeable share and 0.234 of a Class B exchangeable share of Molson Coors Exchangeco (and certain ancillary rights), (ii) through a series of exchanges, 0.126 of a share of Class A common stock and 0.234 of a share of Class B common stock of Molson Coors, or (iii) an equivalent combination of exchangeable shares (and ancillary rights) and, through a series of exchanges, shares of Molson Coors common stock.
>
> Each holder of Molson Class B common shares who was not a Canadian resident received, through a series of exchanges, for each share, 0.126 of a share of Class A common stock and 0.234 of a share of Class B common stock of Molson Coors.

61. **Documents Incorporated by Reference.** The Proxy/Prospectus incorporated by reference additional SEC filings as set forth

below:

> The SEC allows us to "incorporate by reference" the information we file with them, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of this prospectus. If information contained directly in this prospectus is inconsistent with information contained in a document filed with the SEC prior to the date of this prospectus, the information contained directly in this prospectus will apply and will supersede such previously filed information. Information that we later file with the SEC will automatically update and supersede the information contained directly or incorporated by reference in this prospectus. Accordingly, we incorporate by reference the documents listed below and any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 prior to the termination of this offering:
>
> We also incorporate by reference (i) the Joint Proxy Statement Management Information Circular that we filed with the SEC on Schedule 14A on December 10, 2004, including the consolidated balance sheet of Molson Inc. as at March 31, 2004 and March 31, 2003 and the consolidated statements of earnings, retained earnings and cash flows of Molson Inc. for the years then ended and March 31, 2002, the unaudited consolidated balance sheet of Molson Inc. as at September 30, 2004, the unaudited consolidated statements of earnings, retained earnings and cash flows of Molson Inc. for the six months ended September 30, 2004, and (ii) the Supplement to Joint Proxy Statement/Management Information Circular that we filed with the SEC on Schedule 14A on January 19,2005, including the Unaudited Pro Forma Condensed Combined Balance Sheet of Molson Coors Brewing Company as of September 26, 2004 and the Unaudited Pro Forma Condensed Combined Income Statements of Molson Coors.

62. **Molson Shareholders Approve the Merger.** Based on defendants materially false and misleading representations about the nature and effect of the Merger and the financial condition performance of Coors, in late January 2005, shareholders of Molson cast their proxies and voted overwhelmingly in favor of the Merger. Thereafter, on February 9, 2005, the Merger was consummated and, immediately thereafter, the combined Company issued a release which stated, in part, the following:

> Molson and Coors Complete Merger to Form Molson Coors Brewing Company
>
> MONTREAL, Canada and GOLDEN, Colorado, Feb. 9/ - Molson Inc. (TSX: MOL.A) and Adolph Coors Company (NYSE: RKY) today announced that they have completed the transaction announced on July 22,2004 to combine Molson and Coors in a merger of equals. Molson Coors Brewing Company is a new global brewing company with the operating scale and balance sheet strength to be a major player in the continuing consolidation of the brewing industry.
>
> Molson and Coors shareholders approved the combination at their special shareholder meetings held on January 28 and February 1, 2005, respectively, and the Quebec Superior Court approved the transaction as required by Canadian law on February 2, 2005.
>
> W. Leo Kiely III, chief executive officer of Molson Coors Brewing Company said, "By combining Molson and Coors, we have created a company with the market and financial strength necessary to drive organic growth and compete more effectively in today's increasingly challenging global marked, while preserving the rich heritages of two of the world's most prominent brewing companies. We look forward to drawing on this brewing heritage and the combined strengths of a world-class management

> team to deliver greater value to our customers, partners, employees and shareholders."
>
> "This transaction marks a new and important chapter in the history of both companies," said Eric H. Molson, chairman of Molson Coors Brewing Company. "It leverages successful business relationships and builds on the strategic and cultural fit between our two companies. With an impressive track record in brewing excellence, the new Molson Coors Brewing Company will be a dynamic and competitive organization that will create long-term value for our shareholders and the communities in which we operate. "
>
> * * *
>
> Synergies and Cost Savings
>
> The company has established an Office of Synergies and Integration to facilitate the development and implementation of Plan to achieve the expected benefits of the transaction. Through this Office, chaired by Daniel J. O'Neill, the company expects to achieve annualized synergies of approximate& US$175 million over three years. The principal sources of these synergies include the optimization of brewery networks, increased procurement efficiencies, streamlined organizational design and consolidated administrative functions.

