## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| WALTER PHILLIPS, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MOLSON COORS BREWING COMPANY, BARBARA ALBANESI, DAVID BARNES, CHAT CHATTERJEE, JAMES FREDERICKS, MICHAEL J. GANNON, ROBERT KLUGMAN, MICHAEL KRUTECK, VONDA MILLS, MICHAEL RUMLEY, BEN SCHWARTZ, KATHERINE L. MACWILLIAMS, HAROLD R. SMETHHILLS, JEFF MORGAN, ROB WITWER, TIMOTHY WOLF, W. LEO KIELY III, PETER H. COORS, CHARLES M. HERINGTON, FRANKLIN W. HOBBS, RANDALL OLIPHANT, PAMELA PATSLEY, WAYNE SANDERS, and ALBERT C. YATES,<br><br>Defendants. | Civil Action No.: 05-cv-604 KAJ<br><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA** |

Plaintiff Walter Phillips ("Plaintiff"), on behalf of himself and the Coors Savings and Investment Plan (the "Coors Savings Plan") and the 401(k) Savings Plan for Hourly Employees at the Memphis, Tennessee Brewery (the "401(k) Hourly Savings Plan") (collectively, the "Plans"), and a class of similarly situated participants and beneficiaries of the Plans (the "Participants"), alleges the following against defendants:

### INTRODUCTION

1.      Plaintiff is a former employee of the Adolph Coors Company ("Coors"). Through his employment with Coors, plaintiff saved for retirement by participating in the Plans. Plaintiff's retirement accounts in the Plans included Coors common stock and Molson Coors Brewing Company ("Molson Coors" or the "Company") common stock after the merger of

Molson, Inc. ("Molson") into Coors on February 9, 2005 (the "Merger") described below. (The common stock of Coors and the common stock of Molson Coors after the Merger will be referred to throughout as Coors Stock unless otherwise indicated). These stocks were investment options offered by the Plans.

2.    As alleged herein, the Plans and consequently plaintiff and the other participants and beneficiaries of the Plans, suffered substantial losses due to defendants' malfeasance. Defendants breached their fiduciary obligations imposed by the Employee Retirement Income Security Act ("ERISA") and owed to all of the Plans' participants and beneficiaries, including plaintiff.

3.    Plaintiff brings suit as a civil enforcement action under Section 502 of ERISA, 29 U.S.C. § 1132, against fiduciaries of the Plans for relief on behalf of the Plans.

4.    The Plans are defined contribution retirement plans that are intended to qualify under Section 401(a) of the Internal Revenue Code of 1986 and are subject to the provisions of ERISA. From July 22, 2004 to April 27, 2005, the Plans significantly invested in Coors Stock.

5.    Plaintiff participated in the Plans during the Class Period. Plaintiff's retirement account pursuant to the Plans included Coors Stock during the Class Period.

6.    Defendants, as fiduciaries of the Plans, violated ERISA and breached their duties to plaintiff and to the other participants and beneficiaries of the Plans in connection with the investment in and holdings of Coors Stock by the Plans.

7.    Throughout the Class Period, the Plans' purchases and holdings were imprudently invested in Coors Stock. Defendants violated ERISA because it was imprudent for the Plans to purchase or hold Coors Stock as a retirement investment because, among other reasons, investment in Coors Stock carried undue risk because of the myriad financial problems affecting Coors and then Molson Coors throughout the Class Period that ultimately caused financial harm

2

to Molson Coors.

8.       During the Class Period, Defendants failed to properly monitor the Plans' investment in Coors Stock, and failed to give accurate information to the Plans' participants and beneficiaries concerning Coors' and Molson Coors' financial performance and the prudence of investing for retirement in Coors Stock. Because Defendants' failed to provide accurate information, participants in the Plans lacked the proper knowledge to make informed decisions concerning their retirement investments.

9.       In further breach of their fiduciary duties, Defendants had divided loyalties between maintaining a high price for Company stock, in part because of their own holdings and sales of Coors stock and in part because of their positions as directors or senior officers of the Company, and the interests of the Plans' participants and beneficiaries, which should have included the timely receipt of accurate information concerning the Company's financial performance and diversification out of investments, like Coors Stock, that were imprudent retirement investments.

10.      The Merger of Molson and Coors was structured as a stock-for-stock merger and, therefore, required shareholder approval. To obtain approval, certain Defendants stated that the Merger would result in synergies and cost savings, and that the Merger would result in a substantially stronger and more profitable Company.

11.      Coors's financial strength was especially important because, before the Merger, Molson had consistently reported that it was operating below plan, and that it would achieve growth consistent with previous guidance. Coors consistently stated that the below-plan performance of Molson prior to the Merger was not a surprise, and would not adversely affect the combined Company's performance.

12.      On April 28, 2005, however, Defendants released the combined Company's first

3

quarterly financial results. The Company reported a consolidated net loss of $79 million. Participants then learned the truth about the impaired financial and operational condition of Coors. At the time the Merger closed on or about February 9, 2005, which was well into the first fiscal quarter of 2005, *Coors was not operating according to plan and had experienced material adverse changes in its business*. At the time of the Merger, *defendants had violated the terms of the Merger Agreement and Proxy/Prospectus by failing to disclose that Coors's business was being, and foreseeably would continue to be, adversely impacted by conditions that were causing Coors to perform well below plan and consensus estimates*.

13.    Shares of the Company fell sharply on the news, almost $14.50 per share, to $63.00 per share, *a decline of almost 20%*.

14.    Plaintiff alleges that Defendants breached their fiduciary duties because they knew or should have known that investment in the Coors Stock Fund was not a prudent investment. Defendants nevertheless failed to take steps to prevent or minimize such investment, or to eliminate or reduce the amount of Fund shares held by the Plans; failed to limit or eliminate the option to invest in the Fund; negligently made, participated in, or acquiesced in misrepresentations concerning the financial condition of Coors; and negligently misrepresented or failed to disclose material information so that Plaintiff and the Class and co-fiduciaries could make informed investment decisions for the assets held under the Plans.

15.    As alleged below, defendants hid the truth about Coors' financial condition to allow the Merger to be consummated. The Merger permitted the Molson and Coors families, and their heirs and relatives, to dominate the combined company, with 67% ownership. The Merger protected Coors and Molson from being acquired by another, more hostile corporation.

16.    As a result of Defendants' breaches of fiduciary duty, the Plans and their participants have suffered substantial losses of retirement savings and anticipated retirement

4

income from the Plan. Under ERISA, Defendants are obligated to restore to the Plan the losses that resulted from their breach of fiduciary duty.

## JURISDICTION AND VENUE

17. Plaintiff's claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

18. This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. §§ 1132(e)(1).

19. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district where the Plans are administered, where the breaches took place; and/or where the Company is incorporated.

## PARTIES

### Plaintiff

20. Plaintiff Walter Phillips is a resident of the State of Tennessee and, was at all relevant times, a participant in the Plans, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

### Defendants

21. Company Defendant. Defendant Molson Coors is incorporated in Delaware with its principal place of business located at 311 Tenth Street, Golden, Colorado. Its Canadian executive offices are located at 1555 Notre Dame Street East, Montreal, Quebec, Canada. Molson Coors, formerly Adolph Coors Company, is a holding company that manufactures, markets and sells malt beverage products through its principal subsidiaries, Adolph Coors Company, operating in the United States, and Coors Brewers Limited, operating in the United Kingdom. On February 9, 2005, Coors merged with Molson. In connection with the Merger, Coors became the parent of the merged company and changed its name to Molson Coors Brewing Company. Molson sells its beer in Canada, Brazil and the United States. Molson has

five breweries in Canada and eight breweries in Brazil, and distributes over 75 owned or licensed brands of beer and alcohol products. Molson Coors is the Plans sponsor.

22.     Throughout the Class Period, Molson Coors was the Plans' sponsor, a fiduciary of the Plans within the meaning of ERISA, exercised discretionary authority over the Plans and acted within its capacity as a plan fiduciary. Molson Coors had (i) discretionary authority, control, or responsibility over the Plans' management or the Plans' administration and/or (ii) authority or control over management or disposition of the Plans' assets. Molson Coors at all times acted through its officers, employees, and members of the Molson Coors Plan Investment and Administration Committee (the "Plan Committee"), who performed plan related fiduciary functions in the course and scope of their employment and/or service to the Company.

23.     Molson Coors had, at all applicable times, effective control over the activities of its officers, employees, and Plan Committee, including over the Plans related activities. Molson Coors through its Board of Directors, executive officers, or otherwise, had the authority and discretion to hire and terminate said officers and employees. Molson Coors, through its Chief Executive Officer, also had the authority and discretion to appoint, monitor, and remove Plan Committee members from their individual fiduciary roles with respect to the Plans. By failing to properly discharge their fiduciary duties under ERISA, such Defendant-fiduciaries breached duties they owed to the Participants. Accordingly, the actions of these fiduciaries are imputed to Molson Coors under the doctrine of *respondeat superior*, and Molson Coors is liable for such actions.

24.     The Plan Committee. Throughout the Class Period, the Plan Committee was the Plans administrator and charged with the general administration of the Plans. The members of the Plan Committee were named fiduciaries under the Plans and the Coors Savings & Investment

6

Master Trust ("Master Trust"). Under the Master Trust, these named fiduciaries "shall continually monitor the suitability under the fiduciary duty rules of section 404(a)(1) of ERISA (as modified by section 404(a)(2) of ERISA) of acquiring and holding Sponsor Stock." The identities of all the members of the Plan Committee are within the exclusive knowledge of certain Defendants, such as Molson Coors and members of Molson Coors' Board of Directors (the "Board").

   25. Upon information and belief, members of the Plan Committee, during the Class Period, included the following employees during the Class Period:

     (a) Defendant Barbara Albanesi ("Albanesi") was, at all relevant times, Director of Benefits of the Plans;

     (b) Defendant David Barnes ("Barnes") was, at all relevant times, Vice President, Finance and Chief Financial Officer of Coors U.S Brewing Company and Vice President, Treasurer of the Plans;

     (c) Defendant Chat Chatterjee ("Chatterjee") was, at all relevant times, Chief Financial Officer of Coors U.S Brewing Company;

     (d) Defendant James Fredericks ("Fredericks") was, at all relevant times, Vice President of Global Rewards;

     (e) Defendant Michael J. Gannon ("Gannon") was, at all relevant times, Vice President and Global Treasurer of the Company;

     (f) Defendant Robert Klugman ("Klugman") was, at all relevant times, Chief Strategy Officer of the Company;

     (g) Defendant Michael Kruteck ("Kruteck") was, at all relevant times, Director of Corporate Finance and Banking of the Company;

     (h) Defendant Vonda Mills ("Mills") was, at all relevant times, Chief People

Officer of Coors U.S.;

        (i)     Defendant Michael Rumley ("Rumley") was, at all relevant times, the Director of Global Pensions of the Company;

        (j)     Defendant Ben Schwartz ("Schwartz") was, at all relevant times, Vice President of Global Compensation & Benefits of the Company;

        (k)     Defendant Katherine L. MacWilliams ("MacWilliams") was, at all relevant times, Vice Chairman, Treasurer of the Plans;

        (l)     Defendant Harold R. Smethhills ("Smethhills") was, at all relevant times, Chairman of the Plans;

        (m)     Defendant Jeff Morgan ("Morgan") was, at all relevant times, a fiduciary of the Plans;

        (n)     Defendant Rob Witwer ("Witwer") was, at all relevant times, Assistant General Counsel;

        (o)     Defendant Timothy Wolf ("Wolf") was, at all relevant times, Vice President and Chief Financial Officer of Coors, Global and Chairman of the Plans;

    26.    Defendants Albanesi, Barnes, Chatterjee, Fredericks, Gannon, Klugman, Kruteck, Mills, Rumley, Schwartz, MacWilliams, Smethhills, Morgan, Witwer, and Wolf are referred to herein as the "Plan Committee Defendants."

