# EXHIBIT 1
# Part 2 of 3

**ARTICLE VIII**
**ALLOCATION OF RESPONSIBILITIES - NAMED FIDUCIARIES**

8.1  **No Joint Fiduciary Responsibilities.**  The Plan Sponsor has the overall responsibility and authority to manage and control the operation and administration of the Plan and may designate one or more persons or committees to carry out its fiduciary responsibilities and authority under the Plan and its duties as the Plan Administrator. The Plan Sponsor has designated the Committee as the named fiduciary to act on behalf of the Plan Sponsor in the management and control of the Plan assets and to establish and carry out a funding policy consistent with the Plan objectives and with the requirements of any applicable law.

8.2  **The Employer.**  Each Employer shall be responsible for: (a) making its contributions and (b) keeping accurate books and records with respect to its Employees and the appropriate components of each Employee's Compensation and furnishing such data to the Committee. The Plan Sponsor shall be responsible for: (a) certifying to the Trustee the names and specimen signatures of the members of the Committee acting from time to time; (b) selecting agents and fiduciaries to operate and administer the Plan and Trust; (c) appointing an investment manager if it determines that one should be appointed; and (d) reviewing periodically the performance of such agents, managers, and fiduciaries.

8.3  **The Trustee.**  The Trustee shall be responsible for: (a) the investment of the Trust to the extent and in the manner provided in the Trust agreement; (b) the custody and preservation of Trust assets delivered to it; and (c) the payment of such amounts from the Trust as the Committee shall direct.

8.4  **The Committee - Plan Administrator.**  The Board of Directors of the Plan Sponsor shall appoint an administrative Committee consisting of no fewer than three individuals who may be, but need not be, Participants, officers, directors, or Employees of the Employer. If the Board does not appoint a Committee, the Board shall act as the Committee under the Plan. The members of the Committee shall hold office at the pleasure of the Board and shall serve without compensation. The Plan Sponsor shall act as or shall appoint the Plan Administrator. The Committee shall be responsible for establishing and implementing a funding policy consistent with the objectives of the Plan and with the requirements of ERISA.

8.5  **Committee to Construe Plan.**  The Committee shall have such powers as may be necessary to discharge its duties hereunder, including, but not by way of limitation, the following powers and duties, in which the Committee shall have total and complete discretion and in which the Committee's decisions in such matters shall be binding and conclusive as to all parties:

(a)  To appoint a Trustee or Trustees to manage all or part of the Plan assets, including assets maintained under separate accounts, and to appoint one or more persons to serve as the Plan Administrator;

(b)  To allocate the responsibilities and authority being carried out by the Committee among the members of the Committee;

(c)  To take any action appropriate to assure that the Plan assets are invested for the exclusive purpose of providing benefits to Participants and their Beneficiaries in accordance with the Plan and defraying reasonable expenses of administering the Plan, subject to the requirements of any applicable law;

(d)  To determine the amounts and time of payment of benefits and the rights of Participants and Beneficiaries to Plan benefits; to take any actions necessary to assure timely payment

of benefits to any Participant or Beneficiary eligible to receive benefits under the Plan; and to assure a full and fair review of any Participant who is denied a claim to any benefit under the Plan;

(e)    To employ other persons to render advice and assistance with respect to any responsibility or authority being carried out by the Committee, including allocation to and accounting of Individual Accounts and administration of the Plan, and the employment of legal counsel;

(f)    To employ an independent qualified public accountant to examine the books, records and any financial statements which are required to be included in the annual report;

(g)    To take any action necessary or appropriate to assure that the Plan is administered for the exclusive purpose of providing benefits to Participants and their Beneficiaries in accordance with the Plan and defraying reasonable expenses of administering the Plan, subject to the requirements of any applicable law;

(h)    To determine whether a Domestic Relations Order constitutes a QDRO, at its sole discretion, and to appoint such persons (by name, title, or position) as it desires, who shall be authorized to make this determination on its behalf;

(i)    To approve loans to active Participants, at its sole discretion, and to appoint such persons (by name, title, or position) as it desires, who shall be authorized to approve Participant loans on its behalf; and

(j)    Generally, to operate and administer the Plan in all matters and to interpret and construe the Plan.

8.6    **Duties and Powers of the Plan Administrator.**  The Plan Administrator shall have such powers as may be necessary to discharge the duties of the Plan Administrator under the Plan, including, but not by way of limitation, the following powers and duties:

(a)    To file with the Secretary of Labor (the "Secretary") the annual report and other pertinent documents which may be requested by the Secretary;

(b)    To furnish each Participant and each Beneficiary receiving benefits hereunder a summary plan description explaining the Plan;

(c)    To maintain all records necessary for verification of information required to be filed with the Secretary;

(d)    To secure bonding (to be paid by the Plan Sponsor) in such amounts as may be required by ERISA for the Plan Administrator, members of the Committee, or other parties to the Plan;

(e)    To comply with all duties required by ERISA, or any other applicable law, in the administration of this Plan; and

(f)    In the event of the termination of the Plan, to report to all necessary parties all available information regarding benefits and amounts to be distributed to each Participant and Beneficiary.

8.7  **Organization of Committee.**  The Committee shall elect a chairman and shall adopt such rules as it deems desirable for the conduct of its affairs and for the administration of the Plan.  It may appoint agents (who need not be members of the Committee) to whom it may delegate such powers as it deems appropriate, except that any dispute shall be determined by the Committee.  The Committee may make its determinations with or without meetings.  It may authorize one or more of its members or agents to sign instructions, notices and determinations on its behalf.  The action of a majority of the Committee shall constitute the action of the Committee.

8.8  **Agent for Process.**  Coors Brewing Company's most senior in-house counsel shall be the agent of the Plan for service of all process.

8.9  **Indemnification of Committee Members.**  The Committee, the Plan Administrator, the Appeals Committee, and all of the other agents and representatives of the Committee, including employees of the Employer who are performing services for the Plan at the direction of the Committee, the Plan Administrator, the Appeals Committee, or the Employer, shall be indemnified and saved harmless by the Employer against any claims, actions, suits, proceedings, or liabilities, and reasonable expenses incurred in connection with any claim, action, suit or proceeding which is or may be asserted resulting from any action or conduct relating to the Plan, except claims judicially determined to be attributable to gross negligence or willful misconduct.