63. **Molson Results for 3Q:F04**. The same day, February 9, 2005, defendants issued a release that announced financial and operational results for Molson in its last quarter as a non combined company. These results, announcing "virtually flat" net sales revenues, came as no surprise to investors. Accordingly, that day, while shares of the Company traded down slightly on the first day of trading, to $73.50 from about $75.75, this 3% price decline

was expected. The Company's CFO, defendant Wolf, was quoted by the Associated Press as stating that Molson's results were "overall, as anticipated."

64. **Coors Results for 4Q and FY:2004.** On February 9, 2005, defendants also issued a release that purported to announce financial and operational results for Coors 4Q and fiscal year 2004 as a non-combined company. Coors's release, which purported to announce higher consolidated net sales, net income and earnings per share for 44 and FY:2004 stated, in part, the following:

> Molson Coors Reports Adolph Coors Company 2004 Fourth Quarter and Pull-Year Results
>
> GOLDEN, Colo., Feb. 9 -- Molson Coors Brewing Company (NYSE, TSX: TAP) today announced the most recent financial results for Adolph Coors Company, reporting higher consolidated net sales, net income and earnings per share for the fourth quarter and full-year 2004.
>
> For the 13-week fourth quarter ended Dec. 26, 2004, the company reported net sales of $1.1 billion, up 10.2percent from the fourth quarter of 2003. Fourth quarter 2004 sales volume increased 4.7 percent from the fourth quarter 2003. Fourth quarter operating income of $90.9 million and net income of $55.7 million increased 37.5 percent and 54.4percent, respectively, from a year ago. Fourth quarter earnings per share were $1.45, up 48.0 percent from a year earlier. Earnings for fourth quarter 2004 benefitted from solid beer pricing and volume growth in the company's Americas and Europe segments, along with one-time gains on asset sales totaling $19.2 million pretax, a lower effective tax rate, and favorable foreign currency exchange rates. These results do not include Molson Inc. financial results for the quarter ended December 2004, which were released separately.


> For the 52-week fiscal year ended Dec. 26, 2004, Adolph Coors Company achieved consolidated net sales of $4.3 billion, a 7.6 percent increase from 2003. Reported sales volume totaled 32,703,000 U.S. barrels, or 38,376,000 hectoliters, in 2004, a 0.1 percent decrease from 2003. Net income for the full year was $1 96.7 million, a 12.6percent increase compared to full year 2003, and earnings per share were $5.19, up 8.8percent from the prior year.
>
> Leo Kiely, chief executive officer, said, "Overall, Adolph Coors Company finished 2004 with good financial results in a very competitive industry environment. In the U.S., despite very soft industry demand, our sales to retail increased in the fourth quarter, partially driven by the comparison to lower sales in the fourth quarter of 2003, when we faced U.S. supply-chain challenges. Our volume trends also benefitted from the introduction of Aspen Edge earlier this year and strong growth from our Blue Moon and Zima XXX brands in the fourth quarter. In addition, continued progress on productivity initiatives in our U.S. operations enabled us to manage cost pressures, which were particularly challenging in the areas of energy and packaging materials. In Canada, our Coors Light business continued to deliver strong profit growth.
>
> "Looking ahead, we will be simultaneously focused on improving the 'fundamentals of our U.S. and U.K. businesses and on working with our new colleagues from Molson to maximize the value opportunities presented by the Molson Coors merger, which closed earlier today."