    27.    <u>The Molson Coors Board of Directors</u>. The individuals who served on the board (the "Director Defendants") are named as defendants. The Chief Executive Officer ("CEO") of Coors at the time of the Merger is solely and exclusively responsible for the appointment, removal, and replacement of the members of the Plan Committee. Defendant W. Leo Kiely III ("Kiely") was Coors' President and Chief Executive Officer at the time of the Merger, and served on Coors's Board of Directors. He was a plan fiduciary because he had and exercised (i)

discretionary authority, control, or responsibility over the Plans' management or the Plans'
administration and/or (ii) authority or control over management or disposition of the Plans'
assets. Kiely signed amendments to the Master Trust as well as amendments to the 401(k)
Savings Plan. As alleged herein, Kiely acted within his capacity as a plan fiduciary. Kiely was
also instrumental in negotiating the Merger and in preparing, ratifying and filing of the
Proxy/Prospectus. After the Merger, Kiely remained as CEO and a board member of Molson
Coors.

      28.    Defendant Peter H. Coors ("Peter Coors") was the Chairman of the Board of
Directors of Coors at the time of the Merger and is also solely and exclusively responsible for the
appointment, removal, and replacement of the members of the Plan Committee. As such, he was
a plan fiduciary because he had and exercised (i) discretionary authority, control, or
responsibility over the Plans' management or the Plans' administration and/or (ii) authority or
control over management or disposition of the Plans' assets. Peter Coors signed amendments to
the Master Trust and to the 401(k) Savings Plan. As alleged herein, Peter Coors acted within his
capacity as a plan fiduciary. Peter Coors was also instrumental in negotiating the Merger and in
preparing, ratifying and filing the Proxy/Prospectus. After the Merger, Peter Coors remained a
board member of Molson Coors. Peter Coors is also Trustee of the Coors Trust, which before
the Merger held 1.26 million shares of Coors Class A voting stock, representing 100% of Coors'
Class A voting stock, and also held 10.86 million shares of Coors' Class B common stock,
representing approximately 30.9%. After the Merger, the Coors Trust held 33.49% of Molson
Coors' voting power and 3.27% of Molson Coors' economic ownership. In connection with the
Merger, Peter Coors and the Coors Trust entered into a voting agreement with Pentland
Securities ("Pentland"), a company that Eric Molson and his brother Stephen Molson control.
Through Pentland, this group of shareholders came to control over 67% of Molson Coors' voting

9

shares.

29.    Defendant Charles M. Herington ("Herington") was, at the time of the Merger, a member of the Board of Directors of Coors. As such, he was a plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over the Plans' management or the Plans' administration and/or (ii) authority or control over management or disposition of the Plans' assets. As alleged herein, Herington acted within his capacity as a plan fiduciary. In addition, Herington was also instrumental in negotiating the Merger and in the preparation, ratification and filing of the Proxy/Prospectus. Herington remained a board member of Molson Coors after the Merger.

30.    Defendant Franklin W. Hobbs ("Hobbs") was, at the time of the Merger, a member of the Board of Directors of Coors. As such, he was a plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over the Plans' management or the Plans' administration and/or (ii) authority or control over management or disposition of the Plans' assets. As alleged herein, Defendant Hobbs acted within his capacity as a plan fiduciary. Hobbs was also instrumental in negotiating the Merger and in the preparation, ratification and filing of the Proxy/Prospectus. After the Merger, Hobbs remained as a member of the board of Molson Coors.

31.    Defendant Randall Oliphant ("Oliphant") was, at the time of the Merger, a member of the Board of Directors of Coors. As such, he was a plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over the Plans' management or the Plans' administration and/or (ii) authority or control over management or disposition of the Plans' assets. As alleged herein, Oliphant acted within his capacity as a plan fiduciary. Oliphant was also instrumental in negotiating the Merger, and in the preparation, ratification and/or filing of the Proxy/Prospectus.

10

32.    Defendant Pamela Patsley ("Patsley") was, at the time of the Merger, a member of the Board of Directors of Coors. As such, she was a plan fiduciary because she had and exercised (i) discretionary authority, control, or responsibility over the Plans' management or the Plans' administration and/or (ii) authority or control over management or disposition of the Plans' assets. As alleged herein, Patsley acted within her capacity as a plan fiduciary. Patsley was also instrumental in negotiating the Merger of Molson by and into the Company, and in the preparation, ratification and filing of the Proxy/Prospectus. After the Merger, Patsley remained a member of the Molson Coors board.

33.    Defendant Wayne Sanders ("Sanders") was, at the time of the Merger, a member of the Board of Directors of Coors. As such, he was a plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over the Plans' management or the Plans' administration and/or (ii) authority or control over management or disposition of the Plans' assets. As alleged herein, Sanders acted within his capacity as a plan fiduciary. Sanders was also instrumental in negotiating the Merger and in the preparation, ratification and filing of the Proxy/Prospectus.

34.    Defendant Albert C. Yates ("Yates") was, during the Class Period, a member of the Board of Directors of Coors. As such, he was a plan fiduciary because he had and exercised (i) discretionary authority, control, or responsibility over the Plans' management or the Plans' administration and/or (ii) authority or control over management or disposition of the Plans' assets. As alleged herein, Yates acted within his capacity as a plan fiduciary. Yates was also instrumental in negotiating the Merger and in the preparation, ratification and filing of the Proxy/Prospectus. After the Merger, Yates remained a member of the Molson Coors board.

35.    Defendants Kiely, Coors, Herington, Hobbs, Oliphant, Patsley, Sanders, and Yates are herein referred to as the "Director Defendants."

## INCORPORATION BY REFERENCE

36.    Plaintiff incorporates by reference the allegations in the Consolidated Amended

Class Action Complaint in In Re Molson Coors Brewing Company Securities Litig., Civil Action

No. 05-294-KAJ (the "Securities Class Action Complaint").

37.    Although Plaintiff incorporates the Securities Class Action Complaint by

reference, Plaintiff is not required to plead or prove Defendants' fraud or recklessness to plead a

prima facie ERISA claim.

## THE PLANS

38.    Plaintiff and the Class are participants in employee benefit plans within the

meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

39.    The Company sponsors the Plans. Each Plan is a "defined contribution" or

"individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). The

Plans are not parties to this action. Pursuant to ERISA, however, the relief plaintiff seeks is for

the benefit of the Plans.

40.    The stated purpose of the Plans is to permit employees to save for retirement.

For example, the Coors Savings Plan's Summary Plan Description ("SPD") states that the Plan is

designed to give Participants the opportunity to save and invest to achieve a financially secure

retirement. The Coors Savings Plan offered participants the option of investing in the Coors

Stock Fund. According to the SPD, the Coors Stock Fund is a fund "that pools [the Plan

Participants] money with that of other employees to buy shares of stock in [the Plan

Participants'] employer or its affiliates and an amount of short-term investments designed to

allow [the Plan Participants] to buy or sell without the usual trade settlement period for

individual stock transactions."

41.    The 401(k) Hourly Savings Plan states that Coors established this plan to offer

employees the opportunity to "gain a measure of economic security for retirement." The 401(k)

Hourly Savings Plan offered participants the option of investing in the Coors Stock Fund.

According to the "401(k) Hourly Savings Plan Summary Plan Description and Prospectus,"

dated June 2, 2004 (the "401(k) Prospectus"), the Coors Stock Fund "is an investment in the

shares of Class B Common Stock of Adolph Coors Company, par value $0.01 per share ("Coors

Stock") and short-term liquid investments necessary to satisfy the fund's cash needs for transfer

and payments.

  42.  According to the Company's 11-K, filed with the SEC on June 29, 2005, "[t]he

Coors 401(k) Savings Plan for Hourly Employees at the Memphis, Tennessee Brewery was

established effective September 1, 1990 and was amended and restated effective January 1, 1997,

and from time to time is amended to comply with regulatory changes and for other purposes.

The [401(k) Hourly Savings Plan's] purpose is to encourage eligible employees of the Memphis,

Tennessee brewery of the former Adolph Coors Company and subsidiaries [...] to accumulate

savings systematically in order to provide an additional source of income upon retirement,

disability or death."

  43.  Participant contributions ("Voluntary Contributions") to the Plans are made by

means of regular payroll deductions subject to the limits of the Plans and Internal Revenue

Service ("IRS"). For the Coors Savings Plan, Participants may generally contribute between 1%

to 50% of their before-tax compensation. In addition, according to the 401(k) Hourly Savings

Plan's prospectus: "[a Plan Participant] may contribute any percentage of [his or her]

compensation each pay period through payroll withholding. However, [a Plan Participant's]

contributions may never exceed [his or her] compensation after subtracting all mandatory and

voluntary withholdings and deductions. The amount [he or she] contributes must be in whole

percentage (for example: 2%, 25%). The percentage [the Plan Participant] elect[s] to contribute

is multiplied by [his or her] compensation, rounded down to the next dollar, and limited if necessary to the amount available after mandatory and voluntary withholdings and deductions.

44.    The Plans purchased, sold and owned all of the Plans' assets and investments. Participants directed the Plans to purchase with their Voluntary Contributions from investment options pre-selected by the Plan Committee. At all relevant times, the Coors Stock Fund was an investment option for Participants' Voluntary Contributions.

## DEFENDANTS' FIDUCIARY STATUS

45.    At all relevant times, Defendants were fiduciaries of the Plans because  (a)  they were so named; (b) they exercised authority or control respecting management or disposition of the Plans' assets; (c) they exercised discretionary authority or discretionary control respecting management of the Plans; and/or (d) they had discretionary authority or discretionary responsibility in the administration of the Plans. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

46.    The test for whether a person (or entity) is a fiduciary is based not only on the plan documents, but also is functional and based on actual conduct. A person is a fiduciary when he engages in activities to which fiduciary duties attach, even if a plan does not name him as such or by its terms assign fiduciary duties to him.  Those who have control over management of a plan or plan assets are fiduciaries regardless of the labels or duties assigned to them, or not assigned to them, by the language of a plan. Moreover, the definition of "fiduciary" is construed broadly, in order to fulfill the express remedial purpose of ERISA.

47.    A fiduciary may not avoid his fiduciary responsibilities under ERISA by relying solely on the language of the plan documents. While the basic structure of a plan may be specified within limits by the plan sponsor, the fiduciary may not follow the plan document if to do so will contribute to or lead to an imprudent investment result under ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

14

48.    According to the Plans, the Plan Committee was a named fiduciary of the Plans. The Plan Committee's fiduciary status was confirmed by the Plans' Form 11-K filings; the 401(k) Savings Plan for Hourly Employees at the Memphis, Tennessee Brewery Summary Plan Description and Prospectus, dated June 2, 2004; and the Master Trust, dated May 31, 1992, which identified the Plan Committee as plan administrator.

49.    The Plan Committee had the responsibility to set, and did set, the investment policy for the Plans and determined whether the Company's contribution would be made in cash or Coors stock.

50.    The Plan Committee and the committee members were therefore fiduciaries pursuant to ERISA § 3(16)(A), 29 U.S.C.§ 1002 (16)(A), ERISA § 3(21)(A), 29 U.S.C.§ 1002 (21)(A), and ERISA § 402(a), 29 U.S.C. § 1102(a).

51.    The Plan Committee members were appointed, monitored, and removed by Molson Coors and the Director Defendants. Molson Coors and the Director Defendants were thus "appointing fiduciaries" within the definition of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). In addition, Molson Coors and the Director Defendants exercised control over the Molson Coors employees serving on the Plan Committee and were thus *de facto* fiduciaries within the definition of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

52.    Molson Coors was also a fiduciary in that it exercised authority or control respecting management or disposition of the Plans' assets, and exercised discretionary authority or control respecting management and/or administration of the Plans, including controlling the disclosures which were, or were not, provided to or made available to Participants and other fiduciaries.