*** End of Article VIII ***

# ARTICLE IX
## TRUST AGREEMENT - INVESTMENTS

9.1 **Trust Agreement.** The Plan Sponsor has entered into a Trust agreement to provide for the holding, investment and administration of the funds of the Plan. The Trust agreement shall be part of the Plan, and the rights and duties of any individual under the Plan shall be subject to all terms and provisions of the Trust agreement.

9.2 **Expenses of Trust.** All taxes upon or in respect of the Trust shall be paid by the Trustee out of the Trust assets. All expenses of administering the Trust shall be paid by the Trustee out of the Trust assets to the extent they are not paid by the Employer. All expenses of individually-directed transactions in Trust assets, including without limitation the Trustee's transaction fee, brokerage commissions, transfer taxes, and any income taxes, excise taxes, and penalties that may be imposed as a result of an individual's investment direction may be assessed against the Accounts of the individual directing the transactions, to the extent that the expenses are not paid by the Employer. No fiduciary shall receive any compensation for services rendered to the Plan if the fiduciary is being compensated on a full-time basis by the Employer.

All expenses incident to the administration, termination or protection of the Plan and Fund, including, but not limited to, reasonable expenses of the Committee and the Appeals Committee, legal, accounting, administration fees and premiums for bonds, may be paid by the Plan Sponsor, which may require reimbursement from the other Employers for their proportionate shares.

9.3 **Directed Investments.** A Participant may direct that his Accounts be invested in such stocks, bonds, other securities, property, or investment funds specified from time to time by the Committee as available investment options. The Committee may permit "qualifying employer securities" (as is defined in ERISA) to be an available investment option. Up to 100% of the Trust may be invested in "qualifying employer securities." The Committee may limit the frequency with which a Participant may change the Participant's investment direction; however, the Participant shall be able to change the Participant's investment direction at least once every calendar quarter. The Committee shall establish administrative rules and procedures to govern Participant-directed investments. To the extent that a Participant exercises such control over the investment of the Participant's Accounts, no person who is otherwise a fiduciary shall be liable for any loss, or by reason of any breach, that results from such Participant's exercise of control. If a Participant dies, the Participant's Beneficiary shall have the same rights, responsibilities, and investment alternatives as a Participant has pursuant to this Section. To the extent that a Participant or Beneficiary does not direct the investment of the Participant's Accounts, the Accounts for which investment directions are not given shall be invested in the investment fund selected for such purpose in the Trust agreement.

ERISA § 404(c) **Plan.** The Plan is intended to be a plan described in ERISA § 404(c). To the extent that a Participant, Beneficiary or Alternate Payee exercises control over the investment of his Accounts, no person who is a fiduciary shall be liable for any loss, or by reason of any breach, that is the direct and necessary result of the Participant's, Beneficiary's or Alternate Payee's exercise of control.

9.4 **Special Rules for Stock.** A Participant is entitled to direct the exercise of voting rights or other rights with respect to shares of Stock allocated to the Participant's Accounts according to the procedures contained in the Trust. The Employer shall provide to each Participant who owns Stock through this Plan materials pertaining to the exercise of such rights which contain all of the information provided to stockholders. A Participant shall have the opportunity to exercise any such rights within the same time period as other owners of Stock. In the exercise of voting rights, votes representing unallocated shares of Stock shall be voted in the same ratio for the election of directors and for and

against each issue as the applicable vote directed by a Participant with respect to allocated shares of Stock, except as may be otherwise required by ERISA.  The Employer shall take all necessary steps to protect the confidentiality of voting and other decisions made by Participants with respect to Stock held in their Plan accounts.

*** *End of Article IX * * ***

**ARTICLE X**
**TERMINATION AND AMENDMENT**

10.1  <u>Termination of Plan or Discontinuance of Contributions.</u> The Plan Sponsor expects to continue the Plan indefinitely, but the continuance of the Plan and the payment of contributions are not assumed as contractual obligations. The Plan Sponsor may terminate the Plan or discontinue contributions at any time.

10.2  <u>Allocations upon Termination or Discontinuance of Contributions.</u> Upon the termination or partial termination of the Plan or upon the complete discontinuance of contributions, the Committee shall promptly notify the Trustee of such termination or discontinuance.

10.3  <u>Procedure Upon Termination of Plan or Discontinuance of Contributions.</u> If the Plan has been terminated or partially terminated, or if a complete discontinuance of contributions to the Plan has occurred, then after the allocations required under Section 10.2 have been completed, the Trustee shall distribute or transfer the Accounts of affected Employees as follows.

(a)  <u>401(k) Contribution Account.</u> If the Employer maintains or establishes another defined contribution plan (other than an employee stock ownership plan defined in Code § 4975(e)(7)), then no amount in an Employee's 401(k) Contribution Account may be distributed to any Employee who has not yet attained age 59½.

(b)  <u>Other Rules.</u>

(i)  If the affected Employee's Accounts have an aggregate value of $3,500 or less (or was $3,500 or less at the time of any prior distribution, for distributions made prior to March 22, 1999) (calculated in accordance with applicable Treasury regulations), then the Trustee shall distribute the Employee's Accounts (except, if subsection (a) applies, the 401(k) Contribution Accounts) to the Employee in a lump sum (other than an annuity). Effective January 1, 1998, the $3,500 amount shall be changed to $5,000.

(ii)  If the affected Employee's Accounts have an aggregate value of more than $3,500 (or was $3,500 or less at the time of any prior distribution, for distributions made prior to March 22, 1999) (calculated in accordance with applicable Treasury regulations), and if the Employer does not maintain another defined contribution plan (other than an employee stock ownership plan within the meaning of Code § 4975(e)(7)), then the Trustee shall distribute the Employee's Accounts to the Employee in a lump sum (other than an annuity). Effective January 1, 1998, the $3,500 amount shall be changed to $5,000.