65. Defendants' representations, particularized above, were materially false and misleading when made because they failed to disclose the following facts:

a. When the Merger closed on or about February 9,

2005 – almost a third of the way into the first fiscal quarter of 2005 – it was not true that Coors was operating according to plan, nor was it true that no material adverse change in Coors's business had occurred;

b. Defendants violated the terms of the Merger Agreement and the Proxy/Prospectus by failing to disclose that, by that time, Coors's business was being, and would continue to be, adversely impacted by conditions which were then already causing Coors to perform well below plan, and well below consensus estimates;

c. At the time of the Merger, it was foreseeable that O'Neill would not participate in any meaningful way in the integration of the two companies, and would not fulfill the duties and responsibilities of the Office of Synergies and Integration; and

d. At the time of the Merger, defendants were motivated to conceal the adverse conditions which were then impacting Coors and did conceal these adverse conditions because it allowed defendants to arrange the Merger transaction such that the relatives and heirs of the Coors and Molson families could dominate the combined Company – by collectively being able to nominate at least 10 members of the 15 member Board.

**THE TRUTH BEGINS TO BE REVEALED**

66. It was only weeks after the close of the Merger that

investors learned that Coors was operating well below plan. On April 28, 2005, before the opening of trading, defendants published a release announcing disappointing results for the Company's first quarter of 2005. In the release, defendants revealed, in part, the following:

> Molson Coors Reports 2005 First Quarter Results DENVER, April 28 PRNewswire - FirstCall - Molson Coors Brewing Company (NYSE: TAP; Toronto) today announced higher consolidated net sales and sales volume for the first quarter of 2005 compared to the fist quarter of 2004, but reported a net loss in the 2005 first quarter. The net loss was primarily attributable to lower sales volume in key markets versus a year earlier and special charges related to the recent Molson Coors merger totaling $40.7 million in the first quarter of 2005.
>
> The company's 2005 first quarter results include the business of Molson Inc. following the completion of the merger on Feb. 9, 2005, compared to the first quarter of 2004, which includes only the results of the former Adolph Coors Company. The company's reported consolidated sales volume and net sales increased in the 2005 first quarter compared to the first quarter 2004 due to the combination of the Molson and Coors businesses.
>
> For the 13 week first quarter ended March 27, 2005, the merged company reported net sales of $1.1 billion and sales volume of 8,094,000 barrels, or 9,497,985 hectoliters (HLs). The company reported a net loss of $46.5 million, or $0.74 per share, during the 2005 first quarter. Excluding special items, the company reported an after-tax loss of $5.1 million during the 2005 first quarter. (See the company's website, www.rnolsoncoors.com for reconciliation to the nearest U.S. GAAP measure.)

> On a pro foma basis, the company reported a consolidated net loss of $79 million, or $0.91 per share, based on 86.2 million pro forma diluted shares outstanding during the 2005 first quarter.
>
> Leo Kiely, Molson Coors president and chief executive officer, said, "The common underlying cause for difficult first quarter results was the lack of volume growth in each of our major markets. While disappointing, this performance reinforces the importance of integrating the operations and organization of the combined company, so we can capitalize on ow new strengths and build an even more competitive and profitable global enterprise.

67. Immediately following publication of this release, shares of the Company fell precipitously, almost $14.50 per share, to $63.00 per share, a decline of almost 20% – a testament to investors surprise and disappointment in the results. The *Denver Post*, reported, in part, the following:

> Molson Coors shares fell $14.30 to $63. The 19 percent decline was the fifth-largest loss Thursday among companies listed on the New York Stock Exchange. The quarterly loss of 74 cents a share was unexpected by Wall Street analysts, who in consensus forecasts had predicted a 36-cent-a-share profit.
>
> "These results are well below our performance goals and the potential we see for the company," chief executive Leo Kiely said in a conference call. "We obviously had a very tough first quarter in each of our markets." Beer sales fell 2 percent in Canada and the United States and 17 percent in the United Kingdom, Molson Coors said.