53.    As set forth below, Molson Coors' SEC filings, such as proxy statements and reports on Forms 10-K and 10-Q, were incorporated into and made a part of the Plans'

15

communications to Participants to be used by Participants in managing the Plans' assets and

benefits. Therefore, these SEC filings were "Fiduciary Communications" under ERISA, as

defined herein. Molson Coors was a fiduciary in that it exercised discretion in determining the

information relating to the Company's financial condition to be included in the SEC filings

disseminated to Participants as part of Molson Coors' Fiduciary Communications.

54.    Molson Coors was also a *de facto* fiduciary of the Plans because of its

appointment and control of the Plans' fiduciaries who administered the Plans within the scope of

their employment with Molson Coors. The Plan Committee did not meet frequently or for

enough time, and spent insufficient time on matters relating to the prudence of the administration

of the Plans and the Plans' investments. These jobs were performed by Molson Coors

employees acting in the scope of their day-to-day duties and, in particular, by Molson Coors

human resources, legal, corporate communications, finance and treasury personnel.

## ERISA SECTION 404(c) DEFENSE INAPPLICABLE

55.    ERISA § 404(c), 29 U.S.C. § 1104(c), is an affirmative defense inapplicable here.

ERISA § 404(c) provides a limited exception to fiduciary liability for losses that result from Plan

participants' exercise of "independent control" over investment decisions. ERISA § 404(c) thus

applies only when plan participants in fact exercise independent control over investment

decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive

requirements of the statute and the regulations promulgated pursuant thereto.

56.    There are several reasons why ERISA § 404(c) is inapplicable here. First, ERISA

§ 404(c) does not provide any defense to the Plans' fiduciaries' imprudent decision to select and

continue offering Coors Stock as an investment option in the Plans or to continue matching in

Coors Stock - both of which are decisions that are completely out of Plans' Participants' control.

Neither of those decisions was made or controlled by the Plans' Participants.

16

57. Second, even as to participant directed investment in Coors Stock, ERISA §
404(c) does not apply because Defendants failed to ensure effective Participant control by
neglecting to provide complete and accurate material information to the Plans' Participants
regarding Coors Stock. Due to Defendants' failure in this respect, the Plans' Participants did not
have informed control over the portion of the Plans' assets that were invested in Coors Stock at
their direction, and Defendants remain entirely responsible for losses arising therefrom.

58. As a result, ERISA § 404(c) is inapplicable.

## FACTUAL BACKGROUND TO BREACHES OF FIDUCIARY DUTY

### Molson

59. Prior to the Merger, Molson was Canada's largest brewer and one of the world's
leading brewers of beer, with operations in Canada, Brazil and the United States. Founded in
1786, Molson also was North America's oldest beer company, and one of its largest, with (Cdn.)
$3.5 billion in gross sales for the fiscal year ended March 31, 2004. Molson products include a
portfolio of beers including Molson Canadian, Molson Export, Molson Dry, Richard's, A. Marca
Bavaria, Kaiser and Bavaria. Prior to the Merger, Molson was also a licensed authorized brewer
and distributor of Coors brands in Canada under agreements between Molson and Coors. One of
Molson's most profitable products was the Coors Light brand, which it manufactured and
marketed throughout Canada.

### Coors

60. Prior to the Merger, Coors was the third-largest brewer in the United States and the
second largest brewer in the United Kingdom. Founded in 1873, Coors manufactured and
marketed a portfolio of beer brands designed to reach several tastes, styles and price points. At

17

fiscal year end December 28, 2003, Coors had US $5.4 billion in sales. In the United States,

Coors owns and/or licenses such brands as: Coors Light, Coors Original, Coors Edge, Coors

Non-Alcoholic, Aspen Edge, Extra Gold, Zima, George Killian's Irish Red Lager, Keystone,

Keystone Light, Keystone Ice, Blue Moon Belgian White Ale and Mexicali. Coors also sells the

Molson family of brands in the United States through a joint venture. Outside of the United

States, Coors sells Carling, Worthington, Cafiey's, Reef, Screamers, Stones and, through a United

Kingdom joint venture, Grolsch.


**Business of Molson Prior to the Merger**

61.    On July 22, 2004, Molson issued a press release entitled, "Molson announces first

quarter results for fiscal 2005," which reported Molson's results for first quarter of fiscal 2005,

the three months ended June 30, 2004, and stated the following:

> – Consolidated operating profit (EBIT) up 13.2% to $126.7 million.
> Excluding items noted below (i) consolidated EBIT down 14.5% to
> $126.7 million and EBIT in Canada up 1.6% to $154.4 million.
>
> – Consolidated net earnings increased 24.9% from $54.7 million to
> $68.3 million. Excluding items noted below (ii), net earnings
> decreased 19.3% to $68.3 million from $84.6 million.
>
> – Consolidated net earnings per share increased 25.6% from $0.43
> per share to $0.54 per share. Excluding the items below (ii), net
> earnings per share decreased 19.4% from $0.67 per share to $0.54
> per share.
>
> – Cash flow from operations before working capital and
> rationalization costs increased 2.7% to $72.2 million.
>
> – Consolidated net sales revenue up 2.0% to $675.0 million, net
> sales revenue in Canada up 3.2%.
>
> – Total Molson beer volume down 3.4%, volume in Canada down
> 2.8% and volume in Brazil down 4.2%.
>
> – Core brand market share in Canada up 0.9 share points, total

market share in Canada down 1.2 share points.

(i) Excluding the charge for rationalization costs in fiscal 2004 of $36.3 million.

(ii) Excluding the fiscal 2004 after-tax charge for rationalization costs of $38.5 million and minority interest of $8.6 million.

*    *    *

Overall, Molson's total and CANADIAN trademark volume in the United States for the three months ended June 30, 2004 were down 3.4% and 4.7% respectively, compared to the same period last year. According to Nielsen Grocery Channel reporting, which includes only a small portion of Molson USA business, import volumes declined by 1.6% in the three months ended June 30, 2004. Molson USA's share of the import category totaled 3.9%, with volume down 11.5%, according to these same Nielsen results.

62.    Later, in the period prior to the Merger, Molson disclosed that it did not, and would

not in the foreseeable future, achieve 10% growth in earnings before interest and taxes ("EBIT").

63.    On September 30, 2004, Molson issued a press release entitled, "Molson Forecasts

Lower Than Expected Second Quarter Earnings" that warned that it was experiencing below-plan

sales in Canada and weakening profits in Brazil. The press release stated in relevant part:

Molson Inc. announced today that, on the basis of preliminary results compiled for the second quarter ending September 30, 2004, earnings before non-recurring items, such as the charges related to the proposed merger with Coors, will be below the current range of estimates published by financial analysts. *Molson is making an early announcement as part of its reporting obligation to inform shareholders of this earnings shortfall*.

This unfavourable variance was driven by lower profitability in Brazil and lower volumes in Canada. In Brazil, estimated volume was approximately 10% lower than a year ago and compounded by the high cost structure associated with the sales centers put in place over the last nine months. In Canada, a much cooler summer season in most regions across the country and the continued strength of the value segment in certain regional markets led to industry and market share declines.

*"From an EBIT standpoint, we expect results in Brazil to be
slightly below Q1 levels, while the volume shortfall in Canada
points to a mid single-digit percentage decrease in domestic
EBIT"*, indicated Brian Burden, Chief Financial Officer of Molson
Inc.

In light of the continuing challenge presented by the Brazilian beer
market, Molson is performing an impairment test of assets in the
region. Though the impairment test is not completed, preliminary
findings could justify a write-down of approximately CA$200
million. In addition, Molson is re-evaluating the business model in
an effort to drive sustainable profitability in Brazil and specific cost
reduction initiatives are being implemented.

*Last July, Molson indicated that the lower first quarter
performance would make the attainment of the annual 10% EBIT
growth target a challenge. Current quarter performance has
confirmed that this will not be achieved in Fiscal 2005. Molson
will provide more detail when it issues second quarter results
which have been rescheduled for Thursday, October 28th, 2004.*

(Emphasis added.)

64.    Additional facts about Molson's financial and operational condition were known to

Participants in the Plans of the Merger was consummated.

65.    That same day, September 30, 2004, *Canada Press Newswire* reported, in part, the

following:

Molson issues earnings warning: slow sales in Canada, weak profit
in Brazil

MONTREAL (CP) – Molson Inc. has served up a warning of
disappointing summer-quarter earnings, saying sales have been
slow in Canada and profitability continues to be squeezed in Brazil.

The brewer also disclosed Thursday evening that it is considering a
$200-million write-down on its Brazilian assets.

The operations in Brazil are currently valued on the company's
books at about $700 million. Molson paid more than $1 billion in
2002 to acquire Kaiser, the second-largest brewer in the South
American country, but the Brazilian adventure has become a
quagmire: Kaiser's market share was estimated at 10.7 per cent in
August, down from 13.1 per cent a year earlier.

20

In addition to the "preliminary" finding that a $200-million write down might be warranted, Molson said it is "re-evaluating the business model in an effort to drive sustainable profitability in Brazil, and specific cost-reduction initiatives are being implemented."

Molson said July-September earnings in Canada are significantly below the previous quarter, and it confirmed that it will not meet its target of a 10 per cent increase in annual operating profit.

*    *    *

A Coors spokeswoman, Laura Sankey, said Thursday's news does not affect the U.S. brewery's position on the combination.

"We continue to believe that the merger of Coors and Molson is a great transaction that will create a stronger global competitor," Sankey said, adding that Coors was not surprised by Molson 's tepid results.

*    *    *

For analysts surveyed by Thomson One Analytics, this is the second consecutive unpleasant quarterly surprise from Molson. Their consensus estimate was for July-September earnings of 70cents per share, the same as they had predicted for the previous quarter, when Molson came in at 53 cents.

In that quarterly report issued July 22 – the same day the Coors merger plan was announced – Molson said earnings excluding restructuring charges and other one-time items fell 19 per cent from a year earlier to $68.3 million, as beer volumes were down 2.8 per cent in Canada and 4.2 per cent in Brazil.

## Business of Coors Prior to the Merger

66.    During the pre-Merger period, Coors portrayed itself as a company that was experiencing above-consensus growth and profitability and was outperforming the market. Just as Molson had published an earnings release the day the Coors Molson Merger was announced, the same day, Coors too issued a release announcing its results for the second quarter 2004, the thirteen-week period ended June 27, 2004, except that, unlike Molson, Coors reported positive results:

21

**COORS REPORTS 2004 SECOND QUARTER RESULTS**

GOLDEN, Colo. – Adolph Coors Company (NYSE: RKY) today announced *higher consolidated net sales and operating income for the second quarter of 2004, compared to the second quarter of 2003*. The company reported lower net income and earnings per share for the second quarter of 2004, driven primarily by overlapping a temporary reduction a year ago in the company's effective tax rate.

*For the 13-week quarter ended June 27, 2004, the company achieved consolidated net sales of $1.15 billion, a 4.6 percent increase from second quarter 2003. Second quarter 2004 sales volume totaled 8,820,000 U.S. barrels, or 10,350,000 hectoliters (HLs), a 3.4 percent decrease from 2003. Second quarter operating income was $125.6 million, up 6.9 percent from the same period a year ago.* Consolidated second quarter 2004 net income was $72.0 million, down 5.6 percent from second quarter 2003, and earnings per share were $1.90, down 9.1 percent from the prior year.