(iii)  If the affected Employee's Accounts have an aggregate value of more than $3,500 (or was more than $3,500 at the time of any prior distribution, for distributions made prior to March 22, 1999) (calculated in accordance with applicable Treasury regulations), and if the Employer maintains another defined contribution plan (other than an employee stock ownership plan within the meaning of Code § 4975(e)(7)), then the Trustee shall transfer the Employee's Accounts to the other plan unless the Employee consents to an immediate distribution of such Accounts (except, if subsection (a) applies, for the 401(k) Contribution Account) in a lump sum (other than an annuity). Effective January 1, 1998, the $3,500 amount shall be changed to $5,000.

(iv)    Effective January 1, 2002, the aggregate value of a Participant's Accounts for purposes of paragraphs (i), (ii), and (iii) shall be determined without regard to that portion of the Account that is attributable to the Participant's Rollover Contribution Account.

Any distribution or transfer made pursuant to this Section may be in cash, in shares of Stock to the extent a Participant's Accounts are invested in Stock, or partly in cash and partly in shares of Stock. After all such distributions or transfers have been made, the Trustee shall be discharged from all obligations under the Trust; no Participant or Beneficiary who has received any such distribution, or for whom any such transfer has been made, shall have any further right or claim under the Plan or Trust.

10.4  **Amendment by the Plan Sponsor.**  The Plan Sponsor may at any time amend the Plan in any respect, subject to Section 10.5, but no amendment shall be made that would have the effect of vesting in the Employer any part of the Trust or of diverting any part of the Trust to purposes other than for the exclusive benefit of Participants, Alternate Payees, or their Beneficiaries, and the rights of any Participant, Alternate Payee, or Beneficiary with respect to contributions previously made shall not be adversely affected by any amendment. The two most senior executive officers of Coors Brewing Company and the most senior Human Resources executive of Coors Brewing Company shall jointly have the authority to amend the Plan upon the unanimous action of the three designated officers if: (a) the amendment does not result in a significant financial impact to an Employer, (b) the amendment effects either a technical or administrative change to the Plan, or (c) the amendment is recommended by counsel as necessary or desirable to comply with applicable law. All other amendments must be approved by the Board of Directors of the Plan Sponsor and signed by an officer of the Plan Sponsor or of Coors Brewing Company. Upon any amendment of the Plan, the Plan Sponsor shall furnish a copy of the amendment to each Participating Employer.

10.5  **Amendment to Vesting Schedule.**  If the vesting schedule is amended, each Participant with at least three Years of Service may elect, within the period specified in the following sentence after the adoption of the amendment, to have the Participant's nonforfeitable percentage computed under the Plan without regard to such amendment. The period during which the election may be made shall commence with the date the amendment is adopted and shall end on the latest of: (a) sixty days after the amendment is adopted; (b) sixty days after the amendment becomes effective; or (c) sixty days after the Participant is issued written notice of the amendment by the Employer or Committee.

*** *End of Article X* * * *

## ARTICLE XI
## PLAN ADOPTION BY PARTICIPATING EMPLOYERS

11.1 <u>Adoption of Plan</u>. The Plan Sponsor may permit any entities to adopt the Plan and Trust as Participating Employers. The Participating Employer shall deliver to the Trustee a certified copy of the resolutions or other documents evidencing its adoption of the Plan and Trust. Employees of a Participating Employer adopting the Plan shall not be eligible to invest their Accounts in Stock until compliance with the applicable registration and reporting requirements of the securities laws.

11.2 <u>Agent of Participating Employer</u>. Each Participating Employer appoints the Plan Sponsor as its agent with authority to act for the Participating Employer in all transactions in which the Plan Sponsor believes such agency will facilitate the administration of the Plan.

11.3 <u>Withdrawal and Removal from Plan</u>.

(a)    <u>Withdrawal</u>.  Any Participating Employer may discontinue its participation in the Plan, effective as stated in its notice to the Plan Sponsor.

(b)    <u>Removal</u>.  The Plan Sponsor shall have the right to remove any Participating Employer at any time, effective as determined by the Plan Sponsor.

*** *** *** *End of Article XI* *** *** ***

## ARTICLE XII
## TOP HEAVY PROVISIONS

12.1 **Application of Top Heavy Provisions.**  The provisions of this Article XII shall be applicable only if the Plan becomes a Top Heavy Plan.  If the Plan becomes a Top Heavy Plan as of the Determination Date for a Plan Year, the provisions of this Article XII shall apply to the Plan as of the first day of such Plan Year and shall continue to apply to the Plan until the Plan ceases to be a Top Heavy Plan or until the Plan is terminated or otherwise amended.  The Top Heavy Plan provisions shall apply separately to each Related Group.