68. Following publication of these shockingly disappointing results, defendants hosted a conference call, a transcript of which

was available publicly from various sources, for analysts and investors during which defendants also revealed, in part, the following:

> Pro forma volume of only 10.7 billion barrels represented a 5.6% decline yr/yr due to lower volumes in all of the Company's major markets;
>
> Net sales were also down 6% pro-forma yr/yr to $1.2 billion;
>
> Pro-forma net loss was $79.0 million versus a pro-forma net gain of $36 million reported in 1 Q:04 - excluding charges, pro-forma net loss was $4.0 million or $0.04 per share Excluding Molson brands, pro forma US volume year over year declined 3.6% due to soft sales to retail and because distributors ended the first quarter last year with inventories about 100,000 barrels higher than normal due to rollout of Aspen Edge and re-launch of Zima;
>
> "These results are well below our performance goals and the potential we see for our Company. " (Defendant Kiely).

69. **O'Neill Resigns, Pockets $4.8MM Severance Payment.** The same day, April 28, 2005, O'Neill announced that he would abandon the Chair of Office of Synergies and Integration, leave the Company and take with him millions of dollars in severance related payments - which payments were not change of control payments and which payments he could not have obtained had he not waited for the Merger to close. According to the Rocky Mountain News (Denver, CO), O'Neill would receive, in part, the following:

> HEADLINE: BREWERY EXEC'S EXIT LUCRATIVE; MOLSON COORS VICE CHAIRMAN GETS $4.8 MILLION SEVERANCE

Molson Coors Vice Chairman Dan O'Neill will resign with a multimillion-dollar severance package, joining the ranks of departing executives who exit the brewer with buckets of cash. O'Neill will get about $66,709 per month for the next three years - a total of $2.4 million - plus a special bonus of $2.4 million for delivering the "synergies and integration plan" to the Molson Coors board at next month's meeting.

In addition, all the restrictions on his stock options lapse. Most of his options, given to him when he was CEO of Molson, required the stock to gain significantly before the options could be used. The company now has waived those rules. O'Neill cashed out the remainder of a 1999 Molson options grant earlier this year, giving him roughly $33 million in pre tax profit. He is not the only executive to have benefitted from the merger. Previously, 12 former Adolph Coors Co. executives used change of control provisions in their employment contracts to resign and collect two years' worth of salary and bonus. The payments cost Molson Coors $29 million this quarter, the company said Thursday.

The specifics of the announcement came as a surprise to some, however. Coors and Molson heavily sold their merger on $175 million in annual synergies and told investors that O'Neill would be in charge of the cost-cutting plan.

But the company had to back off a special $3 million payment O'Neill was to get after the merger closed. Instead, the companies said O'Neill would get the payment only if he left the company. The new $4.8 million deal, disclosed Thursday, is even more lucrative than the one that irked shareholders last summer.

"It's ludicrous," said Michael Palmer of Toronto's Veritas Research, a longtime harsh critic of Molson. "The company lost 5m market-share points (in Canada).... I always

> like to think in a capitalist system, people are rewarded for success, not for (messing up)."

COUNT I

**Failure to Disseminate Necessary Information**

70. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

71. ERISA fiduciaries have a duty to speak truthfully, to not mislead participants, and to disclose truthful information on their own initiative when participants need such information to exercise their rights under the plan. This duty to inform and disclose includes: (1) the duty to provide to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to advise the average plan participant of the risks associated with investing in any particular fund; and (2) the duty to refrain from making material misrepresentations.

72. A fiduciary must not only disclose complete and correct material information, but must provide information (even where not requested) if failing to convey the information would be harmful to participants. In essence, a fiduciary must act to protect participants from losses when he knows or should know of facts that cast doubt on the soundness of certain plan investment alternatives.

73. The Defendants breached their fiduciary duties by failing to provide Plan participants and beneficiaries with complete and accurate information regarding investment in Molson Coors common

stock.    The Defendants failed to disclose and/or misrepresented
the following adverse facts, which were known to Defendants, or
recklessly disregarded by them, at all relevant times:

        a.    When the Merger closed on or about February 9,
2005 - almost a third of the way into the first fiscal quarter of
2005 - it was not true that Coors was operating according to plan,
nor was it true that no material adverse change in Coors's business
had occurred;