Leo Kiely, CBC president and chief executive officer, said, *"Overall, second quarter results for Coors Brewing Company showed improving trends in several key areas of the business,* but a few, largely temporary, factors negatively impacted our overall results. Improved pricing in our major markets, solid margin and profit growth in the U.K., continued strong performance of our Coors Light business in Canada, and favorable foreign exchange rates drove higher operating income in the quarter. These positive factors were partially offset by the negative impacts of U.S. distributor inventory dynamics and higher logistics-related costs in our Americas business. In the Americas, while our sales to retail declined slightly, our sales to wholesalers declined 5.2 percent due to a significant year-over-year shift in distributor inventory patterns. In addition, our consolidated earnings per share were negatively impacted by a higher tax rate this year versus a one-time reduction in our effective tax rate last year, as well as higher diluted shares outstanding this year."

"While U.S. retail volume declined slightly, the challenges were focused in select market – particularly in Pennsylvania and Texas – where we face unique local issues. Sales to retail grew during the quarter in five of our largest seven states, including California and New Jersey, where trends rebounded from declines early in the year. In addition, we're pleased with the performance of recent U.S. product introductions, including our Aspen Edge low-carbohydrate lager. Now that Aspen Edge and its advertising support have been

> rolled out nationally, this great-tasting beer has been gaining
> volume. Additionally, our high-margin Zima XXX brand has
> returned to double-digit percentage sales-to-retail growth since the
> introduction of new flavors earlier in the year."

(Emphasis added.)

67.    On July 22, 2004, Coors held a conference call regarding its second quarter 2004

earnings. Defendant Kiely stated in relevant part:

> LEO KIELY: Thank you. Thanks, Tim. In summary, *our second
> quarter performance showed improving trends in key areas of the
> business.* We were challenged by U.S. distributor inventory
> dynamics and difficult volume comparisons in the U.K. *In the face
> of these challenges, our results represent a significant
> achievement.*

(Emphasis added.)

68.    On July 22, 2004, Coors filed an Additional Definitive Proxy Statement with the

SEC on Schedule DEFA14A. Defendant Kiely continued to paint a rosy picture of Coors in this

DEF14A presentation even though it was not true that Coors was operating according to plan, nor

was it true that no material adverse change in Coors's business had occurred:



# A Compelling and Transformative Transaction

**Merger of equals unlocks three phases of value creation:**

- **Phase 1** – Estimated US$175M in potential synergies leading to near-term value creation for shareholders:
    - Cost savings primarily through procurement and network optimization
    - Expected to be accretive to earnings in year 1 for shareholders
    - 50% of synergy capture within 18 months
- **Phase 2** – Funding generated by synergies to allow for additional support in key markets on critical brands to grow revenue
- **Phase 3** – Operating and financial scale to become a consolidator:
    - 'Top 5' by volume with 60M hl
    - Strong cash flow and balance sheet to support future plans

> Merger of equals establishes a consistent ability to deliver value creation in the short, medium and longer run

MOLSON        Coors



## Merger Announcement/Synergies

69.     Coors' falsely represented that it was operating according to plan and, therefore,

would provide the combined Company with a strong financial base and greater earnings per share.

This is evidenced by, among other things, the release that was published on July 22, 2004,

announcing that the boards of directors of both Coors and Molson had entered into a definitive

Merger Agreement:

> The combination of Coors and Molson is expected to "deliver
> substantial value to shareholders."
>
> *          *          *
>
> [T]he combination is expected to generate approximately US$175
> million in annualized synergies by 2007, with half of these benefits
> achieved within 18 months following completion of the merger.
> The transaction is expected to be earnings accretive (1) to the
> shareholders of both companies within the first full year of
> combined operations.
>
> *          *          *

"This transaction allows us to create a stronger company in a
consolidating global industry while preserving Molson's rich
heritage as North America's oldest beer company and Canada's
leading brewer," said Eric H. Molson, chairman of Molson. "We are
extremely pleased to be combining with Coors, one of the world's
most respected brewers, in such a strategically compelling merger.
We look forward to working together to realize the full potential of
the new company." (Eric Molson, Chairman Molson Inc.).

\*       \*       \*

Leo Kiely, chief executive officer of Coors, stated, "Together,
Molson and Coors will become the world's fifth largest brewer,
with the market and financial strength necessary to drive organic
growth and compete more effectively in today's increasingly
challenging global market.  With EBITDA of US$1.0 billion before
synergies, Molson Coors Brewing Company will have the financial
flexibility to increase investment behind key brands while
delivering value to shareholders.  We also expect the geographic
footprint of the combined company will facilitate increased
operational and financial efficiency."

70.     Molson Coors also represented that the combined company would realize at least

$175 million in cost savings and synergies annually, in part, because it had created a special

"Office of Synergies," chaired by Daniel J. O'Neill, the former Chief Executive Officer of

Molson:

Synergies and Cost Savings

The companies intend to establish an Office of Synergies and
Integration to facilitate the development and implementation of
plans to achieve the expected benefits of the transaction.  The Office
will be responsible for the realization of cost savings and other
synergies, including the alignment of related capital expenditures,
by applying best practices and global benchmarking. The Office
will be chaired by Daniel J. O'Neill and will also include Eric
Molson and Leo Kiely.

\*    \*    \*    \*

## Analysts & Institutional Investors Initially Oppose The Merger

71.     During the period just before and immediately after the announcement of the

26

Merger, analysts questioned whether the Merger would be profitable.  They noted that both Coors

and Molson appeared to be struggling in their respective home markets, that few synergies could

be expected because Molson and Coors already distributed each other's brands in their respective

home countries, and that Coors would be unable to ameliorate Molson's problems in Brazil.  At

least one analyst, Prudential Equity Group, openly questioned whether the Merger was merely a

"marriage of convenience" to allow the Molson and Coors families to deter potential acquirers

and keep control of Molson Coors for themselves.  Specific analysts reported as follows:

> **Citigroup/Smith Barney:** "Given that Coors and Molson are already a
> combined entity since they operate two joint ventures, one in Canada and
> one in the US, we question 'where is the value and/or cost
> savings/synergies?'" (July 19, 2004);

> **CIBC World Markets:** "[W]e see little long-term strategic benefit to a
> Molson/Coors merger - both companies are struggling in their home
> market; the companies already work closely together to distribute each
> others brands in the other's home country; and Coors can't do much for
> Molson in Brazil." (July 19, 2004);

> **National Bank Financial:** "Bigger Is Not Always Better.  Proposed merger
> increases scale but doesn't solve the strategic issues.  Molson and Coors already
> share the profits in Coors Canada and Molson USA.  We do not see significant
> changes to any of the major markets for each of the companies." (July 19, 2004);

> **Bear Stearns:** We do not think that a merger of these two companies
> resolves any of the problems they face or provide them a better platform for
> surviving in the current landscape of the industry.  Consider the following:
> Molson does not provide Coors any incremental volumes, scale, brand
> expertise or synergies in the United States. . . Molson does not bring any
> new brands to the table that would help Coors out of its 'one-brand'
> problem in the US; [and] Molson adds nothing to the UK base of Coors.  A
> merger seems to take two medium sized problems and creates one new
> major complication." (July 19, 2004) "We're Unconvinced About Molson
> Coors.  We're unconvinced that the proposed merger resolves the
> competitive threats afflicting Molson and Coors.  Near-term, the deal gives
> Molson cheap cost efficiencies to tap for 3 years and lightens the relative
> weight of a wrecked Brazilian business.  But if neither firm can stabilize its
> core market, both may look back on today and regret the transaction."
> (July 22, 2004);

> **Prudential Equity Group.** "Coors and Molson confirm that they are in

merger talks. A Coors/Molson merger seems like a 'Marriage of
Convenience' to prevent a takeover of either company and keep the
families in control, which doesn't sound too shareholder friendly near-
term." (July 19, 2004) "Coors becomes bigger in troubled markets and
smaller in good markets . . . Near term, Coors will likely get bigger, not
better . . . Believing there are few top-line 'synergies' available given the
combination of these 'troubled markets' we don't think that putting [Coors]
and Molson together would create a better company in the near term, just a
bigger company." (Italics omitted) (July 21, 2004);

**J.P. Morgan Securities:** "While this merger does allow Coors to become a
bigger global player with better geographic diversity and deeper resources,
we don't think it provides substantial benefit to either companies existing
operations." (July 20, 2004); and

**RBC Capital Markets:** "[T]ransaction fails to resolve either company's
underlying performance issues . . ." (July 23, 2004).

72.     In the fall of 2004, large institutional Molson investors also opposed the Merger.

Because Molson officers and directors accounted for 66 2/3% of all outstanding Molson options,

investors opposed the reported multi-million dollar Merger bonus to O'Neill. The companies

later revised the approval procedure to allow option holders to vote only to exchange their

options, and O'Neill agreed to accept the change of control payment he was entitled to in lieu of a

severance payment, if he left Molson Coors within two years after the Merger. O'Neill's actual

payment nevertheless was still greater than the earlier reported bonus. Despite these changes,

institutional investors continued to publicly oppose the Merger.

73.     Ian Molson, the former Deputy Chairman of Molson, also opposed the Merger.

According to media reports, Ian Molson had resigned from the Molson board less than one month

before the Merger announcement, because he disagreed with Eric Molson on who would succeed

Eric Molson as Chairman. Eric Molson was Chairman of Molson for the prior fifteen years, and

board member for the prior 30 years. When he resigned, he controlled approximately 45% of

Molson's voting shares. On July 23, 2004, the day after the Merger Agreement was signed, Ian

Molson told the Molson board that he intended to mount a takeover bid with a group of partners,

later identified as Heineken. Although Ian Molson could not secure financing for the acquisition,

he continued to oppose the Merger because it was "in effect a Coors takeover of Molson with no

premium being paid to Molson shareholders. (1/11/05 *Bloomberg* news).

**Merger Agreement**

74.    On August 3, 2004, in connection with the Merger, the Company prepared, ratified

and filed with the SEC a Combination Agreement by and among Aldoph Coors Company, Coors

Canada, Inc. and Molson Inc., dated July 21, 2004 (the "Merger Agreement"). The Merger

Agreement contained the following representations, warranties and conditions:

> **ARTICLE IV**
> **REPRESENTATIONS AND WARRANTIES OF COORS**
>
> 4.9 Absence of Certain Changes or Events. Since December 28,
> 2003, the business of Coors and its Subsidiaries has been conducted
> in the ordinary course consistent with past practices and there has
> not been (i) any event, occurrence or development of a state of
> circumstances or facts which has had or would, individually or in
> the aggregate, reasonably be expected to have any Material Adverse
> Effect on Coors, (ii) any material revaluation by Coors of any of its
> assets, including, without limitation, writing down the value of
> capitalized inventory or writing off notes or accounts receivable or
> any material sale of assets of Coors other than in the ordinary
> course of business, (iii) any material damage, destruction or loss
> (whether or not covered by insurance) with respect to any material
> assets of Coors or its Subsidiaries, (iv) any material Contract
> cancelled, terminated, or materially adversely modified or (v) any
> event or action that if taken after the date hereof would be
> prohibited by Section 5.2 hereof.
>
> **ARTICLE VII**
> **CONDITIONS**
>
> 7.2 Additional Conditions to Obligations of Molson. The
> obligation of Molson to consummate and effect the Arrangement
> shall be subject to the satisfaction at or prior to the Effective Time
> of each of the following conditions, any of which may be waived, in
> writing, exclusively by Molson:

(a) Representations and Warranties. The representations and warranties of each of Coors and Exchange contained in the Agreement (without giving effect to any material (including the word "material" or "Material Adverse Effect" qualification) shall be true and correct as of the Closing Date with the same effect as if made at and as of the Closing Date (other than such representations that are made as of a specified date, which shall be true and correct as of such date), except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Coors or Exchangeco, as applicable. Molson shall have received a certificate with respect to the foregoing signed on behalf of Coors and Exchange by an authorized officer of Coors and Exchangeco.

(b) Agreements and Covenants. Coors shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and Molson shall have received a certificate to such effect signed on behalf of Coors by an authorized officer of Coors.