12.2 **Top Heavy Plan.**  The Plan shall be a Top Heavy Plan in any Plan Year in which, as of the Determination Date for that Plan Year, the aggregate of the account balances (as calculated according to the regulations under Code § 416) of Key Employees under this Plan (and under all other plans required or permitted to be aggregated with this Plan) exceeds 60 % of the aggregate of the account balances (as calculated according to the regulations under Code § 416) in this Plan (and under all other plans required or permitted to be aggregated with this Plan) of all current Employees and all former Employees who terminated employment within five years of the Determination Date (or, effective January 1, 2002, within one year of the Determination Date).  This ratio shall be referred to as the "top heavy ratio."  For Plan Years beginning before January 1, 2002, for purposes of determining the account balance of any Participant, distributions made with respect to such individual within a five-year period ending on the Determination Date shall be included.  For Plan Years beginning on or after January 1, 2002, for purposes of determining the account balance of any Participant, distributions made with respect to such Participant within a one-year period (or a five-year period with respect to distributions made for a reason other than separation from service, death or disability) ending on the Determination Date shall be included.  This shall also apply to distributions under a terminated plan that, if it had not been terminated, would have been required to be included in an aggregation group.  The account balances of a Participant who had once been a Key Employee, but who is not a Key Employee during the Plan Year, shall not be taken into account.  The following plans must be aggregated with this Plan for the top heavy test:  (a) a qualified plan maintained by the Employer (or the portion of the qualified plan attributable to the Employer) in which a Key Employee participated during this Plan Year or during the previous four Plan Years and (b) any other qualified plan maintained by the Employer (or the portion of the qualified plan attributable to the Employer) that enables this Plan or any plan described in clause (a) to meet the requirements of Code § 401(a)(4) or 410(b).  The determination of the plans that must be aggregated for the top heavy test shall be made separately with respect to each Employer.  The following plans may be aggregated with this Plan for the top heavy test:  any qualified plan maintained by the Employer that, in combination with the Plan or any plan required to be aggregated with this Plan when testing this Plan for top-heaviness,  would satisfy the requirements of Code §§ 401(a) and 410.  If one or more of the plans required or permitted to be aggregated with this Plan is a defined benefit plan, a Participant's "account balance" shall equal the present value of his accrued benefit, including any distributions within five years of the Determination Date (or effective January 1, 2002, within one year of the Determination Date, for any distributions made by reason of separation from service, death, or disability).  If the aggregation group includes more than one defined benefit plan, the same actuarial assumptions shall be used with respect to each such defined benefit plan.  The foregoing top heavy ratio shall be computed in accordance with the provisions of Code § 416(g), together with the regulations and rulings thereunder.  The determination of whether any portion of the Plan is a Top Heavy Plan shall be made by calculating the top heavy ratio for the portion of the Plan attributable to the Employer.  For purposes of this Section, "Employer" shall mean a Participating Employer and its Related Group.

### 12.3  Special Minimum Contribution.

(a)     Notwithstanding anything in the Plan to the contrary, and subject to subsection (b), in every Plan Year during which the Plan is a Top Heavy Plan, a minimum allocation is required for each Non-Key Employee who both (i) performed one or more Hours of Service during the Plan Year as a Covered Employee after satisfying the Participation Requirements, and (ii) was an Employee on the last day of the Plan Year. This minimum allocation is required regardless of whether such Non-Key Employee received credit for 1,000 or more Hours of Service or made any required contributions to the Plan for such Plan Year. The minimum allocation shall be a percentage of such Non-Key Employee's Compensation. The percentage shall be the lesser of 3% or the largest percentage of any Key Employee's Compensation contributed to the Plan. For Non-Key Employees, this percentage takes into account all Employer contributions and forfeitures, except for amounts used to restore the accounts of a missing Participant, allocated for the Plan Year. Participant 401(k) Contributions of Non-Key Employees shall not be treated as Employer contributions for purposes of providing the required minimum contribution. For Key Employees, the percentage takes into account all Employer contributions, Participant 401(k) Contributions, and forfeitures, except for amounts used to restore the Accounts of a missing Participant, allocated for the Plan Year. If this minimum allocation is not satisfied for any Non-Key Employee, the Employer shall contribute the additional amount needed to satisfy this requirement. Each entity maintaining the Plan shall make the minimum contribution attributable to the Compensation it pays the Non-Key Employee, unless the entities maintaining the Plan enter into a separate written agreement allocating the responsibility for the minimum contribution in another manner.

(b)     The Employer also maintains the Coors Retirement Plan. Non-Key Employees who participate in this Plan shall receive the minimum contribution as specified in subsection (a). Non-Key Employees who participate in both that plan and this Plan shall receive a minimum allocation under this Plan. Their minimum allocation shall be calculated as in subsection (a), with one exception: the allocation shall be 5% of the Non-Key Employee's Compensation, and Compensation shall include Compensation earned (i) while such an Employee was a covered employee under either plan, and (ii) after such Employee had satisfied the eligibility requirements of either plan. Non-Key Employees who participate only in the Coors Retirement Plan shall accrue the minimum benefit in such plan.

### 12.4  Change in Top Heavy Status.

12.4  Change in Top Heavy Status. If the Plan ceases to be a Top Heavy Plan, and if any change in the benefit structure, vesting schedule or other component of a Participant's accrued benefit shall occur as a result of such change in Top Heavy Plan status, the nonforfeitable percentage of each Participant's benefit attributable to Employer Contributions shall not be decreased as a result of such change. In addition, each Participant with at least three Years of Service with the Employer on the date of such change, may elect to have his nonforfeitable percentage computed under the Plan without regard to such change in status. The period during which the election may be made shall commence on the date the Plan ceases to be a Top Heavy Plan and shall end on the later of (a) 60 days after the change in status occurs, (b) 60 days after the change in status becomes effective, or (c) 60 days after the Participant is issued written notice of the change by the Employer or the Committee. The change in Top Heavy Plan status shall not decrease the nonforfeitable percentage, measured as of the date the change in status is effective, of any Participant's, Beneficiary's, or Alternate Payee's Accounts.

*** End of Article XII ***

## ARTICLE XIII
## MISCELLANEOUS

13.1 <u>Right to Dismiss Employees - No Employment Contract</u>. The Employer may terminate the employment of any Employee as freely and with the same effect as if this Plan were not in existence. Participation in this Plan by an Employee shall not constitute an express or implied contract of employment between the Employer and the Employee.

13.2 <u>Claims Procedure For Claims Filed Before January 1, 2002</u>. The following claims procedure shall apply for all claims filed before January 1, 2002:

(a)    <u>Filing a Claim</u>. All applications and claims for benefits shall be filed in writing by the Participant, his Beneficiary, or the authorized representative of the claimant, by completing the procedures required by the Plan Administrator. The procedures shall be reasonable and may include the completion of forms and the submission of documents and additional information. For purposes of this Section, a request for a Plan loan or an in-service withdrawal shall be considered a claim.