        b.    Defendants violated the terms of the Merger
Agreement and the Proxy/Prospectus by failing to disclose that, by
that time, Coors's business was being, and would continue to be,
adversely impacted by conditions which were then already causing
Coors to perform well below plan, and well below consensus
estimates;

        c.    At the time of the Merger, it was foreseeable that
O'Neill would not participate in any meaningful way in the
integration of the two companies, and would not fulfill the duties
and responsibilities of the Office of Synergies and Integration;
and

        d.    At the time of the Merger, defendants were
motivated to conceal the adverse conditions which were than
impacting Coors and did conceal these adverse conditions because it
allowed defendants to arrange the Merger transaction such that the
relatives and heirs of the Coors and Molson families could dominate

the combined Company - by collectively being able to nominate at least 10 members of the 15 member Board.

74. Thus, the Company practices artificially inflated the value of Molson Coors common stock and misled Participants and beneficiaries regarding the soundness and prudence of investing their retirement benefits in Molson Coors common stock during the Class Period. This information was especially critical because investment in Molson Coors common stock was, by definition, an undiversified investment in a single company's common stock and, as such, carried with it an inherently high degree of risk.

**COUNT II**

**Breach of Duty to Prudently Manage and Invest Plan Assets**

75. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

76. A fiduciary's duties of loyalty and prudence also entail a duty to continually monitor and, if necessary and prudent, conduct independent investigations into the relative merits of all the Plan's investments and of the investment alternatives available in a plan, including employer securities, to ensure that each investment is a suitable and prudent.

77. Defendants breached this duty with respect to the Company stock investment. By the beginning of the Class Period, if not before, Molson Coors common stock was plainly unsuitable and imprudent investment options for the Plan and its Participants and

beneficiaries. By no later than the beginning of the Class Period, the Defendants could and should have made a determination that Molson Coors common stock was not suitable and prudent investment for the Plan, and should have taken appropriate action, including adoption of a reasonable policy of divestment, elimination or restriction of further investment, corrective disclosure to Plan Participants, and/or notification of the Secretary of Labor.

78. The Defendants further breached their fiduciary duties by not monitoring or putting in place procedures to monitor the actions of the Committee and/or any other employees designated by Molson Coors to administer the Plan, and other Plan fiduciaries.

79. Under ERISA, fiduciaries are responsible for the prudence of plan investments and liable for losses resulting from breach of their duty of prudence. The defense to such liability provided for in ERISA § 404(c), 29 U.S.C. § 1104(c), is unavailable to Defendants here because the Plan and the Defendants administration thereof did not satisfy the requirements of the statute or the regulations promulgated thereunder.

**REMEDY FOR BREACHES OF FIDUCIARY DUTY**

80. The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above.

81. As a consequence of the Defendants' breaches, the Plan suffered significant losses.

82. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a

plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary who breaches any of the duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

83. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

84. Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29

U.S.C. §§ 1109(a) and 1132(a)(2-3); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and (v) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

85. Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for:

A. A Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing Plaintiff as class representative, and determining that Plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B. A Declaration that Defendants breached ERISA fiduciary duties owed to the Plan and Participants;

C. A Declaration that Defendants are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D. An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would

have made if Defendants had fulfilled their fiduciary obligations;

E. Imposition a Constructive Trust on any amounts by which Defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F. An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

G. Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

H. An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Molson Coors common stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of Molson Coors common stock;

I. Awarding the Plan and/or Participants rescission and/or money damages (including pre-judgment interest) pursuant to the Securities Act;

J. An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

K. An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 17, 2005

CHIMICLES & TIKELLIS LLP

Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
Robert R. Davis (#4536)
One Rodney Square
P.O. Box 1035
Wilmington, Delaware 19899
(302) 656-2500

Of Counsel:

**GAINEY & MCKENNA**
Thomas J. McKenna, Esq.
485 Fifth Avenue, 3rd Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

**VIANALE & VIANALE LLP**
Kenneth Vianale, Esq.
2499 Glades Road, Suite 112
Boca Raton, Florida 33431
Tel: (561) 392-4750
Fax: (561) 392-4775

***Attorneys for Plaintiff***