(c) No Material Adverse Change. Since the date hereof, there shall not have occurred any fact, event, change, development, circumstance or effect which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect on Coors.

75.    The Merger Agreement thus required Coors to report any material adverse change in its business, operations and/or financial performance in the pre-Merger period. The Merger Agreement also provided that if a rival successfully bid for Molson, Coors would end its licensing agreement with Molson in Canada, which would be detrimental to the combined entity.

76.    In October 2004, Coors conducted a presentation (along with Molson), entitled, "Molson Coors Brewing Company Reshaping the Competitive Brewing Landscape." Defendant Kiely continued to paint a rosy picture of Coors even though it was not true that Coors was operating according to plan, nor was it true that no material adverse change in Coors' business had occurred:

30



## Coors Performance Overview: 2003

- Improvements made in key areas of the business

- Continued investments in future growth

- Generated cash and exceeded debt repayment goals

- Strengthened financial position; strengthened and grew returns on capital

In the most recent fiscal year, Coors emerged a stronger company in a very tough year.

Coors Americas Segment: Coors Brewing Company

- Continued strong U.S. pricing environment
- Share maintained in a flat, highly competitive beer market
- Refined marketing strategy gaining traction with key demographic groups
- Sales organization strengthened and making progress in key markets (Hispanic) and channels (national accounts, convenience stores)
- Proven track record in improving efficiency and reducing cost of U.S. operations (Goal: US$100mm in next 5 years)
- Consistently able to generate cash, pay down debt
- Canada: 7+% volume growth; 28% pretax income growth in 2003

77.    Coors further stated that it was operating at or above plan, and that the proposed

Merger would provide Molson with significantly added strength and near-term profitability.  For

example, when Coors published a release on October 28, 2004, which announced financial results

for the fiscal third quarter of 2004, incorporated by reference into the Proxy/Prospectus,

Defendant Kiely stated, in part, the following:

> HEADLINE: Coors Reports 2004 Third Quarter Results
>
> GOLDEN, Colo., Oct. 28 RRNewswire – Firstcall – Adolph Coors
> Company (NYSE: RKY) today announced higher consolidated net
> sales and net income on lower consolidated sales volume for the
> third quarter of 2004.
>
> *For the 13-week quarter ended September 26, 2004, the company
> achieved consolidated net sales of $1.10 billion, a 5.3 percent
> increase from third quarter 2003.  Third quarter 2004 sales
> volume totaled 8,559,000 US. barrels, or 10,043,650 hectoliters
> (HLs), a 2.4 percent decrease from 2003.*  Third quarter operating
> income was $103.9 million, down 5.0 percent from the same period
> a year ago. *Consolidated third quarter 2004 net income was $64.1
> million, up 4.4 percent from third quarter 2003, and earnings per*

*share were $1.68, equal to the third quarter last year.*

Leo Kiely, Coors Brewing Company (CBC) president and chief executive officer, said, overall, the third quarter was a tough volume quarter for Coors Brewing Company, with weak trends in both our Americas and Europe segments. Nonetheless, *our net income was higher due to improved beer pricing, one-time nonoperating income, a lower effective tax rate and favorable exchange rates compared to the third quarter of last year.*

                              *   *   *

"For the balance of 2004, we are focused on achieving a strong finish to the year. In the U.S., we will be lapping significant volume declines and additional costs related to our supply-chain disruptions in the fourth quarter of last year. Our new systems are now running smoothly and have resulted in substantially improved service to our distributors. In the U.K., in addition to our expectations that positive on-trade pricing will continue, we believe volume trends will improve from a difficult summer. On the other hand, if foreign exchange rates remain at today's levels, we anticipate less currency benefit to our U.K. financial results in the fourth quarter.

"We also continue to work toward closing our merger of equals with Molson. The transaction has received U.S. and Canadian anti-trust clearance, and we have filed a preliminary proxy statement for SEC review. This transaction will build on the strengths of both companies, make us more competitive in the consolidating global beer market and increase profits, cash flow and shareholder value substantially in both the short and long term."

(Emphasis added.)

78.   On October 28, 2004, Coors held a conference call regarding its third quarter 2004

earnings. Defendant Kiely stated in relevant part:

Earlier this morning, we reported third quarter total company net income of $64.1 million, up 4.4 percent versus a year ago. Diluted earnings per share were $1.68, the same as last year. These results reflect a tough volume quarter for our company. Despite the volume-related challenges, net income improved due to solid beer pricing, a one-time non-operating income, a lower effective tax rate, and favorable foreign exchange rates versus a year ago.

                              *   *   *

33

W. LEO KIELY III: In summary, our third quarter performance reflected volume challenges in all of our major markets, along with higher costs. *Nonetheless, we grew bottom line results because of positive beer pricing, a lower effective tax rate, increased non-operating income, and favorable foreign exchange rates. In the face of a challenging environment for many beer companies, we believe that our plans are in place, and we'll improve our volume and financial performance going forward.*

We also continue to work towards closing our merger of equals with Molson. The transaction has received U.S. and Canadian anti-trust clearance, and we have filed a preliminary proxy statement, and we're awaiting SEC clearance. This is a great transaction that's designed to build on the strengths of both of our companies, make us more competitive in the global consolidating beer business, and increase profits, cash flow, and shareholder value substantially, in both the short and the long term.

(Emphasis added.)

## Preliminary Proxy-Prospectus

79.    On or about September 17, 2004, when Coors first filed the Preliminary Proxy

Statement with the SEC, Coors issued a press release which highlighted the purported benefits of

the Merger, Molson's reasons for the Merger, and again quoted Defendant Kiely, in part, as

follows:

The combination is expected to unlock significant value for shareholders. From the outset, value creation will come from both the ability to focus marketing investments on core brands to grow revenues and the ability to capture an expected US$175 million in annualized synergies, half of which are expected to be realized within the first 18 months following completion of the merger. Secondly, a stronger overall financial platform will lead to deeper support of core brand and key markets to drive revenue, share and volume growth. Finally, the merger will create the scale and balance sheet strength to allow Molson Coors Brewing Company to compete more effectively in the increasingly global and highly dynamic brewing industry long-term.

Leo Kiely, chief executive officer of Coors, stated, "Today's filing of the preliminary proxy is an important step in the merger process. We look forward to continuing to demonstrate to our shareholders the compelling nature of this transaction, notably its ability to create

34

shareholder value on a sustained basis. ***I'm confident in our ability
to achieve our goals for the new organization***, and I am excited to
work with a strong management team that represents a balanced
combination of talent from both organizations."

Daniel J. O'Neill, chief executive officer of Molson, stated,
"Through the capture of US$175 million in synergies, all of which
will be taken to the bottom line in the first three years, this
transaction will result in a 24 percent increase in pro forma
profitability above current base-line trends. Given the combined
company's significant cash flow and strong balance sheet with
relatively low debt levels, we will also have the financial resources
to make the investments necessary to ensure the ongoing strength of
our brands."

(Emphasis added.)

### The December 10, 2004 Proxy Statement

80.    On or about December 10, 2004, the Company filed a proxy statement with the

SEC, pursuant to Schedule 14A (the "Proxy/Prospectus" or "Proxy Statement"), which reaffirmed

these disclosure requirements, in part, as follows:

Each party's obligation to complete the merger transaction is
subject to the satisfaction of the following additional conditions by
the other party:

- the material truth of representations and warranties and
  material compliance with covenants by the other party;

- the absence of events or changes that have or would
  reasonably be expected to have a material adverse effect on
  the other party;

                          *    *    *

**Representations and Warranties**

The combination agreement contains a number of customary
representations and warranties of Molson and Coors relating to,
among other things:

                          *    *    *

- the accuracy of reports required to be filed with Canadian

securities regulatory authorities and the Toronto Stock
Exchange, in the case of Molson, and with the SEC and the
New York Stock Exchange, in the case of Coors, since
January 1, 2002 and the accuracy of the financial statements
included in those reports;

- absence of undisclosed liabilities;

- absence of any material adverse effect and certain other
  changes or events since the date of the last audited financial
  statements.

81.    Plaintiff incorporates by reference the following allegations made by plaintiffs in

the Securities Class Action Complaint:

    a)    ¶¶63-73 (Coors management hid Coors' pre-merger
financial problems and operational difficulties from investors);

    b)    ¶¶74-77 (Coors' false statements about the pre-existing
synergies between Molson and Coors that would supposedly save
Coors $175 million in costs by 2007);

    c)    ¶¶78-93 (Coors misrepresented Molson's losses in
Brazil and the adverse effect these losses would have on Molson
Coors' prospects for success).

## Factors Considered by the Molson Independent Committee

82.    The Molson Independent Committee relied upon Coors' financial condition and

projected synergies in approving the Merger. The December 2004 Proxy Statement disclosed the

factors the Molson Independent Committee supposedly relied on before it ratified the Merger

Agreement and before it advised Molson shareholders to approve the Merger:

**Factors Considered by the Molson Independent Committee**

On July 21, 2004, Molson's independent committee, after an
extensive review and thorough discussion of all facts and issues it
considered relevant with respect to the proposed merger transaction,
concluded unanimously that the proposed merger transaction is fair

to, and in the best interests of, the shareholders of Molson, other than Pentland and Eric H. Molson, from a financial and non-financial point of view. The Molson independent committee subsequently proposed that Molson's full board of directors authorize Molson to enter into the proposed combination agreement and recommend to shareholders of Molson that they vote in favor of the Molson shareholders resolution. On November 10, 2004, the Molson independent committee reaffirmed the conclusions reached on July 21, 2004 as well as the recommendations to Molson's full board of directors regarding the proposed combination agreement, as amended, and the Molson shareholders special resolution.

In reaching their conclusion and making their recommendation, the members of the Molson independent committee relied on their personal knowledge of Molson and the industry in which it is involved and on the advice of its legal and financial advisors. The Molson independent committee also reviewed the information provided by Molson and its advisors. The Molson independent committee considered numerous factors to be in favor of the merger, including among other things, the following:

- the current economic, industry and market trends affecting each of Molson and Coors in their respective markets, including those which favor the concentration of business in the hands of a small number of large companies;

- the significant opportunities for the combined company to realize the estimated annual cost savings resulting from the merger of approximately U.S. $50 million and $90 million, respectively, in the first two years following the merger and U.S. $175 million in annual cost savings thereafter;

- the ability of the shareholders of Molson to continue to participate in future earnings and growth of the combined company after completion of the merger transaction through their ownership of shares of the combined company's stock or exchangeable shares of Molson Coors Exchangeco.

**Final Prospectus: The Merger Transaction**

83.    The foregoing statements were also reproduced and incorporated by reference into the Company's Proxy/Prospectus, which described the final terms of the Merger.

**Documents Incorporated by Reference**

84.    The Proxy/Prospectus incorporated by reference additional SEC filings as set forth

below:

> We also incorporate by reference the Joint Proxy
> Statement/Management Information Circular that we filed with the
> SEC on Schedule 14A on December 10, 2004, including the
> consolidated balance sheet of Molson Inc. as at March 31, 2004 and
> March 31, 2003 and the consolidated statements of earnings,
> retained earnings and cash flows of Molson Inc. for the years then
> ended and March 31, 2002, the unaudited consolidated balance
> sheet of Molson Inc. as at September 30, 2004, the unaudited
> consolidated statements of earnings, retained earnings and cash
> flows of Molson Inc. for the six months ended September 30, 2004,
> the Unaudited Pro Forma Condensed Combined Balance Sheet of
> Molson Coors Brewing Company as of September 26, 2004 and the
> Unaudited Pro Forma Condensed Combined Income Statements of
> Molson Coors Brewing Company for the year ended December 28,
> 2003 and for the thirty-nine weeks ended September 26, 2004.