(b)    <u>Review by Plan Administrator</u>. The Plan Administrator shall review all applications and claims for benefits and shall decide whether to approve or deny the claim. If a claim is denied in whole or in part, the Plan Administrator shall furnish written notice of denial to the claimant within ninety days after the Plan Administrator receives the Claim, unless special circumstances require an extension of time for processing the claim. If an extension is required, the Plan Administrator shall notify the claimant in writing before the end of the initial ninety-day period. The extension shall not exceed an additional ninety days. The notice of denial shall be written in a manner calculated to be understood by the claimant and shall include the following:

(i)    specific reasons for the denial;

(ii)    specific references to pertinent Plan provisions;

(iii)    a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such information is necessary; and

(iv)    appropriate information as to the steps the claimant should take if the claimant wishes to submit the denied claim for review.

(c)    <u>Appealing a Claims Denial</u>. If the claimant wishes a review of the denied claim, the claimant shall notify the Plan Administrator in writing within 60 days. The claimant or the claimant's representative may review pertinent documents and may submit issues or comments to the Plan Administrator in writing. The claimant or the claimant's representative may furnish the Plan Administrator with a written statement of the claimant's position and with written materials in support of the claimant's position.

(d)    <u>Review by Appeals Committee</u>.

(i)    All reviews of denied claims shall be conducted by the Appeals Committee.

(ii)    The following subsection applies to claims filed before September 15, 1996. The Plan Administrator shall forward all requests for review of a denied claim

together with all associated documents to the Chairman of the Appeals Committee promptly after receipt. The Appeals Committee shall make a decision on review within 60 days after the Plan Administrator receives the claimant's written request for review unless special circumstances, such as the claimant's request for a hearing, require additional time for review of the claim. If the Appeals Committee needs an extension of time to review the claim, it shall notify the claimant in writing before the end of the initial 60-day period. The extension shall not be longer than an additional 60 days. The Appeals Committee shall give the claimant written notice of its decision, written in a manner calculated to be understood by the claimant and shall include specific reasons for the decision as well as specific references to the pertinent plan provisions on which the decision is based. If the Appeals Committee does not make a decision within the time periods specified above, the claim shall be deemed denied.

(iii)    The following subsection applies to all claims filed on or after September 15, 1996 and before January 1, 2002. The Plan Administrator shall forward all requests for review of a denied claim together with all associated documents to the Chairman of the Appeals Committee promptly after receipt. The Appeals Committee shall make its decision solely on the basis of the written record, including documents and written materials submitted by the Plan Administrator and documents and written materials submitted by the claimant and/or the claimant's representative. The Appeals Committee shall make a decision on review within 60 days after the Plan Administrator receives the claimant's written request for review unless special circumstances require additional time for review of the claim. If the Appeals Committee needs an extension of time to review the claim, it shall notify the claimant in writing before the end of the initial 60-day period. The extension shall not be longer than an additional 60 days. The Appeals Committee shall give the claimant written notice of its decision, written in a manner calculated to be understood by the claimant and shall include specific reasons for the decision as well as specific references to the pertinent plan provisions on which the decision is based. If the Appeals Committee does not make a decision within the time periods specified above, the claim shall be deemed denied.

(e)    <u>Discretion of Plan Administrator and Appeals Committee</u>. The Plan Administrator and the Appeals Committee shall have full discretionary authority to consider claims filed under the Plan and to determine eligibility, status and rights of all individuals under the Plan and to construe any and all terms of the Plan.

(f)    <u>Binding Arbitration</u>. If, after the completion of the claims procedure set forth in the preceding paragraphs, the claimant wishes to further pursue the claim, the claim shall be submitted to, and determined through, binding arbitration in the metropolitan area in which the claimant's work place is located in accordance with the employment arbitration procedures of the American Arbitration Association ("AAA") existing at the time the arbitration is conducted, before a single arbitrator chosen in accordance with AAA procedures. The decision of the arbitrator shall be enforceable as a court judgment.

13.3 <u>Claims Procedure For Claims Filed On or After January 1, 2002</u>. The following claims procedure shall apply for all claims filed on or after January 1, 2002:

(a)    <u>Filing a Claim</u>. All claims shall be filed in writing by the Participant, the Participant's Beneficiary, or the authorized representative of the claimant, by completing the procedures required by the Plan Administrator. The procedures shall be reasonable and may include the completion of forms and the submission of documents and additional information. For purposes of this Section, a request for a Plan loan or an in-service withdrawal shall be considered a claim.

(b)    <u>Review by Plan Administrator</u>. The Plan Administrator shall review all materials and shall decide whether to approve or deny the claim. If a claim is denied in whole or in part, the Plan Administrator shall provide written notice of denial to the claimant within a reasonable period of time no later than 90 days after the Plan Administrator receives the claim, unless special circumstances require an extension of time for processing the claim. If an extension is required, the Plan Administrator shall notify the claimant in writing before the end of the initial 90-day period and indicate the special circumstances requiring an extension of time and the date by which the Plan Administrator expects to render a decision on the claim. The extension shall not exceed an additional 90 days. The notice of denial shall be written in a manner calculated to be understood by the claimant and shall include the following:

  (i)    specific reasons for the denial;

  (ii)   specific references to pertinent Plan provisions;

  (iii)  a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

  (iv)   appropriate information as to the steps the claimant should take if the claimant wishes to submit the denied claim for review, including any applicable time limits and including a statement of the claimant's right to bring a civil action under ERISA § 502(a) following a denied claim on review.

(c)    <u>Appealing a Claims Denial</u>. If the claimant wishes a review of the denied claim, the claimant shall notify the Plan Administrator in writing within 60 days of the claimant's receipt of notification of the denied claim. The claimant or the claimant's representative may review pertinent documents and may submit issues or comments to the Plan Administrator in writing. The claimant or the claimant's representative may provide the Plan Administrator with a written statement of the claimant's position and with written materials in support of the claimant's position including documents, records and other information relating to the claim. The claimant or the claimant's representative may have, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim. A document, record, or other information shall be considered relevant to the claim if such document, record, or other information (i) was relied upon in making the benefit determination, (ii) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination, or (iii) demonstrates compliance with the administrative processes and safeguards designed to ensure and verify that benefit claim determinations are made in accordance with the Plan and that, where appropriate, the Plan provisions have been applied consistently with respect to similarly situated claimants.