## The Special Dividend Was Little More Than a "Bribe"

85.    In response to opposition to the Merger, Coors announced that in connection with

the Merger it would pay Molson shareholders a special dividend of C $3.26 per share, for a total

of C $381 million.  (U.S. $316 million).  Coors would pay this special dividend to both Molson

Class A non-voting and Class B common shares, excluding those held by Pentland.

86.    Investors continued to voice opposition to the Merger.  In response, on January 13,

2005, Coors increased the special dividend from C $3.26 per share to C $5.44 per share (U.S.

$4.53).  The increased dividend also raised Molson Coors' debt level after the Merger, raising it

20% to $2.5 billion.

87.    The dividend increase strongly encouraged Molson shareholders to vote to approve

the Merger.  For example, Amvescap Plc's AIM Trimark Investments, holding 16 million or 15%

of Molson's Class A shares, acknowledged that it would vote its shares for the Merger because of

the increased special dividend.  Another holder openly acknowledged the bribe-effect of the

dividend boost: "This transaction doesn't make sense long-term, but if they give us enough money we'll just get out of the way . . . What they are saying is we will bribe you out of the deal so we can do it. . . ." (1/14/05 *Bloomberg* article quoting Stephen Jarislowsky, Chairman of Jarislowsky Fraiser, a holder of 4.5 million Molson shares).

88.    Molson shareholders and others did not know that this special dividend would be no compensation for the losses class members would suffer after the Merger was consummated.

## The Merger Is Approved

89.    Based on the representations about the nature and effect of the Merger and the financial condition performance of Coors, in late January 2005, the Merger was approved. On February 9, 2005, the Merger was consummated and, immediately thereafter, the combined Company issued a press release announcing shareholder approval and reiterating the projected $175 million in cost savings:

> Molson and Coors Complete Merger to Form Molson Coors
> Brewing Company
>
> MONTREAL, Canada, and GOLDEN, Colorado, February 9, 2005
> - Molson Inc. (TSX: MOL.A) and Adolph Coors Company (NYSE:
> RKY) today announced that they have completed the transaction
> announced on July 22, 2004, to combine Molson and Coors in a
> merger of equals. Molson Coors Brewing Company is a new global
> brewing company with the operating scale and balance sheet
> strength to be a major player in the continuing consolidation of the
> brewing industry.
>
> Molson and Coors shareholders approved the combination at their
> special shareholder meetings held on January 28 and February 1,
> 2005, respectively, and the Quebec Superior Court approved the
> transaction as required by Canadian law on February 2, 2005.
>
> W. Leo Kiely III, chief executive officer of Molson Coors Brewing
> Company said, "By combining Molson and Coors, we have created
> a company with the market and financial strength necessary to drive
> organic growth and compete more effectively in today's
> increasingly challenging global market, while preserving the rich
> heritages of two of the world's most prominent brewing companies.

We look forward to drawing on this brewing heritage and the combined strengths of a world-class management team to deliver greater value to our customers, partners, employees and shareholders."

"This transaction marks a new and important chapter in the history of both companies," said Eric H. Molson, chairman of Molson Coors Brewing Company. "It leverages successful business relationships and builds on the strategic and cultural fit between our two companies. With an impressive track record in brewing excellence, the new Molson Coors Brewing Company will be a dynamic and competitive organization that will create long-term value for our shareholders and the communities in which we operate."

\*    \*    \*

Synergies and Cost Savings

The company has established an Office of Synergies and Integration to facilitate the development and implementation of Plan to achieve the expected benefits of the transaction.  Through this Office, chaired by Daniel J. O'Neill, the company expects to achieve annualized synergies of approximately US$175 million over three years.  The principal sources of these synergies include the optimization of brewery networks, increased procurement efficiencies, streamlined organizational design and consolidated administrative functions. [Emphasis added]

**Molson's Fiscal 2005 Third Quarter Results**
**For The Three-Month Period Ended December 31, 2004**

90.    The same day, February 9, 2005, the Company issued a release that announced

financial and operational results for Molson in its last quarter as a non combined company.  These

results, announcing "virtually flat" net sales revenues, came as no surprise.  Accordingly, that day,

while shares of the Company traded down slightly on the first day of trading, to $73.50 from

about $75.75, this 3% price decline was expected.  The Company's CFO, Defendant Wolf, was

quoted by the *Associated Press* as stating that Molson's results were "overall, as anticipated."

**Coors' Fiscal 2005 Fourth Quarter**
**Results And For The Full-Year 2004**

91.    On February 9, 2005, the Company also issued a release that purported to announce

financial and operational results for Coors 4Q and full-year 2004 as a non-combined Company.

Coors's release, which purported to announce higher consolidated net sales, net income and

earnings per share for the fourth quarter and full-year 2004 stated, in part, the following:

> Molson Coors Reports Adolph Coors Company 2004 Fourth
> Quarter and Full-Year Results
>
> GOLDEN, Colo., Feb. 9 /PRNewswire-FirstCall/ -- Molson Coors
> Brewing Company (NYSE: TAP; TSX) today announced the most
> recent financial results for Adolph Coors Company, reporting
> higher consolidated net sales, net income and earnings per share for
> the fourth quarter and full-year 2004.
>
> For the 13-week fourth quarter ended Dec. 26, 2004, the company
> reported net sales of $1.1 billion, up 10.2 percent from the fourth
> quarter of 2003. Fourth quarter 2004 sales volume increased 4.7
> percent from the fourth quarter 2003. Fourth quarter operating
> income of $90.9 million and net income of $55.7 million increased
> 37.5 percent and 54.4 percent, respectively, from a year ago. Fourth
> quarter earnings per share were $1.45, up 48.0 percent from a year
> earlier. Earnings for fourth quarter 2004 benefited from solid beer
> pricing and volume growth in the company's Americas and Europe
> segments, along with one-time gains on asset sales totaling $19.2
> million pretax, a lower effective tax rate, and favorable foreign
> currency exchange rates. These results do not include Molson Inc.
> financial results for the quarter ended December 2004, which were
> released separately.
>
> For the 52-week fiscal year ended Dec. 26, 2004, Adolph Coors
> Company achieved consolidated net sales of $4.3 billion, a 7.6
> percent increase from 2003. Reported sales volume totaled
> 32,703,000 U.S. barrels, or 38,376,000 hectoliters, in 2004, a 0.1
> percent decrease from 2003. Net income for the full year was
> $196.7 million, a 12.6 percent increase compared to full year 2003,
> and earnings per share were $5.19, up 8.8 percent from the prior
> year.
>
> Leo Kiely, chief executive officer, said, ***"Overall, Adolph Coors
> Company finished 2004 with good financial results in a very
> competitive industry environment.*** In the U.S., despite very soft
> industry demand, our sales to retail increased in the fourth quarter,
> partially driven by the comparison to lower sales in the fourth
> quarter of 2003, when we faced U.S. supply-chain challenges. ***Our***

41

*volume trends also benefited from the introduction of Aspen Edge earlier this year and strong growth from our Blue Moon and Zima XXX brands in the fourth quarter.* In addition, continued progress on productivity initiatives in our U.S. operations enabled us to manage cost pressures, which were particularly challenging in the areas of energy and packaging materials. *In Canada, our Coors Light business continued to deliver strong profit growth."*

*      *      *

"Looking ahead, we will be simultaneously focused on improving the fundamentals of our U.S. and U.K. businesses and on working with our new colleagues from Molson to maximize the value opportunities presented by the Molson Coors merger, which closed earlier today."

(Emphasis added.)

92.    The following paragraphs are incorporated by reference from the Securities Class Action Complaint:

> a) ¶97 (Molson Coors conference call on February 9, 2005 for analysts and investors: Molson Coors was "more confident than ever" that the Merger would produce $175 million in cost savings synergies).

93.    On March 1-2, 2005, the Company conducted presentations in New York and Toronto. The Company continued painting a rosy picture even though Coors was not operating according to plan, and material adverse changes in Coors's business had occurred:

## Continued Share Growth in the Off Trade in 2004



Off Trade

## Molson Coors 2004 Combined Results

| US$mm | 2004 Actuals | | 2004 Combined | |
|---|---|---|---|---|
| | **Coors** | **Molson** | **GAAP Adj.** | **Pre-Synergies** |
| Volume (U.S. Bbls) | 32.7 | 17.0 | -- | 49.7 |
| EBIT | $336 | $389 | ($46) | $680 |
| D&A | $266 | $51 | -- | $317 |
| EBITDA | $602 | $440 | ($46) | $997 |
| Capital Spending | $211 | $68 | -- | $279 |
| Debt | $932 | $848 | $162 | $1,942 |

Note: Year-end Dec. 2004 combined results, excluding special and non-recurring items. Does not include synergies.

**Margin Expansion, Stronger Cash Flow, Increased Profits**

## Merger Synergies, Benefits Build Value

• Cost Synergy Savings
  – $175 million in 3 years, all to the bottom line

• Revenue Synergies
  – $25+ million in 3 years, reinvested

• Other benefits: debt, interest, tax
  – $25+ million per year

MOLSON $Coors$

94.     Defendants' representations, particularized above, were false and misleading when
made because they failed to disclose the following facts:

(a)     When the Merger closed on or about February 9, 2005 – almost one third
into the first fiscal quarter of 2005 – Coors was *not* operating according to plan, and *had* suffered
material adverse changes in its business;

(b)     Defendants violated the terms of the Merger Agreement and the
Proxy/Prospectus by failing to disclose that, by that time, Coors' business was being, and would
continue to be, adversely affected by conditions then already causing Coors to perform well below
plan, and consensus estimates;

(c)     At the time of the Merger, it was foreseeable that O'Neill would not
participate in any meaningful way in the integration of the two companies, and would not fulfill
the duties and responsibilities of the Office of Synergies and Integration; and

(d)     At the time of the Merger, Defendants were  motivated to conceal the
adverse conditions then affecting Coors and did conceal these adverse conditions because it
allowed Defendants to arrange the Merger transaction so that the relatives and heirs of the Coors

and Molson families could dominate the combined Company with their collective power to nominate at least 10 members of the 15 member Board.

95.    The following allegations are incorporated by reference from the Securities Class Action Complaint:

a)    ¶¶98-100 (falsity of December 6, 2004 Form 10-K, filed on March 11, 2005);

b)    ¶101 (statements made in Investors' Prospectus filed with the SEC on February 11, 2005 and incorporating December 28, 2003 Form 10-K; and various Forms 10-Q and 8-K.

c)    ¶102 (CEO Kiely's March 2, 2005 interview with *Bloomberg* analyst Mike McKee regarding Kiely's confidence about synergies);

d)    ¶¶103-107 (analysts' estimates of Molson Coors expected cost savings and future performance).

## THE TRUTH BEGINS TO BE REVEALED

96.    Only weeks after the close of the Merger, the public learned that Coors was operating well below plan; that the cost synergies from the Merger would not be achieved; and that Molson's Brazilian operations were worse than reported. On April 28, 2005, before the opening of trading, the Company announced disappointing results for its first quarter of 2005. The press release stated, in part:

### MOLSON COORS REPORTS 2005 FIRST QUARTER RESULTS

DENVER, Colo.– Molson Coors Brewing Company (NYSE: TAP; TSX) today announced higher consolidated net sales and sales volume for the first quarter of 2005 compared to the first quarter of 2004, but reported a net loss in the 2005 first quarter. The net loss was primarily attributable to lower sales volume in key markets versus a year earlier and special charges related to the recent Molson Coors merger totaling $40.7 million in the first quarter of 2005.

45

The company's 2005 first quarter results include the business of Molson Inc. following the completion of the merger on Feb. 9, 2005, compared to the first quarter of 2004, which includes only the results of the former Adolph Coors Company. The company's reported consolidated sales volume and net sales increased in the 2005 first quarter compared to the first quarter 2004 due to the combination of the Molson and Coors businesses.