    (d)    <u>Review by Appeals Committee</u>.

        (i)    All reviews of denied claims shall be conducted by the Appeals Committee.

        (ii)    The Plan Administrator shall forward all requests for review of a denied claim together with all associated documents to the Chairman of the Appeals Committee promptly after receipt. The Appeals Committee shall make its decision solely on the basis of the written record, including documents and written materials submitted by the Plan Administrator and documents and written materials submitted by the claimant and/or the claimant's representative. The Appeals Committee shall make a decision on review within a reasonable period of time, not later than 60 days after the Plan Administrator receives the claimant's written request for review unless special circumstances require additional time for review of the claim. If the Appeals Committee needs an extension of time to review the claim, it shall notify the claimant in writing before the end of the initial 60-day period, and shall indicate the special circumstances requiring an extension of time and the date by which the Appeals Committee expects to render the determination on review. The extension shall not be longer than an additional 60 days. The decision on review will be written in a manner calculated to be understood by the claimant. If the claim is denied, the written notice shall include specific reasons for the decision as well as specific references to the pertinent Plan provisions on which the decision is based, and shall include a statement of the claimant's right to bring an action under ERISA § 502(a) (subject to the limitations described in (f), below) and a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits, with "relevant" defined as provided in the previous subsection (c).

    (e)    <u>Discretion of Plan Administrator and Appeals Committee</u>. The Plan Administrator and the Appeals Committee shall have full discretionary authority to consider claims filed under the Plan and to determine eligibility, status and rights of all individuals under the Plan and to construe any and all terms of the Plan.

    (f)    <u>Binding Arbitration</u>. If, after the completion of the claims procedure set forth in the preceding paragraphs, the claimant wishes to further pursue the claim, the claim shall be submitted to, and determined through, binding arbitration in the metropolitan area in which the claimant's work place is located in accordance with the employment arbitration procedures of the American Arbitration Association ("AAA") existing at the time the arbitration is conducted, before a single arbitrator chosen in accordance with AAA procedures. The decision of the arbitrator shall be enforceable as a court judgment.

13.4  <u>Source of Benefits</u>. All benefits payable under the Plan shall be paid solely from the Trust, and the Employer assumes no liability or responsibility therefor.

13.5  <u>Exclusive Benefit of Employees</u>. Except as the Plan permits the return of contributions under circumstances specified in the Plan, it shall be impossible at any time prior to the satisfaction of all liabilities with respect to Participants, Alternate Payees, and their Beneficiaries, for any part of the Trust to be used for, or diverted to, purposes other than the exclusive benefit of Plan Participants, Beneficiaries, and Alternate Payees, except that payment of taxes and administrative expenses may be made from the Trust. The Trustee shall discharge its duties under this Plan solely in the interest of the Participants, Beneficiaries, and Alternate Payees and for the exclusive purpose of providing benefits to Participants,

Beneficiaries and Alternate Payees and defraying reasonable expenses of administering the Plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, all in accordance with the provisions of this Plan insofar as they are consistent with the provisions of ERISA.

13.6  **Forms of Notices.**  Wherever provision is made in the Plan for the filing of any notice, election, or designation by a Participant, Spouse, Alternate Payee, or Beneficiary, the action of the individual shall be effective if the Participant, Spouse, Alternate Payee, or Beneficiary complies fully with any applicable provisions of the Plan and any rules and procedures specified by the Committee from time to time.

13.7  **Merger, Consolidation, or Transfer.**

(a)     The Trustee may not consent to, or be a party to, any merger or consolidation with another plan, or to a transfer of assets or liabilities to another plan, unless immediately after the merger, consolidation, or transfer, the surviving plan provides each Participant with a benefit equal to or greater than the benefit each Participant would have received had the Plan terminated immediately before the merger, consolidation or transfer. The Trustee possesses the specific authority to enter into merger agreements or direct transfer of assets agreements with the trustees of plans described in Code § 401(a), including an elective transfer, and to accept the direct transfer of plan assets, or to transfer plan assets, as a party to any such agreement.

(b)     The Trustee may accept a direct transfer of plan assets on behalf of an Employee prior to the date the Employee becomes a Participant in accordance with the Participation Requirements. If the Trustee accepts a direct transfer of plan assets, the Plan Administrator and Trustee shall treat the Employee as a Participant for all purposes of the Plan except for purposes of sharing in Employer contributions under the Plan until the Employee actually becomes a Participant in accordance with the Participation Requirements.

(c)     **Code § 401(k) Transfer Rules.**  If the Plan receives a direct transfer (by merger or otherwise) of elective contributions (or amounts treated as elective contributions) from a plan with a cash or deferred arrangement, the distribution restrictions of Code §§ 401(k)(2) and (10) shall continue to apply to those transferred elective contributions.

13.8  **Inalienability of Benefits.**  Except as provided in Section 7.2 relating to Plan loans and this Section, no Participant or Beneficiary shall have any right to assign, alienate, transfer, hypothecate, encumber or anticipate the Participant's or Beneficiary's interest in any benefits under this Plan, nor shall such benefits be subject to any legal process to levy upon or attach the same for payment of any claim against any such Participant or Beneficiary.

**Exception: QDROs.**  This Section shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a Participant pursuant to a Domestic Relations Order, unless the Domestic Relations Order is a QDRO, in which case the Plan shall make payment of benefits in accordance with the applicable requirements of the QDRO.

**Exception: Certain Judgments and Settlements.**  This Section shall not apply to any offset of the Participant's Accounts in an amount equal to an amount that the Participant is ordered or required to pay to the Plan if:

      (i)      the order or requirement to pay arises

           (A)      under a judgment of conviction of a crime involving the Plan, or

           (B)      under a civil judgment, including a consent decree, entered by a court in an action brought in connection with a violation (or an alleged violation) of the fiduciary responsibility requirements of Title I of ERISA, or

           (C)      pursuant to a settlement agreement between the Secretary of Labor and the Participant in connection with a violation (or an alleged violation) of the fiduciary responsibility requirements of Title I of ERISA, and

      (ii)     the judgment, order, decree, or settlement agreement expressly provides for the offset of all or a part of the amount ordered or required to be paid to the Plan against the Participant's Account balance(s) under the Plan, and

      (iii)    the judgment, order, decree, or settlement agreement occurred after August 4, 1997.