For the 13-week first quarter ended March 27, 2005, the merged company reported net sales of $1.1 billion and sales volume of 8,094,000 barrels, or 9,497,985 hectoliters (HLs). The company reported a net loss of $46.5 million, or $0.74 per share, during the 2005 first quarter. Excluding special items, the company reported an after-tax loss of $5.1 million during the 2005 first quarter. (See the company's website, www.molsoncoors.com for reconciliation to the nearest U.S. GAAP measure.)

                    *       *       *

On a pro forma basis, the company reported a consolidated net loss of $79 million, or $0.91 per share, based on 86.2 million pro forma diluted shares outstanding during the 2005 first quarter.

Leo Kiely, Molson Coors president and chief executive officer, said, *"The common underlying cause for difficult first quarter results was the lack of volume growth in each of our major markets. While disappointing, this performance reinforces the importance of integrating the operations and organization of the combined company, so we can capitalize on our new strengths and build an even more competitive and profitable global enterprise."*

(Emphasis added.)

97.     After the Company issued this release, its shares fell sharply, almost $14.50 per

share, to $63.00 per share, a decline of almost 20% – a testament to investor surprise and

disappointment in the results. The *Denver Post*, reported, in part, the following:

Molson Coors shares fell $14.30 to $63. The 19 percent decline was the fifth-largest loss Thursday among companies listed on the New York Stock Exchange. The quarterly loss of 74 cents a share was unexpected by Wall Street analysts, who in consensus forecasts had predicted a 36-cent-a-share profit.

"These results are well below our performance goals and the

46

potential we see for the company," chief executive Leo Kiely said
in a conference call. "We obviously had a very tough first quarter
in each of our markets." Beer sales fell 2 percent in Canada and the
United States and 17 percent in the United Kingdom, Molson Coors
said.

98.    Following publication of these shockingly disappointing results, the Company

hosted a conference call, a transcript of which was available publicly from various sources, which

Defendant Kiely revealed, in part, the following:

> LEO KIELY, PRESIDENT, CEO, MOLSON COORS BREWING
> COMPANY: Hello, and welcome everybody. Thanks for joining us
> today. With me on the call are Tim Wolf, our global CFO, Kevin
> Boyce, CEO of Molson Canada, Peter Kendall, CEO of Coors
> Brewers Limited, Mike Gannon, our global Treasurer, Ron
> Tricostate, our global Controller, and Dave Dunnewald, Investor
> Relations Director.
>
> During the call today, Tim and I will cover three topics with you.
> First, an overview of Molson Coors brewing company's first quarter
> 2005 performance, second, a discussion of the results drivers for
> each of our five reporting segments, and following the merger of
> Molson and Coors, these segments now consist of Canada, the
> United States, Europe, Brazil and corporate. Third, we'll share some
> perspective on the balance of 2005 for our Company. Then we'll
> open it up for questions. So let's get started.
>
> In the first quarter, despite a challenging industry environment in all
> of our major businesses, we kept our focus on the immediate actions
> needed to strengthen the Molson Coors brewing company for the
> future. In this time of transformation for our merged Company, we
> gained shareholder approval for our merger of equals, we took
> immediate steps to capture the substantial cost synergies generated
> by the merger, including announcing the planned closing of our
> Memphis brewery, upsizing of the brewery we're building in
> Virginia, and moving quickly to eliminate the redundancies
> resulting from the combination.
>
> We're also moving quickly to realize tax and interest benefits of the
> merger, including simplifying and reducing the cost of our debt
> structure. We took decisive action to build a new Molson Coors
> organization. We transitioned substantial portion of our U.S. top
> management team. We appointed new CEOs for our U.S. and
> Europe businesses, and we announced the top leaders of the Molson
> Coors management committee.

We had a successful U.S. distributor convention and Canadian sales conferences, to energize our sales and distribution – distributor teams leading into our peak season. And we met with our top leaders of the conference in Miami to assure that we're all aligned and focused on driving profitable growth this summer.

Now let's look at the financial highlights for the first quarter for our merged company. Earlier this morning we reported total company sales volume of 8.1 million barrels for the first quarter, up 15% from a year ago with the addition of Molson Canada and Brazil volume, following the completion of the Molson Coors merger on February 9th, 2005. Net sales were $1.1 billion and we reported a net loss of $46.5 million, or $0.74 per diluted share. For the quarter, due to lower volume in our major markets, and special charges largely related to the merger, totaling $40.7 million, or $0.60 per share.

Importantly, aggregating all restructuring, severance, facility closures, and other nonrecurring costs, totals $107 million in pretax in the first quarter. And the merger-related step up in non-cash depreciation and amortization totaled $19 million. This is very important to note we believe, because it puts an admittedly tough quarter in a more clear perspective and context. Our first quarter results have added complexity because it was the first reporting period post-merger. U.S. accounting rules require that reported financial results for periods prior to February 9th, 2005 exclude all Molson Inc. results, so index comparisons for the first quarter are not very useful.

Therefore, we'll spend most of our time today looking at comparative proforma information, as if the merger had been completed at the beginning of 2004. Which we believe will be more helpful for your analysis. In a few cases we'll also provide performance measures excluding special or one-time items, again, to offer greater visibility to our underlying business performance. Total Company proforma volume of 10.7 million barrels for the first quarter was down 5.6% from a year ago. Due to lower volume in our major markets. Weak industry conditions drove part of this decline, along with challenges particular to each business. We'll take you through these by segment in a few minutes.

*Net sales were $1.2 billion, down 6% on proforma basis. In terms of profitability, the combined company proforma net loss of $79 million was down from a proforma net income of 36 million in the first quarter of 2004, due to lower volume and 84 million of pretax special charges.* If you exclude these special charges, we would have a proforma after-tax loss of 4 million, or $0.04 per share in the

48

first quarter. *These results are well below our performance goals and the potential we see for our Company.*

(Emphasis added.)

## O'Neill Resigns, Pockets $4.8 Million Severance Payment

99.    The same day, April 28, 2005,  Daniel J. O'Neill, the former Chief Executive

Officer of Molson, announced that he would abandon the Chair of Office of Synergies and

Integration, and leave the Company with his approximately $4.8 million in severance related

payments.  According to the *Rocky Mountain News* (Denver, CO), O'Neill would receive, in part,

the following:

> HEADLINE: BREWERY EXEC'S EXIT LUCRATIVE;
> MOLSON COORS VICE CHAIRMAN GETS $4.8 MILLION
> SEVERANCE
>
> Molson Coors Vice Chairman Dan O'Neill will resign with a multi-million dollar severance package, joining the ranks of departing executives who exit the brewer with buckets of cash. O'Neill will get about $66,709 per month for the next three years – a total of $2.4 million – plus a special bonus of $2.4 million for delivering the "synergies and integration plan" to the Molson Coors board at next month's meeting.
>
> In addition, all the restrictions on his stock options lapse. Most of his options, given to him when he was CEO of Molson, required the stock to gain significantly before the options could be used. The company now has waived those rules. O'Neill cashed out the remainder of a 1999 Molson options grant earlier this year, giving him roughly $33 million in pre tax profit. He is not the only executive to have benefitted from the merger. Previously, 12 former Adolph Coors Co. executives used change of control provisions in their employment contracts to resign and collect two years' worth of salary and bonus. The payments cost Molson Coors $29 million this quarter, the company said Thursday.
>
> The specifics of the announcement came as a surprise to some, however. Coors and Molson heavily sold their merger on $175 million in annual synergies and told investors that O'Neill would be in charge of the cost-cutting plan.
>
> But the company had to back off a special $3 million payment

O'Neill was to get after the merger closed. Instead, the companies
said O'Neill would get the payment only if he left the company.
The new $4.8 million deal, disclosed Thursday, is even more
lucrative than the one that irked shareholders last summer.

"It's ludicrous," said Michael Palmer of Toronto's Veritas
Research, a longtime harsh critic of Molson. "The company lost
5m market-share points (in Canada). . . . I always like to think in a
capitalist system, people are rewarded for success, not for (messing
up).

100.    The following allegations are incorporated by reference from the Securities Class

Action Complaint:

> a)    ¶¶115-117 (Analysts' reactions to the Company's results;
> Prudential Equity Group says Molson Coors is "more of a 'mystery'
> than an investment right now.")
>
> b)    ¶¶118-121 ($500 million in tax liabilities resulting from
> Molson's failed pre-Merger Brazilian operations);
> c)    ¶122 (SEC requests that Molson Coors produce documents
> regarding Company's first quarter earnings report and operations in
> Brazil);
>
> d)    ¶123 (Molson Coors announces a restatement of its financial
> results for the first quarter of 2005 and that for the second quarter of
> 2005, Molson Coors' profits declined by 46%);
>
> e)    ¶124 (Molson Coors agrees to sell 68% of its 83% interest in
> its Brazilian unit to Fomento Economico Mexicano SA for $68
> million; Molson Coors, however, will receive only $8 million from
> the sale -- debts and other claims account for $60 of the $68
> million);
>
> f)    ¶¶125-149 (GAAP violations; failure to writedown goodwill and
> long-lived assets);
>
> g)    ¶¶166-184 (additional false statements and omissions
> regarding: Coors' financial condition; the expected Merger
> synergies; Molson's Brazilian losses; and Molson's financial
> performance and financial position before the Merger).

## CLASS ACTION ALLEGATIONS

101.    Plaintiff brings this action in part as a class action pursuant to Rules 23(a) and

(b)(1), (2), and (3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all Participants in the Plans for whose individual accounts the Plans held shares in the Fund from July 22, 2004 through the present .

102.    The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is available from Defendants' records. Plaintiff believes there are, at a minimum, hundreds, if not thousands, of geographically dispersed members of the Class in the Plans.

103.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to the Plans and members of the Class;

(b)    whether Defendants breached their fiduciary duties to the Plans and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)    whether the Plans and, indirectly, the Participants were injured by such breaches; and

(d)    whether the Plans and/or Class are entitled to damages and if so, the measure of such damages.

104.    Plaintiff's claims are typical of the claims of the members of the Class, as Plaintiff and members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein. Each of the Plans was structured as a defined contribution plan under ERISA; the operations of each plan were managed by the Plan Committee, who served as the plan administration; each plan held the Fund,

51

which constituted a substantial amount of that Plans' assets; and the same material

misrepresentations and omissions were made by Defendants to Participants in each of the Plans,

including the statements in Molson Coors' SEC filings, which were incorporated in each Plans'

filings. Defendants' lack of prudence and loyalty also impacted the Plans and their Participants

in an identical manner.

105.    Plaintiff will fairly and adequately protect the interests of the members of the

Class. Plaintiff has retained competent counsel. Plaintiff has no interests antagonistic to or in

conflict with those of the Class.

106.    Prosecution of separate actions by members of the Class would create a risk of

inconsistent adjudications with respect to individual members of the Class which would establish

incompatible standards of conduct for Defendants, or adjudications with respect to individual

members of the Class would, as a practical matter, be dispositive of the interests of the other

members not parties to the adjudications or substantially impair or impede their ability to protect

their interests.

## CAUSATION

107.    The Plans suffered at least millions of dollars in losses because substantial assets

of the Plans were imprudently allowed to be put at great risk by Defendants, through investment

by the Plans in Coors Stock during the Class Period, in breach of Defendants' fiduciary duties.

108.    Defendants are responsible for losses caused by participant direction of investment

in Coors Stock, because Defendants failed to take the necessary and required steps to ensure

effective and informed independent participant control over the investment decision making

process, as required by ERISA Section 404(c), 29 U.S.C. § 1104(c), and the regulations

promulgated thereunder. Defendants concealed material, non public facts from Participants and

provided misleading, inaccurate, and incomplete information to them regarding the nature of the

Defendants' improper activities, as well as the true underlying values of Coors Stock offered by the Plans, misrepresenting its soundness as an investment vehicle. As a consequence, Participants did not exercise independent control over their investments in Coors Stock and Defendants remain liable under ERISA for losses caused by such investment.