13.9  **Qualified Domestic Relations Orders (QDROs).** In order to be a Qualified Domestic Relations Order, the Domestic Relations Order:

    (a)     must clearly specify the name and the last known mailing address of the Participant;

    (b)     must specify the name and mailing address of each Alternate Payee covered by the order;

    (c)     must specify either the amount or percentage of the Participant's benefits to be paid by the Plan to each such Alternate Payee, or the manner in which such amount or percentage is to be determined;

    (d)     must specify the number of payments or period to which such order applies;

    (e)     must specify each plan to which such order applies;

    (f)     may not require the Plan to provide any type or form of benefit, or any option, not otherwise provided under the Plan;

    (g)     may not require the Plan to provide increased benefits (determined on the basis of actuarial value); and

    (h)     may not require the payment of benefits to an Alternate Payee if such benefits have already been designated to be paid to another Alternate Payee under another order previously determined to be a QDRO.

           Procedures Effective Before January 1, 2000. The Committee shall establish reasonable procedures to determine the qualified status of Domestic Relations Orders and to administer distributions under QDROs. Such procedures shall be in writing and shall permit an Alternate Payee to designate a representative to receive copies of notices. When the Committee receives a Domestic Relations Order, it shall promptly notify the Participant and each Alternate Payee of such receipt and provide them with copies of the Plan's procedures for determining the qualified status of the order. Within a reasonable period after receipt of a Domestic Relations Order, the Committee shall determine whether such order is a QDRO and notify the Participant and each Alternate Payee of such determination. During any period in

which the issue of whether a Domestic Relations Order is a QDRO is being determined (by the Committee, by a court of competent jurisdiction, or otherwise), the Committee shall separately account for the amounts payable to the Alternate Payee if the order is determined to be a QDRO. If the order (or modification thereof) is determined to be a QDRO within eighteen months after the date the first payment would have been required by such order, the Committee shall pay the amounts separately accounted for (plus any interest thereon) to the individual(s) entitled thereto. However, if the Committee determines that the order is not a QDRO, or if the issue as to whether such order is a QDRO has not been resolved within eighteen months after the date the first payment would have been required by such order, then the Committee shall pay the amounts separately accounted for (plus any interest thereon) to the individual(s) who would have been entitled to such amounts if there had been no order. Any determination that an order is a QDRO that is made after the close of the eighteen-month period shall be applied prospectively only. If the Plan's fiduciaries act in accordance with fiduciary provisions of ERISA in treating a Domestic Relations Order as being (or not being) a QDRO or in taking action in accordance with this Section, then the Plan's obligation to the Participant and each Alternate Payee shall be discharged to the extent of any payment made pursuant to the acts of such fiduciaries.

Procedures Effective On and After January 1, 2000.  Upon receiving a Domestic Relations Order (either in draft form or approved by a court), the Plan Administrator promptly shall notify the Participant and any Alternate Payee named in the order of the receipt of the order and the Plan's procedures for determining the qualified status of the order. Upon receiving a Domestic Relations Order (either in draft form or approved by a court), the Plan Administrator shall place a hold on the Participant's Accounts which prohibits the Participant from receiving a distribution (either upon termination of employment or in-service) or from receiving the proceeds of a Plan loan. In addition, the Plan Administrator shall place a hold on the Participant's Accounts which prohibits the Participant from receiving a distribution (either upon termination of employment or in-service) or from receiving the proceeds of a Plan loan if a domestic relations court issues an order requesting such action. If the Domestic Relations Order being reviewed has not been approved by a court, the hold shall remain upon the Participant's Accounts for 120 days following the date the Plan Administrator responds to the submitting party with its comments. If a Domestic Relations Order that has been approved by a court is not received within the 120 day period following the Plan Administrator's response, the hold will be removed from the Participant's Accounts. If a Domestic Relations Order that has been approved by a court is received within the 120 day period, the hold will remain on the Participant's Accounts until the earlier of (i) the date the order is determined to be qualified and the Participant's Account is divided or (ii) 120 days following the date the Plan Administrator responds to the submitting party with its comments. Within a reasonable period of time after receiving the Domestic Relations Order, the Plan Administrator shall determine the qualified status of the order and shall notify the Participant and each alternate payee, in writing, of its determination. The Plan Administrator shall provide notice under this paragraph by mailing to the individual's address specified in the Domestic Relations Order, or in a manner consistent with Department of Labor regulations. If any portion of the Participant's Account is distributable during the period the Plan Administrator is making its determination of the qualified status of the Domestic Relations Order (which has been approved by a court), the Plan Administrator shall make a separate accounting of the amounts distributable. If the Plan Administrator determines the order is a QDRO within 18 months following receipt of the Domestic Relations Order, the Plan Administrator shall direct the Trustee to distribute the Distributable Amounts in accordance with the Domestic Relations Order. If the Plan Administrator does not make its determination of the qualified status of the order within the 18 months following receipt of the order, the Plan Administrator shall direct the Trustee to distribute the Distributable Amounts in the manner the Plan would distribute if the Domestic Relations Order did not exist and shall apply the order prospectively if the Plan Administrator later determines the order is a QDRO. The Trustee shall make any distributions required under this Section by separate benefit checks or other separate distribution to the Alternate Payees.

Rights of Alternate Payee.  The Alternate Payee shall have the following rights under the Plan:

(a)    Designation of Beneficiary.  The Alternate Payee may designate Beneficiaries in the same manner as a Participant.  However, any such Beneficiary designation shall be effective without the consent of the spouse of the Alternate Payee.  In the absence of an effective Beneficiary designation, the Distributable Amount of the Alternate Payee's Accounts shall be paid to the Alternate Payee's surviving spouse; or if none, in equal shares to the Alternate Payee's surviving children and issue of deceased children by right of representation; or if none, in equal shares to each surviving parent of the Alternate Payee; or if none, to the Alternate Payee's estate.