109.    Had the Defendants properly discharged their fiduciary and/or co fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Coors Stock and divesting the Plans from Company Stock offered by the Plans when maintaining such an investment became imprudent, the Plans would have avoided a substantial portion of the losses that it suffered through its continued investment in Company stock.

110.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Coors Stock offered by the Plans, eliminating this investment when it became imprudent, and divesting the Plans from any then existing investments in this investment when maintaining such investment became imprudent, the Plans would have avoided a substantial portion of the losses that it suffered through such continued tainted investment.

## FIRST CLAIM FOR RELIEF

### Failure To Prudently And Loyally Manage Assets Held By The Plans

### (Breaches of Fiduciary Duties in Violation of ERISA § 404)

111.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

112.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are

responsible for ensuring that assets within a plan are prudently invested. The exercise of prudence in this context requires a deliberative process. In this regard, fiduciaries deciding whether to make any changes in a plan's investment options, or to invest a plan's assets, must make decisions that are as well informed as possible under the circumstances. Defendants failed to properly advise and inform themselves in this regard.

113.    Defendants were responsible for ensuring that all investments in the Fund and all Fund investments in Coors Stock were prudent, and are liable to make good losses incurred as a result of such investments being imprudent.

114.    Defendants breached their duty to manage the Plans' assets prudently and their duty of loyalty, *inter alia*, because during the Class Period these Defendants knew, or would have known if they had conducted an appropriate investigation, that the Fund and Coors Stock were not suitable or appropriate investments for the Plans, and that Plans assets should not have been invested in that Fund and Fund assets should not have been invested in Coors Stock based on the facts alleged above.

115.    Nonetheless, these fiduciaries breached their fiduciary duties in permitting the Plans to maintain and offer the Fund as an investment option and to facilitate, direct and approve the investment of the Plans' assets in the Fund and the Fund's investment in Coors Stock instead of other investments. Moreover, Defendants failed to take adequate steps to prevent the Plans, and indirectly the Participants in the Plans, from suffering losses as a result of the Plans' investment in the Fund.

116.    Defendants had a duty to prevent, and should have prevented, the Plans from purchasing shares in the Fund. They should also have directed the Plans to sell all of their shares in the Fund and should have disclosed nonpublic information prior to any sales by the Plans. Had they done any of these things, the Plans would have avoided and/or limited their losses

substantially.

117.    Defendants also breached their co-fiduciary obligations by, among other failures,
knowingly participating in, making no effort to remedy, and/or knowingly undertaking to conceal
their fellow Defendants' misleading disclosures and failure to prudently and loyally manage
assets of the Plans in the exercise of their powers with respect to the offering of the Fund as an
investment option for the Plans despite knowing that such failures were breaches of their ERISA-
mandated fiduciary duties.

118.    As a direct and proximate result of the breaches of fiduciary duties alleged herein,
the Plans (and indirectly the Plaintiff and the Plans' other Participants) lost a significant portion of
the value of their investments.

119.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C.
§ 1109(a), Defendants are liable to restore the losses to the Plans caused by their breaches of
fiduciary duties alleged in this Claim for Relief.

## SECOND CLAIM FOR RELIEF

### Failure To Provide Complete And Accurate Information
### To Participants In The Plans And Beneficiaries

### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA)

120.    Plaintiff incorporates the allegations contained in the previous paragraphs of this
Complaint as if fully set forth herein.

121.    At all relevant times, as alleged above, Defendants were fiduciaries within the
meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A).

122.    Defendants failed to disclose complete and accurate information in a fiduciary
capacity in Fiduciary Communications as alleged above intended to communicate to Participants

information necessary for Participants to direct investments and manage their retirement benefits under the Plans, and in particular, failed to provide material information to be used by Participants in directing the Plans to invest Plans assets in the Coors Stock Fund.

123.    The SEC filings alleged above which were incorporated into Fiduciary Communications negligently misstated and/or failed to disclose the Company's improper business activities as set forth above.

124.    As a consequence of the foregoing negligent non-disclosures and negligent misrepresentations, Defendants also breached their fiduciary duties in that they failed to provide Participants and/or the Plans with an adequate description of the risk and return characteristics of the Coors Stock Fund.

125.    As a consequence of Defendants' breaches, the Plans, the Plaintiff, and the Class suffered losses.

126.    Each Defendant is liable for the acts of the other Defendants as a co-fiduciary. Upon information and belief, each Defendant (a) knowingly participated in or knowingly undertook to conceal the breaches of the other fiduciaries, (b) by virtue of his own breach of fiduciary duty, enabled the other Defendants to breach their fiduciary duties, and/or (c) had knowledge of the other Defendants' breaches and failed to take reasonable steps to remedy them.

127.    Defendants are liable to personally make good to the Plans any losses to the Plans resulting from each breach under 29 U.S.C. § 502(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a).

## THIRD CLAIM FOR RELIEF

### Failure To Monitor The Plan Committee Defendants
### And Provide Them With Accurate Information

### (Breaches of Fiduciary Duties in Violation of ERISA
### § 404 by Molson Coors and the Board Defendants)

128.    Plaintiff incorporates the allegations contained in the previous paragraphs of this
Complaint as if fully set forth herein.

129.    At all relevant times, as alleged above, Molson Coors and the Director Defendants
were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

130.    At all relevant times, as alleged above, the scope of Molson Coors and the
Director Defendants' fiduciary responsibilities included the responsibility to monitor other
fiduciaries.

131.    The duty to monitor entails both giving information to and reviewing the actions
of the monitored fiduciaries.  In this case, that meant that Molson Coors and the Director
Defendants had the duty to:

(a)    Ensure that the monitored fiduciaries possessed the needed credentials and
experience, or used and monitored qualified advisors and service providers to fulfill their duties,
such advisors being knowledgeable about the operations of the Plans, the goals of the Plans, and
the behavior of participants in the Plans;

(b)    Ensure that the monitored fiduciaries had ready access to qualified outside,
impartial advisors, counsel, and experts when needed;

(c)    Ensure that the monitored fiduciaries were provided with adequate financial
resources to do their job;

(d)    Ensure that the monitored fiduciaries had adequate information to do their
job of overseeing the Plans' investments;

57

(e)     Ensure that the monitored fiduciaries maintained adequate records of the information on which they base their decisions and analysis with respect to Plans' investment options;

(f)     Ensure that the monitored fiduciaries reported regularly to the monitoring fiduciaries; and

(g)     Review, understand, and approve the conduct of the hands-on fiduciaries.

132.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets and disclosures with respect thereto, and must take prompt and effective action to protect the plan and participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

133.     The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance and disclosures in Fiduciary Communications, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for concluding that their appointees were faithfully and effectively performing their obligations to participants in the plan or for deciding whether to retain or remove them.

134.     Molson Coors and the Director Defendants breached their fiduciary monitoring duties by, among other things, failing to disclose to the Plan Committee Defendants that: (a) when the Merger closed on or about February 9, 2005 – almost a third of the way into the first fiscal

58

quarter of 2005 – it was not true that Coors was operating according to plan, nor was it true that no material adverse change in Coors' business had occurred; (b) the Director Defendants violated the terms of the Merger Agreement and the Proxy/Prospectus by failing to disclose that, by that time, Coors's business was being, and would continue to be, adversely impacted by conditions which were then already causing Coors to perform well below plan, and well below consensus estimates; (c) at the time of the Merger, it was foreseeable that O'Neill would not participate in any meaningful way in the integration of the two companies, and would not fulfill the duties and responsibilities of the Office of Synergies and Integration; and (d) at the time of the Merger, certain defendants were motivated to conceal the adverse conditions which were then impacting Coors and did conceal these adverse conditions because it allowed certain defendants to arrange the Merger transaction such that the relatives and heirs of the Coors and Molson families could dominate the combined Company – by collectively being able to nominate at least 10 members of the 15 member Board. Molson Coors and the Director Defendants should have known that the fiduciaries they were responsible for monitoring were imprudently allowing the Plans to continue offering the Coors Stock Fund, and continuing to invest the Plans' assets in the Coors Stock Fund when it was not prudent to do so, yet failed to take action to disclose to Participants or otherwise protect them from the consequences of these fiduciaries' failures.

135.    In addition, as a result of their inappropriate practices and implicit knowledge thereof, Molson Coors and the Director Defendants – in connection with their monitoring and oversight duties – were required to disclose to their appointees accurate information about the financial condition and practices of Molson Coors that they should have known and which these appointees needed to make sufficiently informed decisions. By remaining silent and withholding such information from the other fiduciaries, Molson Coors and the Director Defendants breached their monitoring duties under the Plans and ERISA.

136.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans and indirectly, the Plaintiff and the Class, were injured and, in addition, lost a significant portion of the value of their investments.

### Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Molson Coors, The Plan Committee Defendants and The Director Defendants Are Liable To Restore the Losses To The Plans Caused By Their Breaches Of Fiduciary Duties Alleged In This Claim For Relief

137.    As alleged herein, all Defendants breached their fiduciary duties, and as a consequence of Defendants' breaches, the Plans suffered significant losses and opportunity losses. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

138.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, a plan would not have made or maintained investments in the challenged investment, and that the investments made or maintained in the challenged investment – here, the Coors Stock Fund – would have instead been made in the most profitable alternative investment. In this way, the remedy restores the value of a plan's assets to what it would have been if a plan had been properly administered.

139.    Plaintiff, the Plans, and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plans to make good to the Plans the losses and opportunity losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by

ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to

remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C.

§§ 1109(a) and 1132(a); (c) reasonable attorney fees and expenses, as provided by ERISA

§ 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable

costs and (e) interests on these amounts, as provided by law; and (f) such other legal or equitable

relief as may be just and proper.

140.    Each Defendant is jointly liable for the acts of the other Defendants as a co-

fiduciary under ERISA § 405, 29 U.S.C. § 1105.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment for all relief available, including an order:

A.    Declaring that Defendants, and each of them, have breached their ERISA

fiduciary duties to the Participants;

B.    Compelling Defendants to make good to the Plans all losses to the Plans

resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans

resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits

Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the

Participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.    Imposing a constructive trust on any amounts by which any Defendant was

unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.    Enjoining Defendants, and each of them, from any further violations of

their ERISA fiduciary obligations;

E.    Awarding Plaintiff and the Class damages in the amount of the losses the

Plans suffered, to be allocated among the Participants' individual accounts in proportion to the

accounts' losses;

      F.     Ordering Defendants to allocate the Plans' recoveries to the accounts of all

Class member participants as their interests appear;

      G.     Awarding Plaintiff and the Class costs, pursuant to 29 U.S.C. § 1132(g);

      H.     Awarding Plaintiff and the Class attorneys' fees, pursuant to 29 U.S.C.

§ 1132(g) and the common fund doctrine;

      I.     Ordering equitable restitution and other appropriate equitable monetary

relief against Defendants; and

      J.     Awarding Plaintiff and the Class such other and further relief as the Court

deems just and proper.

Dated: March 30, 2006

                        **CHIMICLES & TIKELLIS LLP**

                        _____

                        Pamela S. Tikellis (#2172)
                        Robert J. Kriner, Jr. (#2546)
                        A. Zachary Naylor (#4539)
                        Robert R. Davis (#4536)
                        One Rodney Square
                        P.O. Box 1035
                        Wilmington, DE 19899
                        Tel: (302) 656-2500

                        **GAINEY & MCKENNA**
                        Thomas J. McKenna, Esq.
                        295 Madison Avenue, 4th Floor
                        New York, NY 10017
                        Tel: (212) 983-1300

                        **VIANALE & VIANALE LLP**
                        Kenneth Vianale, Esq.
                        2499 Glades Road, Suite 112
                        Boca Raton, Florida 33431

Tel: (561) 392-4750

**Attorneys for Plaintiff**