(b)    Immediate Distribution Required.  An Alternate Payee shall receive a distribution of the Alternate Payee's Accounts immediately after the Committee determines that the Domestic Relations Order is a QDRO and the Alternate Payee's Accounts are established, unless the QDRO requires crediting to the Alternate Payee of a future Annual Addition to this Plan, in which case the distribution shall occur immediately after all such future Annual Additions have been completed.

(c)    Lump Sum Distribution Option.  An Alternate Payee may only receive a distribution in the form of a lump sum distribution of the Alternate Payee's entire interest in the Plan.  An Alternate Payee may choose to receive the Alternate Payee's distribution in cash or in Stock, in the same manner as a Participant.

(d)    Distribution Upon Death of Alternate Payee.  Upon the death of an Alternate Payee, the Alternate Payee's entire interest in the Plan shall be distributed in a lump sum distribution by the end of the calendar year containing the fifth anniversary of the Alternate Payee's death.  The Alternative Payee's Beneficiary may choose to receive the Alternate Payee's distribution in cash or in Stock, in the same manner as a Participant's Beneficiary.

(e)    Investment Direction.  The Alternate Payee may direct the investment of the Alternate Payee's interest in the Plan in the same manner as a Participant, after the Alternate Payee's Accounts have been established by the Trustee.

(f)    Claims Procedures.  The claims procedures of the Plan shall apply to the Alternate Payee (or the Alternate Payee's Beneficiary) in the same manner as a Participant.

13.10   **Payments Due Minors or Incapacitated Individuals.**  If any individual entitled to a payment under the Plan is a minor or a legally incompetent person, or in the sole judgment of the Committee, is unable to apply such payments to his own best interest, or, effective January 1, 2001, if the Committee determines that any such individual is incapacitated by reason of physical or mental disability, whether or not legally adjudicated as incapacitated, the Committee may direct all or any portion of such payments to be made in any one or more of the following ways:

(a)    directly to such person;

(b)    to the individual's legal guardian or conservator; or

(c)    to the individual's spouse or any other person, to be expended for the individual's benefit.

The direction of the Committee will, in each case, be final and binding upon all persons and neither the Committee nor the funding agent shall be obliged to see to the proper application of any payment so made.  Payments made pursuant to such direction shall operate as a complete discharge of the Trust, the Trustee and the Committee.

13.11 **Uniformity of Application.** The provisions of this Plan shall be applied in a uniform and non-discriminatory manner in accordance with rules adopted by the Committee which rules shall be systematically followed and consistently applied so that all individuals similarly situated shall be treated alike.

13.12 **Disposition of Unclaimed Payments.** Each Participant, Alternate Payee, or Beneficiary with an Account balance in this Plan must file with the Committee from time to time in writing his address, the address of each of his Beneficiaries (if applicable), and each change of address. Any communication, statement or notice addressed to such individual at his last address filed with the Committee (or if no address is filed with the Committee then at the individual's last address as shown on the Employer's records) will be binding on such individual for all purposes of the Plan. Neither the Committee nor the Trustee shall be required to search for or locate any missing individual. If the Committee notifies an individual that the individual is entitled to a distribution and also notifies the individual of the provisions of this Section, and the individual fails to claim the individual's benefits under the Plan or make his address known to the Committee within five calendar years after the notification, the benefits under the Plan of such individual shall be forfeited as of the end of the Plan Year coincident with or following the five-year waiting period. Any amount forfeited pursuant to this Section shall be allocated pursuant to Section 5.4. If the individual should later make a claim for the individual's forfeited benefit, the Employer shall make a special contribution to the Plan equal to the forfeiture, and such amount shall be distributed to the individual.

13.13 **Information to Participants and Beneficiaries.** Any Participant in the Plan or any Beneficiary may examine copies of the Plan description, latest annual report, any bargaining agreement, this Plan and Trust, and any contract or other instrument under which the Plan was established or is operated. The Plan Administrator shall maintain all of the items listed in this Section in the Plan Administrator's office, or in such other place or places as the Plan Administrator may designate from time to time, for examination during reasonable business hours. A Beneficiary's right to (and the Plan Administrator's or the Trustee's duty to provide the Beneficiary) information or data concerning the Plan shall not arise until the Beneficiary first becomes entitled to receive a benefit under the Plan. Upon the written request of a Participant or Beneficiary, the Plan Administrator shall provide a copy of any item listed in this Section. The Plan Administrator may make a reasonable charge to the requesting person for the copy so furnished. No Participant, other than a Participant acting as Plan Administrator, has the right to inspect the records reflecting the Accounts of any other Participant. The Plan Administrator, within the time prescribed by ERISA, shall provide to all Participants and Beneficiaries a summary description of any material amendment to the Plan, a notice of discontinuance of the Plan, and all other information required by ERISA to be provided without charge.

13.14 **Fiduciaries not Insurers.** The Trustee, the Plan Administrator, and the Employer in no way guarantee the Trust from loss or depreciation. The Employer does not guarantee the payment of any money which may be due or becomes due to any person from the Trust. The liability of the Plan Administrator and the Trustee to make any payment from the Trust at any time and all times shall be limited to the then available assets of the Trust.

13.15 **Waiver of Notice.** Any person entitled to notice under the Plan may waive the notice.

13.16 **Pronouns: Gender and Number.** Unless the context clearly indicates otherwise, words in either gender shall include the other gender and the singular shall include the plural and vice versa.

13.17 **Applicable Law.** This Plan shall be construed and regulated by ERISA, the Code, and, except as otherwise provided herein and to the extent applicable, the laws of the State of Colorado except for any conflicts-of-laws provisions.

*** End of Article XIII ***

IN WITNESS WHEREOF, Coors Brewing Company has caused its duly authorized officer to execute the Plan as of the date set forth below.

**COORS BREWING COMPANY**
Plan Sponsor

By _Annita M. Menogan_

Title: _Secretary_

Date: _February 28, 2002_