# EXHIBIT 3
# Part 2 of 2

## ARTICLE X
## TERMINATION AND AMENDMENT

10.1 **Termination of Plan or Discontinuance of Contributions.** The Plan Sponsor expects to continue the Plan indefinitely, but the continuance of the Plan and the payment of contributions are not assumed as contractual obligations. The Plan Sponsor may terminate the Plan or discontinue contributions at any time.

10.2 **Allocations upon Termination or Discontinuance of Employer Contributions.** Upon the termination or partial termination of the Plan or upon the complete discontinuance of contributions, the Committee shall promptly notify the Trustee of such termination or discontinuance.

10.3 **Procedure Upon Termination of Plan or Discontinuance of Contributions.** If the Plan has been terminated or partially terminated, or if a complete discontinuance of contributions to the Plan has occurred, then after the allocations required under Section 10.2 have been completed, the Trustee shall distribute or transfer the Accounts of affected Employees as follows.

(a)    401(k) Contribution Account. If the Employer maintains or establishes another defined contribution plan (other than an employee stock ownership plan defined in Code § 4975(e)(7)), then no amount in an Employee's 401(k) Contribution Account may be distributed to any Employee who has not yet attained age 59½.

(b)    Other Rules.

    (i)    If the affected Employee's Accounts have an aggregate value of $3,500 or less (or was $3,500 or less at the time of any prior distribution, for distributions made prior to March 22, 1999) (calculated in accordance with applicable Treasury regulations), then the Trustee shall distribute the Employee's Accounts (except, if subsection (a) applies, the 401(k) Contribution Accounts) to the Employee in a lump sum (other than an annuity). Effective January 1, 1998, the $3,500 amount shall be changed to $5,000.

    (ii)    If the affected Employee's Accounts have an aggregate value of more than $3,500 (or was $3,500 or less at the time of any prior distribution, for distributions made prior to March 22, 1999) (calculated in accordance with applicable Treasury regulations), and if the Employer does not maintain another defined contribution plan (other than an employee stock ownership plan within the meaning of Code § 4975(e)(7)), then the Trustee shall distribute the Employee's Accounts to the Employee in a lump sum (other than an annuity). Effective January 1, 1998, the $3,500 amount shall be changed to $5,000.

    (iii)    If the affected Employee's Accounts have an aggregate value of more than $3,500 (or was more than $3,500 at the time of any prior distribution, for distributions made prior to March 22, 1999) (calculated in accordance with applicable Treasury regulations), and if the Employer maintains another defined contribution plan (other than an employee stock ownership plan within the meaning of Code § 4975(e)(7)), then the Trustee shall transfer the Employee's Accounts to the other plan unless the Employee consents to an immediate distribution of such Accounts (except, if subsection (a) applies, for the 401(k) Contribution Account) in a lump sum (other than an annuity). Effective January 1, 1998, the $3,500 amount shall be changed to $5,000.

(iv)    Effective January 1, 2002, the aggregate value of a Participant's Accounts for purposes of paragraphs (i), (ii), and (iii) shall be determined without regard to that portion of the Account that is attributable to the Participant's Rollover Contribution Account.

Any distribution or transfer made pursuant to this Section may be in cash, in shares of Stock to the extent a Participant's Accounts are invested in Stock, or partly in cash and partly in shares of Stock. After all such distributions or transfers have been made, the Trustee shall be discharged from all obligations under the Trust; no Participant or Beneficiary who has received any such distribution, or for whom any such transfer has been made, shall have any further right or claim under the Plan or Trust.

10.4    **Amendment by the Plan Sponsor.**    The Plan Sponsor may at any time amend the Plan in any respect, subject to Section 10.5, but no amendment shall be made that would have the effect of vesting in the Employer any part of the Trust or of diverting any part of the Trust to purposes other than for the exclusive benefit of Participants, Alternate Payees, or their Beneficiaries, and the rights of any Participant, Alternate Payee, or Beneficiary with respect to contributions previously made shall not be adversely affected by any amendment. The two most senior executive officers of Coors Brewing Company and the most senior Human Resources executive of Coors Brewing Company shall jointly have the authority to amend the Plan upon the unanimous action of the three designated officers if: (a) the amendment does not result in a significant financial impact to an Employer, (b) the amendment effects either a technical or administrative change to the Plan, or (c) the amendment is recommended by counsel as necessary or desirable to comply with applicable law. All other amendments must be approved by the Board of Directors of the Plan Sponsor and signed by an officer of the Plan Sponsor or of Coors Brewing Company. Upon any amendment of the Plan, the Plan Sponsor shall furnish a copy of the amendment to each Participating Employer.

10.5    **Amendment to Vesting Schedule.**    If the vesting schedule is amended, each Participant with at least three Years of Service may elect, within the period specified in the following sentence after the adoption of the amendment, to have the Participant's nonforfeitable percentage computed under the Plan without regard to such amendment. The period during which the election may be made shall commence with the date the amendment is adopted and shall end on the latest of: (a) sixty days after the amendment is adopted; (b) sixty days after the amendment becomes effective; or (c) sixty days after the Participant is issued written notice of the amendment by the Employer or Committee.

* * * *End of Article X* * * *

**ARTICLE XI**
**PLAN ADOPTION BY PARTICIPATING EMPLOYERS**

11.1 <u>Adoption of Plan.</u> The Plan Sponsor may permit any entities to adopt the Plan and Trust as Participating Employers. The Participating Employer shall deliver to the Trustee a certified copy of the resolutions or other documents evidencing its adoption of the Plan and Trust. Employees of a Participating Employer adopting the Plan shall not be eligible to invest their Accounts in Stock until compliance with the applicable registration and reporting requirements of the securities laws.

11.2 <u>Agent of Participating Employer.</u> Each Participating Employer appoints the Plan Sponsor as its agent with authority to act for the Participating Employer in all transactions in which the Plan Sponsor believes such agency will facilitate the administration of the Plan.

11.3 <u>Withdrawal and Removal from Plan.</u>

(a)      <u>Withdrawal.</u>  Any Participating Employer may discontinue its participation in the Plan, effective as stated in its notice to the Plan Sponsor.

(b)      <u>Removal.</u> The Plan Sponsor shall have the right to remove any Participating Employer at any time, effective as determined by the Plan Sponsor.

*** *** End of Article XI *** ***

## ARTICLE XII
## TOP HEAVY PROVISIONS

12.1 **Application of Top Heavy Provisions.** The provisions of this Article XII shall be applicable only if the Plan becomes a Top Heavy Plan. If the Plan becomes a Top Heavy Plan as of the Determination Date for a Plan Year, the provisions of this Article XII shall apply to the Plan as of the first day of such Plan Year and shall continue to apply to the Plan until the Plan ceases to be a Top Heavy Plan or until the Plan is terminated or otherwise amended. The Top Heavy Plan provisions shall apply separately to each Related Group.

12.2 **Top Heavy Plan.** The Plan shall be a Top Heavy Plan in any Plan Year in which, as of the Determination Date for that Plan Year, the aggregate of the account balances (as calculated according to the regulations under Code § 416) of Key Employees under this Plan (and under all other plans required or permitted to be aggregated with this Plan) exceeds 60 % of the aggregate of the account balances (as calculated according to the regulations under Code § 416) in this Plan (and under all other plans required or permitted to be aggregated with this Plan) of all current Employees and all former Employees who terminated employment within five years of the Determination Date (or, effective January 1, 2002, within one year of the Determination Date). This ratio shall be referred to as the "top heavy ratio." For Plan Years beginning before January 1, 2002, for purposes of determining the account balance of any Participant, distributions made with respect to such individual within a five-year period ending on the Determination Date shall be included. For Plan Years beginning on or after January 1, 2002, for purposes of determining the account balance of any Participant, distributions made with respect to such Participant within a one-year period (or a five-year period with respect to distributions made for a reason other than separation from service, death or disability) ending on the Determination Date shall be included. This shall also apply to distributions under a terminated plan that, if it had not been terminated, would have been required to be included in an aggregation group. The account balances of a Participant who had once been a Key Employee, but who is not a Key Employee during the Plan Year, shall not be taken into account. The following plans must be aggregated with this Plan for the top heavy test: (a) a qualified plan maintained by the Employer (or the portion of the qualified plan attributable to the Employer) in which a Key Employee participated during this Plan Year or during the previous four Plan Years and (b) any other qualified plan maintained by the Employer (or the portion of the qualified plan attributable to the Employer) that enables this Plan or any plan described in clause (a) to meet the requirements of Code § 401(a)(4) or 410(b). The determination of the plans that must be aggregated for the top heavy test shall be made separately with respect to each Employer. The following plans may be aggregated with this Plan for the top heavy test: any qualified plan maintained by the Employer that, in combination with the Plan or any plan required to be aggregated with this Plan when testing this Plan for top-heaviness, would satisfy the requirements of Code §§ 401(a) and 410. If one or more of the plans required or permitted to be aggregated with this Plan is a defined benefit plan, a Participant's "account balance" shall equal the present value of his accrued benefit, including any distributions within five years of the Determination Date (or effective January 1, 2002, within one year of the Determination Date, for any distributions made by reason of separation from service, death, or disability). If the aggregation group includes more than one defined benefit plan, the same actuarial assumptions shall be used with respect to each such defined benefit plan. The foregoing top heavy ratio shall be computed in accordance with the provisions of Code § 416(g), together with the regulations and rulings thereunder. The determination of whether any portion of the Plan is a Top Heavy Plan shall be made by calculating the top heavy ratio for the portion of the Plan attributable to the Employer. For purposes of this Section, "Employer" shall mean a Participating Employer and its Related Group.

12.3 **Special Minimum Contribution.**

(a)     Notwithstanding anything in the Plan to the contrary, and subject to subsection (b), in every Plan Year during which the Plan is a Top Heavy Plan, a minimum allocation is required for each Non-Key Employee who both (i) performed one or more Hours of Service during the Plan Year as a Covered Employee after satisfying the Participation Requirements, and (ii) was an Employee on the last day of the Plan Year. This minimum allocation is required regardless of whether such Non-Key Employee received credit for 1,000 or more Hours of Service or made any required contributions to the Plan for such Plan Year. The minimum allocation shall be a percentage of such Non-Key Employee's Compensation. The percentage shall be the lesser of 3% or the largest percentage of any Key Employee's Compensation contributed to the Plan. For Non-Key Employees, this percentage takes into account all Employer Contributions and forfeitures, except for amounts used to restore the accounts of a missing Participant, allocated for the Plan Year; however, any Employer Matching Contributions used to satisfy the minimum allocation of this Section shall not be treated as Employer Matching Contributions for purposes of the ADP, ACP, and Multiple Use Tests, but shall be subject to the Code § 401(a)(4) discrimination test. Participant 401(k) Contributions of Non-Key Employees shall not be treated as Employer Contributions for purposes of providing the required minimum contribution. For Key Employees, the percentage takes into account all Employer Matching Contributions, Participant 401(k) Contributions, and forfeitures, except for amounts used to restore the Accounts of a missing Participant, allocated for the Plan Year. If this minimum allocation is not satisfied for any Non-Key Employee, the Employer shall contribute the additional amount needed to satisfy this requirement to such Non-Key Employee's Post-1986 Employer Matching Contribution Account. Each entity maintaining the Plan shall make the minimum contribution attributable to the Compensation it pays the Non-Key Employee, unless the entities maintaining the Plan enter into a separate written agreement allocating the responsibility for the minimum contribution in another manner.

(b)     The Employer also maintains the Coors Retirement Plan. Non-Key Employees who participate in this Plan shall receive the minimum contribution as specified in subsection (a). Non-Key Employees who participate in both that plan and this Plan shall receive a minimum allocation under this Plan. Their minimum allocation shall be calculated as in subsection (a), with one exception: the allocation shall be 5% of the Non-Key Employee's Compensation, and Compensation shall include Compensation earned (i) while such an Employee was a covered employee under either plan, and (ii) after such Employee had satisfied the eligibility requirements of either plan. Non-Key Employees who participate only in the Coors Retirement Plan shall accrue the minimum benefit in such plan.

12.4 **Change in Top Heavy Status.** If the Plan ceases to be a Top Heavy Plan, and if any change in the benefit structure, vesting schedule or other component of a Participant's accrued benefit shall occur as a result of such change in Top Heavy Plan status, the nonforfeitable percentage of each Participant's benefit attributable to Employer Contributions shall not be decreased as a result of such change. In addition, each Participant with at least three Years of Service with the Employer on the date of such change, may elect to have his nonforfeitable percentage computed under the Plan without regard to such change in status. The period during which the election may be made shall commence on the date the Plan ceases to be a Top Heavy Plan and shall end on the later of (a) 60 days after the change in status occurs, (b) 60 days after the change in status becomes effective, or (c) 60 days after the Participant is issued written notice of the change by the Employer or the Committee. The change in Top Heavy Plan status

shall not decrease the nonforfeitable percentage, measured as of the date the change in status is effective, of any Participant's, Beneficiary's, or Alternate Payee's Accounts.

*** End of Article XII ***

**ARTICLE XIII**
**MISCELLANEOUS**

13.1 <u>Right to Dismiss Employees - No Employment Contract</u>. The Employer may terminate the employment of any Employee as freely and with the same effect as if this Plan were not in existence. Participation in this Plan by an Employee shall not constitute an express or implied contract of employment between the Employer and the Employee.

13.2 <u>Claims Procedure For Claims Filed Before January 1, 2002</u>. The following claims procedure shall apply for all claims filed before January 1, 2002:

(a)  <u>Filing a Claim</u>. All applications and claims for benefits shall be filed in writing by the Participant, his Beneficiary, or the authorized representative of the claimant, by completing the procedures required by the Plan Administrator. The procedures shall be reasonable and may include the completion of forms and the submission of documents and additional information. For purposes of this Section, a request for a Plan loan or an in-service withdrawal shall be considered a claim.

(b)  <u>Review by Plan Administrator</u>. The Plan Administrator shall review all applications and claims for benefits and shall decide whether to approve or deny the claim. If a claim is denied in whole or in part, the Plan Administrator shall furnish written notice of denial to the claimant within ninety days after the Plan Administrator receives the Claim, unless special circumstances require an extension of time for processing the claim. If an extension is required, the Plan Administrator shall notify the claimant in writing before the end of the initial ninety-day period. The extension shall not exceed an additional ninety days. The notice of denial shall be written in a manner calculated to be understood by the claimant and shall include the following:

(i)  specific reasons for the denial;

(ii)  specific references to pertinent Plan provisions;

(iii)  a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such information is necessary; and

(iv)  appropriate information as to the steps the claimant should take if the claimant wishes to submit the denied claim for review.

(c)  <u>Appealing a Claims Denial</u>.

(i)  The following subsection applies to claims filed before September 15, 1996. If the claimant wishes a review of the denied claim, the claimant shall notify the Plan Administrator in writing within 60 days. The claimant may review pertinent documents and may submit issues or comments to the Plan Administrator in writing. If the claimant wishes a hearing, the claimant must include a request for a hearing in the notice to the Plan Administrator. The claimant may furnish the Plan Administrator with a written statement of his position.

(ii)  The following subsection applies to claims filed on or after September 15, 1996 and before January 1, 2002. If the claimant wishes a review of the denied claim, the claimant shall notify the Plan Administrator in writing within 60 days. The

claimant or the claimant's representative may review pertinent documents and may submit issues or comments to the Plan Administrator in writing. The claimant or the claimant's representative may furnish the Plan Administrator with a written statement of the claimant's position and with written materials in support of the claimant's position.

(d)   Review by Appeals Committee.

(i)   All reviews of denied claims shall be conducted by the Appeals Committee.

(ii)   The following subsection applies to claims filed before September 15, 1996. The Plan Administrator shall forward all requests for review of a denied claim together with all associated documents to the Chairman of the Appeals Committee promptly after receipt. The Appeals Committee shall make a decision on review within 60 days after the Plan Administrator receives the claimant's written request for review unless special circumstances, such as the claimant's request for a hearing, require additional time for review of the claim. If the Appeals Committee needs an extension of time to review the claim, it shall notify the claimant in writing before the end of the initial 60-day period. The extension shall not be longer than an additional 60 days. The Appeals Committee shall give the claimant written notice of its decision, written in a manner calculated to be understood by the claimant and shall include specific reasons for the decision as well as specific references to the pertinent plan provisions on which the decision is based. If the Appeals Committee does not make a decision within the time periods specified above, the claim shall be deemed denied.

(iii)   The following subsection applies to all claims filed on or after September 15, 1996 and before January 1, 2002. The Plan Administrator shall forward all requests for review of a denied claim together with all associated documents to the Chairman of the Appeals Committee promptly after receipt. The Appeals Committee shall make its decision solely on the basis of the written record, including documents and written materials submitted by the Plan Administrator and documents and written materials submitted by the claimant and/or the claimant's representative. The Appeals Committee shall make a decision on review within 60 days after the Plan Administrator receives the claimant's written request for review unless special circumstances require additional time for review of the claim. If the Appeals Committee needs an extension of time to review the claim, it shall notify the claimant in writing before the end of the initial 60-day period. The extension shall not be longer than an additional 60 days. The Appeals Committee shall give the claimant written notice of its decision, written in a manner calculated to be understood by the claimant and shall include specific reasons for the decision as well as specific references to the pertinent plan provisions on which the decision is based. If the Appeals Committee does not make a decision within the time periods specified above, the claim shall be deemed denied.

(e)   Discretion of Plan Administrator and Appeals Committee. The Plan Administrator and the Appeals Committee shall have full discretionary authority to consider claims filed under the Plan and to determine eligibility, status and rights of all individuals under the Plan and to construe any and all terms of the Plan.

(f)     Binding Arbitration. If, after the completion of the claims procedure set forth in the preceding paragraphs, the claimant wishes to further pursue the claim, the claim shall be submitted to, and determined through, binding arbitration in the metropolitan area in which the claimant's work place is located in accordance with the employment arbitration procedures of the American Arbitration Association ("AAA") existing at the time the arbitration is conducted, before a single arbitrator chosen in accordance with AAA procedures. The decision of the arbitrator shall be enforceable as a court judgment.

13.3 **Claims Procedure For Claims Filed On or After January 1, 2002.** The following claims procedure shall apply for all claims filed on or after January 1, 2002 except that, to the extent required by law and to the extent the Plan Administrator is ruling on a claim for disability benefits for a claim filed on or after January 1, 2002, the Plan will follow, with respect to that claim, claims procedures required by law for plans providing disability benefits:

(a)     Filing a Claim. All claims shall be filed in writing by the Participant, the Participant's Beneficiary, or the authorized representative of the claimant, by completing the procedures required by the Plan Administrator. The procedures shall be reasonable and may include the completion of forms and the submission of documents and additional information. For purposes of this Section, a request for a Plan loan or an in-service withdrawal shall be considered a claim.

(b)     Review by Plan Administrator. The Plan Administrator shall review all materials and shall decide whether to approve or deny the claim. If a claim is denied in whole or in part, the Plan Administrator shall provide written notice of denial to the claimant within a reasonable period of time no later than 90 days after the Plan Administrator receives the claim, unless special circumstances require an extension of time for processing the claim. If an extension is required, the Plan Administrator shall notify the claimant in writing before the end of the initial 90-day period and indicate the special circumstances requiring an extension of time and the date by which the Plan Administrator expects to render a decision on the claim. The extension shall not exceed an additional 90 days. The notice of denial shall be written in a manner calculated to be understood by the claimant and shall include the following:

(i)     specific reasons for the denial;

(ii)    specific references to pertinent Plan provisions;

(iii)   a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(iv)    appropriate information as to the steps the claimant should take if the claimant wishes to submit the denied claim for review, including any applicable time limits and including a statement of the claimant's right to bring a civil action under ERISA § 502(a) following a denied claim on review.

(c)     Appealing a Claims Denial. If the claimant wishes a review of the denied claim, the claimant shall notify the Plan Administrator in writing within 60 days of the claimant's receipt of notification of the denied claim. The claimant or the claimant's representative may review pertinent documents and may submit issues or comments to the Plan Administrator in writing. The claimant or the claimant's representative may provide the Plan Administrator with a written statement of the claimant's position and with written

materials in support of the claimant's position including documents, records and other information relating to the claim. The claimant or the claimant's representative may have, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim. A document, record, or other information shall be considered relevant to the claim if such document, record, or other information (i) was relied upon in making the benefit determination, (ii) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination, or (iii) demonstrates compliance with the administrative processes and safeguards designed to ensure and verify that benefit claim determinations are made in accordance with the Plan and that, where appropriate, the Plan provisions have been applied consistently with respect to similarly situated claimants.

(d)    Review by Appeals Committee.

(i)    All reviews of denied claims shall be conducted by the Appeals Committee.

(ii)    The Plan Administrator shall forward all requests for review of a denied claim together with all associated documents to the Chairman of the Appeals Committee promptly after receipt. The Appeals Committee shall make its decision solely on the basis of the written record, including documents and written materials submitted by the Plan Administrator and documents and written materials submitted by the claimant and/or the claimant's representative. The Appeals Committee shall make a decision on review within a reasonable period of time, not later than 60 days after the Plan Administrator receives the claimant's written request for review unless special circumstances require additional time for review of the claim. If the Appeals Committee needs an extension of time to review the claim, it shall notify the claimant in writing before the end of the initial 60-day period, and shall indicate the special circumstances requiring an extension of time and the date by which the Appeals Committee expects to render the determination on review. The extension shall not be longer than an additional 60 days. The decision on review will be written in a manner calculated to be understood by the claimant. If the claim is denied, the written notice shall include specific reasons for the decision as well as specific references to the pertinent Plan provisions on which the decision is based, and shall include a statement of the claimant's right to bring an action under ERISA § 502(a) (subject to the limitations described in (f), below) and a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits, with "relevant" defined as provided in the previous subsection (c).

(e)    Discretion of Plan Administrator and Appeals Committee. The Plan Administrator and the Appeals Committee shall have full discretionary authority to consider claims filed under the Plan and to determine eligibility, status and rights of all individuals under the Plan and to construe any and all terms of the Plan.

(f)    Binding Arbitration. If, after the completion of the claims procedure set forth in the preceding paragraphs, the claimant wishes to further pursue the claim, the claim shall be submitted to, and determined through, binding arbitration in the metropolitan area in which the claimant's work place is located in accordance with the employment arbitration procedures of the American Arbitration Association ("AAA") existing at the time the

arbitration is conducted, before a single arbitrator chosen in accordance with AAA procedures. The decision of the arbitrator shall be enforceable as a court judgment.

13.4 **Source of Benefits.** All benefits payable under the Plan shall be paid solely from the Trust, and the Employer assumes no liability or responsibility therefor.

13.5 **Exclusive Benefit of Employees.** Except as the Plan permits the return of Employer Contributions under circumstances specified in the Plan, it shall be impossible at any time prior to the satisfaction of all liabilities with respect to Participants, Alternate Payees, and their Beneficiaries, for any part of the Trust to be used for, or diverted to, purposes other than the exclusive benefit of Plan Participants, Beneficiaries, and Alternate Payees, except that payment of taxes and administrative expenses may be made from the Trust. The Trustee shall discharge its duties under this Plan solely in the interest of the Participants, Beneficiaries, and Alternate Payees and for the exclusive purpose of providing benefits to Participants, Beneficiaries and Alternate Payees and defraying reasonable expenses of administering the Plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, all in accordance with the provisions of this Plan insofar as they are consistent with the provisions of ERISA.

13.6 **Forms of Notices.** Wherever provision is made in the Plan for the filing of any notice, election, or designation by a Participant, Spouse, Alternate Payee, or Beneficiary, the action of the individual shall be effective if the Participant, Spouse, Alternate Payee, or Beneficiary complies fully with any applicable provisions of the Plan and any rules and procedures specified by the Committee from time to time.

13.7 **Merger, Consolidation, or Transfer.**

(a)     The Trustee may not consent to, or be a party to, any merger or consolidation with another plan, or to a transfer of assets or liabilities to another plan, unless immediately after the merger, consolidation, or transfer, the surviving plan provides each Participant with a benefit equal to or greater than the benefit each Participant would have received had the Plan terminated immediately before the merger, consolidation or transfer. The Trustee possesses the specific authority to enter into merger agreements or direct transfer of assets agreements with the trustees of plans described in Code § 401(a), including an elective transfer, and to accept the direct transfer of plan assets, or to transfer plan assets, as a party to any such agreement.

(b)     The Trustee may accept a direct transfer of plan assets on behalf of an Employee prior to the date the Employee becomes a Participant in accordance with the Participation Requirements. If the Trustee accepts a direct transfer of plan assets, the Plan Administrator and Trustee shall treat the Employee as a Participant for all purposes of the Plan except for purposes of sharing in Employer Contributions under the Plan until the Employee actually becomes a Participant in accordance with the Participation Requirements.

(c)     Code § 401(k) Transfer Rules. If the Plan receives a direct transfer (by merger or otherwise) of elective contributions (or amounts treated as elective contributions) from a plan with a cash or deferred arrangement, the distribution restrictions of Code §§ 401(k)(2) and (10) shall continue to apply to those transferred elective contributions.

13.8 **Inalienability of Benefits.** Except as provided in Section 7.2 relating to Plan loans and this Section, no Participant or Beneficiary shall have any right to assign, alienate, transfer, hypothecate,

encumber or anticipate the Participant's or Beneficiary's interest in any benefits under this Plan, nor shall such benefits be subject to any legal process to levy upon or attach the same for payment of any claim against any such Participant or Beneficiary.

Exception: QDROs.  This Section shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a Participant pursuant to a Domestic Relations Order, unless the Domestic Relations Order is a QDRO, in which case the Plan shall make payment of benefits in accordance with the applicable requirements of the QDRO.

Exception: Certain Judgments and Settlements.  This Section shall not apply to any offset of the Participant's Accounts in an amount equal to an amount that the Participant is ordered or required to pay to the Plan if:

    (i)    the order or requirement to pay arises

        (A)    under a judgment of conviction of a crime involving the Plan, or

        (B)    under a civil judgment, including a consent decree, entered by a court in an action brought in connection with a violation (or an alleged violation) of the fiduciary responsibility requirements of Title I of ERISA, or

        (C)    pursuant to a settlement agreement between the Secretary of Labor and the Participant in connection with a violation (or an alleged violation) of the fiduciary responsibility requirements of Title I of ERISA, and

    (ii)    the judgment, order, decree, or settlement agreement expressly provides for the offset of all or a part of the amount ordered or required to be paid to the Plan against the Participant's Account balance(s) under the Plan, and

    (iii)    the judgment, order, decree, or settlement agreement occurred after August 4, 1997.

13.9  **Qualified Domestic Relations Orders (QDROs)**.  In order to be a Qualified Domestic Relations Order, the Domestic Relations Order:

    (a)    must clearly specify the name and the last known mailing address of the Participant;

    (b)    must specify the name and mailing address of each Alternate Payee covered by the order;

    (c)    must specify either the amount or percentage of the Participant's benefits to be paid by the Plan to each such Alternate Payee, or the manner in which such amount or percentage is to be determined;

    (d)    must specify the number of payments or period to which such order applies;

    (e)    must specify each plan to which such order applies;

    (f)    may not require the Plan to provide any type or form of benefit, or any option, not otherwise provided under the Plan;

    (g)    may not require the Plan to provide increased benefits (determined on the basis of actuarial value); and

(h)    may not require the payment of benefits to an Alternate Payee if such benefits have already been designated to be paid to another Alternate Payee under another order previously determined to be a QDRO.

Procedures Effective Before January 1, 2000. The Committee shall establish reasonable procedures to determine the qualified status of Domestic Relations Orders and to administer distributions under QDROs. Such procedures shall be in writing and shall permit an Alternate Payee to designate a representative to receive copies of notices. When the Committee receives a Domestic Relations Order, it shall promptly notify the Participant and each Alternate Payee of such receipt and provide them with copies of the Plan's procedures for determining the qualified status of the order. Within a reasonable period after receipt of a Domestic Relations Order, the Committee shall determine whether such order is a QDRO and notify the Participant and each Alternate Payee of such determination. During any period in which the issue of whether a Domestic Relations Order is a QDRO is being determined (by the Committee, by a court of competent jurisdiction, or otherwise), the Committee shall separately account for the amounts payable to the Alternate Payee if the order is determined to be a QDRO. If the order (or modification thereof) is determined to be a QDRO within eighteen months after the date the first payment would have been required by such order, the Committee shall pay the amounts separately accounted for (plus any interest thereon) to the individual(s) entitled thereto. However, if the Committee determines that the order is not a QDRO, or if the issue as to whether such order is a QDRO has not been resolved within eighteen months after the date the first payment would have been required by such order, then the Committee shall pay the amounts separately accounted for (plus any interest thereon) to the individual(s) who would have been entitled to such amounts if there had been no order. Any determination that an order is a QDRO that is made after the close of the eighteen-month period shall be applied prospectively only. If the Plan's fiduciaries act in accordance with fiduciary provisions of ERISA in treating a Domestic Relations Order as being (or not being) a QDRO or in taking action in accordance with this Section, then the Plan's obligation to the Participant and each Alternate Payee shall be discharged to the extent of any payment made pursuant to the acts of such fiduciaries.

Procedures Effective On and After January 1, 2000. Upon receiving a Domestic Relations Order (either in draft form or approved by a court), the Plan Administrator promptly shall notify the Participant and any Alternate Payee named in the order of the receipt of the order and the Plan's procedures for determining the qualified status of the order. Upon receiving a Domestic Relations Order (either in draft form or approved by a court), the Plan Administrator shall place a hold on the Participant's Accounts which prohibits the Participant from receiving a distribution (either upon termination of employment or in-service) or from receiving the proceeds of a Plan loan. In addition, the Plan Administrator shall place a hold on the Participant's Accounts which prohibits the Participant from receiving a distribution (either upon termination of employment or in-service) or from receiving the proceeds of a Plan loan if a domestic relations court issues an order requesting such action. If the Domestic Relations Order being reviewed has not been approved by a court, the hold shall remain upon the Participant's Accounts for 120 days following the date the Plan Administrator responds to the submitting party with its comments. If a Domestic Relations Order that has been approved by a court is not received within the 120 day period following the Plan Administrator's response, the hold will be removed from the Participant's Accounts. If a Domestic Relations Order that has been approved by a court is received within the 120 day period, the hold will remain on the Participant's Accounts until the earlier of (i) the date the order is determined to be qualified and the Participant's Account is divided or (ii) 120 days following the date the Plan Administrator responds to the submitting party with its comments. Within a reasonable period of time after receiving the Domestic Relations Order, the Plan Administrator shall determine the qualified status of the order and shall notify the Participant and each alternate payee, in writing, of its determination. The Plan Administrator shall provide notice under this paragraph by mailing to the individual's address specified in the Domestic Relations Order, or in a manner consistent with Department of Labor regulations. If any portion of the Participant's Account is distributable during the period the Plan

Administrator is making its determination of the qualified status of the Domestic Relations Order (which has been approved by a court), the Plan Administrator shall make a separate accounting of the amounts distributable. If the Plan Administrator determines the order is a QDRO within 18 months following receipt of the Domestic Relations Order, the Plan Administrator shall direct the Trustee to distribute the Distributable Amounts in accordance with the Domestic Relations Order. If the Plan Administrator does not make its determination of the qualified status of the order within the 18 months following receipt of the order, the Plan Administrator shall direct the Trustee to distribute the Distributable Amounts in the manner the Plan would distribute if the Domestic Relations Order did not exist and shall apply the order prospectively if the Plan Administrator later determines the order is a QDRO. The Trustee shall make any distributions required under this Section by separate benefit checks or other separate distribution to the Alternate Payees.

Rights of Alternate Payee. The Alternate Payee shall have the following rights under the Plan:

(a)    Designation of Beneficiary. The Alternate Payee may designate Beneficiaries in the same manner as a Participant. However, any such Beneficiary designation shall be effective without the consent of the spouse of the Alternate Payee. In the absence of an effective Beneficiary designation, the Distributable Amount of the Alternate Payee's Accounts shall be paid to the Alternate Payee's surviving spouse; or if none, in equal shares to the Alternate Payee's surviving children and issue of deceased children by right of representation; or if none, in equal shares to each surviving parent of the Alternate Payee; or if none, to the Alternate Payee's estate.

(b)    Immediate Distribution Required. An Alternate Payee shall receive a distribution of the Alternate Payee's Accounts immediately after the Committee determines that the Domestic Relations Order is a QDRO and the Alternate Payee's Accounts are established, unless the QDRO requires crediting to the Alternate Payee of a future Annual Addition to this Plan, in which case the distribution shall occur immediately after all such future Annual Additions have been completed.

(c)    Lump Sum Distribution Option. An Alternate Payee may only receive a distribution in the form of a lump sum distribution of the Alternate Payee's entire interest in the Plan. An Alternate Payee may choose to receive the Alternate Payee's distribution in cash or in Stock, in the same manner as a Participant.

(d)    Distribution Upon Death of Alternate Payee. Upon the death of an Alternate Payee, the Alternate Payee's entire interest in the Plan shall be distributed in a lump sum distribution by the end of the calendar year containing the fifth anniversary of the Alternate Payee's death. The Alternative Payee's Beneficiary may choose to receive the Alternate Payee's distribution in cash or in Stock, in the same manner as a Participant's Beneficiary.

(e)    Investment Direction. The Alternate Payee may direct the investment of the Alternate Payee's interest in the Plan in the same manner as a Participant, after the Alternate Payee's Accounts have been established by the Trustee.

(f)    Claims Procedures. The claims procedures of the Plan shall apply to the Alternate Payee (or the Alternate Payee's Beneficiary) in the same manner as a Participant.

13.10    **Payments Due Minors or Incapacitated Individuals.** If any individual entitled to a payment under the Plan is a minor or a legally incompetent person, or in the sole judgment of the Committee, is unable to apply such payments to his own best interest, or, effective January 1, 2001, if the Committee determines that any such individual is incapacitated by reason of physical or mental disability,

whether or not legally adjudicated as incapacitated, the Committee may direct all or any portion of such payments to be made in any one or more of the following ways:

(a)    directly to such person;

(b)    to the individual's legal guardian or conservator; or

(c)    to the individual's spouse or any other person, to be expended for the individual's benefit.

The direction of the Committee will, in each case, be final and binding upon all persons and neither the Committee nor the funding agent shall be obliged to see to the proper application of any payment so made. Payments made pursuant to such direction shall operate as a complete discharge of the Trust, the Trustee and the Committee.

13.11    **Uniformity of Application.** The provisions of this Plan shall be applied in a uniform and non-discriminatory manner in accordance with rules adopted by the Committee which rules shall be systematically followed and consistently applied so that all individuals similarly situated shall be treated alike.

13.12    **Disposition of Unclaimed Payments.** Each Participant, Alternate Payee, or Beneficiary with an Account balance in this Plan must file with the Committee from time to time in writing his address, the address of each of his Beneficiaries (if applicable), and each change of address. Any communication, statement or notice addressed to such individual at his last address filed with the Committee (or if no address is filed with the Committee then at the individual's last address as shown on the Employer's records) will be binding on such individual for all purposes of the Plan. Neither the Committee nor the Trustee shall be required to search for or locate any missing individual. If the Committee notifies an individual that the individual is entitled to a distribution and also notifies the individual of the provisions of this Section, and the individual fails to claim the individual's benefits under the Plan or make his address known to the Committee within five calendar years after the notification, the benefits under the Plan of such individual shall be forfeited as of the end of the Plan Year coincident with or following the five-year waiting period. Any amount forfeited pursuant to this Section shall be allocated pursuant to Section 5.4. If the individual should later make a claim for the individual's forfeited benefit, the Employer shall make a special contribution to the Plan equal to the forfeiture, and such amount shall be distributed to the individual.

13.13    **Information to Participants and Beneficiaries.** Any Participant in the Plan or any Beneficiary may examine copies of the Plan description, latest annual report, any bargaining agreement, this Plan and Trust, and any contract or other instrument under which the Plan was established or is operated. The Plan Administrator shall maintain all of the items listed in this Section in the Plan Administrator's office, or in such other place or places as the Plan Administrator may designate from time to time, for examination during reasonable business hours. A Beneficiary's right to (and the Plan Administrator's or the Trustee's duty to provide the Beneficiary) information or data concerning the Plan shall not arise until the Beneficiary first becomes entitled to receive a benefit under the Plan. Upon the written request of a Participant or Beneficiary, the Plan Administrator shall provide a copy of any item listed in this Section. The Plan Administrator may make a reasonable charge to the requesting person for the copy so furnished. No Participant, other than a Participant acting as Plan Administrator, has the right to inspect the records reflecting the Accounts of any other Participant. The Plan Administrator, within the time prescribed by ERISA, shall provide to all Participants and Beneficiaries a summary description of any material amendment to the Plan, a notice of discontinuance of the Plan, and all other information required by ERISA to be provided without charge.

13.14 <u>Fiduciaries not Insurers</u>. The Trustee, the Plan Administrator, and the Employer in no way guarantee the Trust from loss or depreciation. The Employer does not guarantee the payment of any money which may be due or becomes due to any person from the Trust. The liability of the Plan Administrator and the Trustee to make any payment from the Trust at any time and all times shall be limited to the then available assets of the Trust.

13.15 <u>Waiver of Notice</u>. Any person entitled to notice under the Plan may waive the notice.

13.16 <u>Pronouns:  Gender and Number</u>. Unless the context clearly indicates otherwise, words in either gender shall include the other gender and the singular shall include the plural and vice versa.

13.17 <u>Applicable Law</u>. This Plan shall be construed and regulated by ERISA, the Code, and, except as otherwise provided herein and to the extent applicable, the laws of the State of Colorado except for any conflicts-of-laws provisions.

* * * End of Article XIII * * *

IN WITNESS WHEREOF, Adolph Coors Company has caused its duly authorized officer to execute the Plan as of the date set forth below.

**ADOLPH COORS COMPANY**
Plan Sponsor

By _Annета M. Menogaw_

Title: _Secretary_

Date: _February 26, 2002_

**FIRST AMENDMENT**
**TO THE**
**COORS SAVINGS AND INVESTMENT PLAN**
(As Amended and Restated Effective January 1, 1997)

1.     **Plan Sponsor**:  Adolph Coors Company (the "Corporation").

2.     **Amendment of Plan:**  Pursuant to the authority of the two most senior executive officers of Coors Brewing Company and the most senior Human Resources executive of Coors Brewing Company  and the provisions of Section 10.4 of the Coors Savings and Investment Plan (the "Plan"), the Plan is hereby amended to allow "catch-up deferrals" by participants who are age 50 and over, as provided in the Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA"), effective as provided in Paragraph 3:

A.  **Elective Deferral Catch-Up for Individuals Age 50 and Over. Section 3.1 of the Plan shall be amended by adding the following paragraph at the end of Section 3.1:**

Elective Deferral Catch-Up for Individuals Age 50 and Over.  Effective for pay dates after September 20, 2002, Participants who have attained age 50 or over before the end of the Plan Year shall be permitted to contribute an additional pre-tax contribution ("Catch-Up Deferral") in accordance with Code § 414(v) and not exceeding the limitation prescribed by Code § 414(v). The amount of the Catch-Up Deferral shall not be treated as a Participant 401(k) Contribution and shall not be treated as an Annual Addition.  The Catch-Up Deferral shall not be taken into account for purposes of the provisions of the Plan implementing the required limitations of Code §§ 402(g) and 415. The Plan shall not be treated as failing to satisfy the provisions of the Plan implementing the requirements of Code §§ 401(k)(3), 401(k)(11), 401(k)(12), 410(b) or 416, as applicable, by reason of such Catch-Up Deferral. The Employer shall contribute Employer Matching Contributions with respect to Catch-Up Deferrals, to the extent the Participant's 401(k) Contributions plus Catch-Up Deferral does not exceed the maximum deferrals or percentage of Compensation taken into account for purposes of the Employer Matching Contribution formula.

3.     **Effective Date:**  The Effective Date of this First Amendment to the Plan shall be as stated in paragraph A.

4.     **Terms and Conditions of Plan:**  Except for the above Amendment, all terms and conditions of the Plan are unamended and shall remain in full force and effect.

5.    **Execution:** The Plan Sponsor has executed this First Amendment as of the date set forth below.

**COORS BREWING COMPANY**
**Plan Sponsor**

By:_____

Title:_____

Date:  8-27-02

By:_____

Title:_____

Date:

By:_____

Title:  CHAIRMAN

Date:  8-29-02

SECOND AMENDMENT
TO THE
COORS SAVINGS AND INVESTMENT PLAN
(As Amended and Restated Effective January 1, 1997)

1.    **Plan Sponsor**:  Adolph Coors Company (the "Corporation")

2.    **Amendment of Plan**:  Pursuant to the authority of the two most senior executive officers of Coors Brewing Company and the most senior Human Resources executive of Coors Brewing Company and the provisions of Section 10.4 of the Coors Savings and Investment Plan (the "Plan"), the Plan is hereby amended to incorporate new required minimum distribution regulations, technical amendments to EGTRRA contained in the Job Creation and Worker Assistance Act of 2002, and subsequent U.S. Department of Treasury and Internal Revenue Service guidance, and to add the statute of limitations in the claims procedures, effective as provided in Paragraph 3. This amendment, combined with the First Amendment and the restated Plan document, is intended as good faith compliance with the requirements of EGTRRA and is to be construed in accordance with EGTRRA and guidance issued thereunder.

A.    **Minimum Required Distribution Regulations.**  **Section 6.6 of the Plan shall be amended by adding the following sentences to Section 6.6:**

Final regulations under Code § 401(a)(9) were issued on April 17, 2002 (the "Final 2002 Regulations"). The Plan shall apply the Final 2002 Regulations effective for distributions under the Plan made on or after January 1, 2003.

B.    **Deemed Code § 125 Compensation.**  **Sections 1.10(a), (b) and (c) of Plan shall be amended by inserting the following sentences:**

Effective January 1, 1998, pursuant to Rev. Rul. 2002-27, "125" shall include any amounts not available to a Participant in cash in lieu of group health coverage because the Participant is unable to certify that the Participant has other health coverage. An amount will be treated as an amount under Code § 125 only if the Employer does not request or collect information regarding the Participant's other health coverage as part of the enrollment process for the health plan.

C.    **Top Heavy Provisions – Five Year Period Reduced to One Year Period.**  **Section 12.2 of the Plan shall be amended by replacing the fourth sentence and the tenth sentence of Section 12.2 with the following sentences:**

For Plan Years beginning on or after January 1, 2002, for purposes of determining the account balance of any Participant, distributions made with respect to such Participant within a one-year period (or a five-year period with respect to distributions made for a reason other than severance from employment, death or disability) ending on the Determination Date shall be included.

If one of more of the plans required or permitted to be aggregated with this Plan is a defined benefit plan, a Participant's "account balance" shall equal the present value of his accrued benefit, including any distributions within five years of the Determination Date (or effective January 1, 2002, within one year of the Determination Date, for any distributions made by reason of severance from employment, death, or disability).

D.    <u>Statute of Limitations</u>. Section 13.3(f) of the Plan shall be amended by replacing the existing Section 13.3(f) with the following Section 13.3(f):

(f)    <u>Arbitration and Statute of Limitations.</u>  If, after the completion of the claims procedure set forth in the preceding paragraphs, the claimant wishes to further pursue the claim, the claim shall be submitted to, and determined through, binding arbitration in the metropolitan area in which the claimant's work place is located in accordance with the employment arbitration procedures of the American Arbitration Association ("AAA") existing at the time the arbitration is conducted, before a single arbitrator chosen in accordance with AAA procedures.  The decision of the arbitrator shall be enforceable as a court judgment. Effective for claims for which the Appeals Committee's final decision on review is received by the claimant on or after January 1, 2002, the claimant must submit the claim to binding arbitration within 365 days after the date the claimant receives the Appeals Committee's final decision on review, or the claim shall be forever barred and the Appeals Committee's decision on review will become permanent.

3.    <u>Effective Date:</u>  The Effective Dates of paragraphs A and B of this Second Amendment to the Plan shall be as stated in those paragraphs.  The Effective Date of all other paragraphs of this Second Amendment to the Plan shall be January 1, 2002.

4.    <u>Terms and Conditions of Plan</u>: Except for the above Amendment, all terms and conditions of the Plan are unamended and shall remain in full force and effect.

5.    <u>Execution</u>: The Plan Sponsor has executed this Second Amendment as of the date set forth below.

**ADOLPH COORS COMPANY**
Plan Sponsor

By: _____
    Peter H. Coors, Chairman

Date: _____

By: _____
    W. Leo Kiely, III, Chief Executive Officer

Date: _____

By: _____
    Mara E. Swan, Chief People Officer

Date: _____

**THIRD AMENDMENT**
**to the**
**COORS SAVINGS AND INVESTMENT PLAN**
(As Amended and Restated Effective January 1, 1997)

1.      **Plan Sponsor**:  Adolph Coors Company ("Plan Sponsor")

2.      **Amendment of Plan:**  Pursuant to the authority of the two most senior executive officers and the most senior Human Resources executive of Coors Brewing Company and the provisions of Section 10.4 of the Coors Savings and Investment Plan (the "Plan"), the following Amendments to the Plan are adopted, effective as provided in Paragraph 3.

A.      **Covered Employee.  Effective January 1, 1997, Section 1.11 of the Plan shall be corrected by replacing the existing Section 1.11 with the following Section 1.11:**

1.11 *Covered Employee* means any Employee of the Employer except for:

(a)     A non-resident alien who either (i) receives no earned income (within the meaning of Code § 911(d)(2)) from the Employer that constitutes income from sources within the United States (within the meaning of Code § 861(a)(3)) or (ii) receives earned income from the Employer that constitutes income from sources within the United States, but such income is exempt from United States income tax by an income tax treaty or convention;

(b)     An Employee included in a unit of Employees covered by a collective bargaining agreement, unless the collective bargaining agreement specifically provides for participation in the Plan by the Employees covered by the collective bargaining agreement;

(c)     An Employee who is a resident of Puerto Rico and has Puerto Rico source income; and

(d)     An Employee who is classified by the Employer as a seasonal employee at the Memphis, Tennessee plan.

B.      **Participating Employer.  Effective January 1, 2003, Coors Global Properties, Inc. shall be added as a Participating Employer in Section 1.38 of the Plan, with a period of participation commencing January 1, 2003.**

C.      **Rollover Contribution.  Effective January 1, 2002, Section 1.49 of the Plan shall be clarified by replacing the existing Section 1.49 with the following Section 1.49:**

1.49 *Rollover Contribution* means a contribution to the Plan by an Employee of a distribution from a qualified plan under Code § 402(c), a distribution from a qualified annuity plan under Code § 403(a)(4), or a distribution from an individual retirement account or annuity under Code § 408(d)(3)(A)(ii), excluding any distribution or portion of a distribution that includes after-tax contributions. The contribution may be a "direct rollover." A "direct rollover" is a voluntary, direct transfer of assets to this Plan, from another qualified retirement plan, that is nontaxable under Code §§ 402(c) and 401(a)(31).

**D.**     **Elective Deferrals.** Effective January 1, 2004, the second paragraph of Section 3.1 of the Plan shall be amended by replacing the second paragraph of Section 3.1 with the following second paragraph of Section 3.1:

> Plan Limits. A Participant's Participant 401(k) Contributions in a Plan Year shall not be less than 1% of the Participant's Compensation and shall not exceed 17% (22%, effective March 1, 1998) (50%, effective January 1, 2002). Effective January 1, 2004, a Participant may elect to contribute any percentage (that is not less than 1%) of the Participant's Compensation as the Participant 401(k) Contributions in a Plan Year; however the Participant's Participant 401(k) Contributions for a payroll period shall not exceed 100% of the Participant's Code § 415 Compensation after subtracting all voluntary and mandatory deductions and withholdings.

**E.**     **Required Minimum Distributions.** Effective January 1, 2004, Section 6.6 of the Plan shall be amended by adding the following paragraphs at the end of Section 6.6:

> 2002 Final Regulations. The following paragraphs shall apply instead of the preceding paragraphs of this Section 6.6 effective as of the Final Reg Effective Date (as defined in this Section) and shall take precedence over any inconsistent provisions of the Plan. All distributions required under this Section 6.6 will be determined and made in accordance with the Treasury regulations under Code § 401(a)(9). Notwithstanding the other provisions of this Section 6.6, distributions may be made under a designation before January 1, 1984, in accordance with § 242(b)(2) of the Tax Equity and Fiscal Responsibility Act ("TEFRA") and the provisions of the Plan that relate to TEFRA § 242(b)(2).

> Definitions. The following definitions apply to the determination of a Participant's minimum distribution on and after the Final Reg Effective Date.

(a)     *5 Year Rule* shall mean that the Participant's nonforfeitable accrued benefit will be distributed by December 31 of the calendar year that includes the 5th anniversary of the Participant's death.

(b)     *Designated Beneficiary* shall mean the individual who is designated as the Beneficiary under Section 1.7 of the Plan and is the designated beneficiary under Code § 401(a)(9) and Treas. Reg. § 1.401(a)(9)-1, Q&A-4.

(c)     *Distribution Calendar Year ("DCY")* shall mean a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first DCY is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date. For distributions beginning after the Participant's death, the first DCY is the calendar year in which distributions are required to begin. The required minimum distribution for the Participant's first DCY will be made on or before the Participant's Required Beginning Date. The required minimum distribution for other DCYs, including the required minimum distribution for the DCY in which the Participant's Required Beginning Date occurs, will be made on or before December 31 of that DCY.

(d)     *Final Reg Effective Date* shall mean January 1, 2003 for purposes of determining required minimum distributions under the provisions of the final Treasury regulations under Code § 401(a)(9) issued on April 17, 2002.

(e)     ***Life Expectancy*** shall mean life expectancy as computed by using the Single Life Table in Treas. Reg. § 1.401(a)(9)-9.

(f)     ***Participant's Account Balance*** shall mean the Participant's Account balance as of the last Valuation Date in the calendar year immediately preceding the DCY ("Valuation Calendar Year") increased by the amount of any contributions made and allocated or forfeitures allocated to the Participant's Account during the Valuation Calendar Year following the Valuation Date and decreased by distributions made in the Valuation Calendar Year following the Valuation Date. The Participant's Account Balance for the Valuation Calendar Year includes any amounts rolled over or transferred to the Plan either in the Valuation Calendar Year or in the DCY if distributed or transferred in the Valuation Calendar Year.

Time of Distribution. The Participant's nonforfeitable accrued benefit will be distributed, or begin to be distributed, no later than the Participant's Required Beginning Date. If a Participant dies before distributions begin, the Participant's nonforfeitable accrued benefit will be distributed, or begin to be distributed, no later than as follows:

(a)     If the Participant's spouse is the Participant's sole Designated Beneficiary, distributions to the spouse will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 70½, if later, unless the Participant or Designated Beneficiary elects the 5 Year Rule.

(b)     If the Participant's spouse is not the Participant's sole Designated Beneficiary, distributions to the Designated Beneficiary will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, unless the Participant or Designated Beneficiary elects the 5 Year Rule.

(c)     If there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's nonforfeitable accrued benefit will be distributed by December 31 of the calendar year that includes the 5th anniversary of the Participant's death.

(d)     If the Participant's spouse is the Participant's sole Designated Beneficiary, and the spouse dies after the Participant but before distributions to the spouse begin, distributions will be made as if the spouse were the Participant.

For purposes of determining when distributions begin, unless subparagraph (d) applies, distributions are considered to begin on the Participant's Required Beginning Date. If subparagraph (d) applies, distributions are considered to begin on the date distributions are required to begin to the spouse under subparagraph (a). If distributions under an annuity purchased from an insurance company irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's spouse before the date distributions are required to begin to the spouse), the date distributions are considered to begin is the date distributions actually commence.

Form of Distribution. Unless the Participant's nonforfeitable accrued benefit is distributed in the form of an annuity purchased from an insurance company or in a single sum on or before the Required Beginning Date, distributions will be made at least as rapidly

as the amounts required by the applicable paragraph below. If the Participant's nonforfeitable accrued benefit is distributed in the form of an annuity purchased from an insurance company, distributions will be made in accordance with the requirements of Code § 401(a)(9) and the Treasury regulations. If the Participant's employment has terminated at the time a distribution is required by this Section 6.6, the Participant or Beneficiary must receive a distribution in a form permitted by Section 6.4 that is at least equal to the amount required by this Section 6.6. If the Participant's employment has not terminated at the time a distribution is required by this Section 6.6, the Participant or Beneficiary must receive a distribution in a form permitted by Section 7.1 that is at least equal to the amount required by this Section 6.6. If Section 7.1 does not allow a distribution prior to the Participant's termination of employment or if Section 7.1 does not allow a distribution that is at least equal to the Participant's required minimum distribution, the Plan Administrator shall direct the Trustee to distribute only the minimum amount required to be distributed by this Section 6.6 to the employed Participant notwithstanding the provisions of Section 7.1.

Required Minimum Distributions During Participant's Lifetime. During the Participant's lifetime, the minimum amount that will be distributed for each DCY is the lesser of:

(a)     the amount determined by dividing the Participant's Account Balance by the distribution period in the Uniform Lifetime Table in Treas. Reg. § 1.401(a)(9)-9, using the Participant's age as of the Participant's birthday in the DCY; or

(b)     if the Participant's sole Designated Beneficiary for the DCY is the Participant's spouse, the amount determined by dividing the Participant's Account Balance by the number in the Joint and Last Survivor Table in Treas. Reg. § 1.401(a)(9)-9, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the DCY.

Required minimum distributions will be determined beginning with the first DCY and up to and including the DCY that includes the Participant's date of death.

Required Minimum Distributions After Participant's Death. After the Participant's death, the minimum amount will be determined based upon whether or not distributions began prior to death.

(a)     Death On or After Distributions Begin.

(1)     Participant Survived by Designated Beneficiary. If the Participant dies on or after the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each DCY after the year of the Participant's death is the amount determined by dividing the Participant's Account Balance by the longer of the remaining Life Expectancy of the Participant or of the remaining Life Expectancy of the Participant's Designated Beneficiary (using the oldest Designated Beneficiary, if the Participant has more than one Designated Beneficiary), determined as follows:

(A)     The Participant's remaining Life Expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(B)     If the Participant's spouse is the Participant's sole Designated Beneficiary, the remaining Life Expectancy of the spouse is calculated for each DCY after the year of the Participant's death using the spouse's age as of his or her birthday in that year. For DCYs after the year of the spouse's death, the remaining Life Expectancy of the spouse is calculated using the age of the spouse as of his or her birthday in the calendar year of the spouse's death reduced by one for each subsequent calendar year.

(C)     If the Participant's spouse is not the Participant's sole Designated Beneficiary, the Designated Beneficiary's remaining Life Expectancy is calculated using his or her age in the year following the year of the Participant's death, reduced by one for each subsequent year.

(2)     <u>No Designated Beneficiary</u>. If the Participant dies on or after the date distributions begin and there is no Designated Beneficiary as of September 30 of the year after the year of the Participant's death, the minimum amount that will be distributed for each DCY after the year of the Participant's death is the amount determined by dividing the Participant's Account Balance by the Participant's remaining Life Expectancy calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(b)     <u>Death Before Distributions Begin</u>.

(1)     <u>Participant Survived by Designated Beneficiary</u>. If the Participant dies before the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each DCY after the year of the Participant's death is the amount determined by dividing the Participant's Account Balance by the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as provided in subparagraph (a) above.

(2)     <u>No Designated Beneficiary</u>. If the Participant dies before the date distributions begin and there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's nonforfeitable accrued benefit will be completed by December 31 of the calendar year that includes the 5th anniversary of the Participant's death.

(3)     <u>Death of Spouse Before Distributions to Spouse Are Required to Begin</u>. If the Participant dies before the date distributions begin, the Participant's spouse is the Participant's sole Designated Beneficiary, and the spouse dies before distributions are required to begin to the spouse, this subparagraph (b) will apply as if the spouse were the Participant.

<u>5 Year Rule</u>. Participants or Beneficiaries may elect on an individual basis whether the 5 Year Rule or the life expectancy rule of the Plan applies to distributions after the death of a Participant who has a Designated Beneficiary. The election must be made no later than the earlier of

September 30 of the calendar year in which distribution would be required to begin, or by September 30 of the calendar year which contains the 5th anniversary of the Participant's (or, if applicable, spouse's) death. If neither the Participant nor the Beneficiary makes an election under this paragraph, distributions will be made as described above.

A Designated Beneficiary who is receiving payments under the 5 Year Rule may make a new election to receive payments under the life expectancy rule until December 31, 2003, provided that all amounts that would have been required to be distributed under the life expectancy rule for all DCYs before 2004 are distributed by the earlier of December 31, 2003, or the end of the 5 year period.

F.    <u>Loans</u>. **Effective January 1, 2002, Section 7.2 of the Plan shall be amended by replacing the existing Section 7.2 with the following Section 7.2:**

7.2   <u>Loans</u>. Participant loans shall be permitted under the Plan in accordance with this Section. The Committee may adopt additional guidelines for administering its Participant loan program, in the form of a loan policy. The Committee shall administer the Plan's loan program in accordance with any loan policy and the following rules:

<u>Availability</u>. Loans are available only to Employees (referred to in this Section as "Borrowers"). Loans shall be made on a reasonably equivalent basis to any eligible Borrower who has demonstrated to the satisfaction of the Committee that the Borrower intends to repay the loan and that the Borrower has sufficient income to repay the Borrower's loan, except that a loan shall not be available to an otherwise eligible individual if the individual either (1) has a Plan loan in default at the time the loan request is made or, effective January 1, 2004, has a loan in default under another plan maintained by the Employer at the time the loan request is made, or (2) is not receiving Compensation from the Employer at the time a loan request is made. Loans shall not be made available to Highly Compensated Employees in an amount greater than the amount made available to other Employees.

<u>Loan Amount</u>. The minimum loan amount for any single loan is $1,000. A Borrower may only have one outstanding loan at a time from this Plan. Refinancing of any outstanding loan shall not be permitted. The original principal amount of each loan shall be a whole dollar amount. The maximum outstanding indebtedness under this Plan shall not exceed 50 % of the aggregate balance in all the Borrower's Plan Accounts, excluding the PAYSOP Contribution Account and Pre-1987 Employer Matching Contribution Account, less any portion allocated to an Alternate Payee. The maximum total outstanding indebtedness of the Borrower under this Plan and all other plans maintained by the Employer is the lesser of:

(i)    $50,000, reduced by the excess (if any) of (A) the highest outstanding balance of loans to the Borrower from this Plan and all other plans maintained by the Employer during the one-year period ending on the day before such loan is made, over (B) the outstanding balance of loans to the Borrower from this Plan and all other plans maintained by the Employer on the date such loan is made; or

(ii)   one-half the values of the Borrower's Accounts under this Plan, excluding the PAYSOP Contribution Account and Pre-1987 Employer Matching Contributions Account, and under all other qualified plans maintained by the Employer, excluding amounts allocated to an Alternate Payee.

Rate of Interest. Effective before June 1, 2002, the rate of interest charged on a loan shall be the prime rate as reported in the *Wall Street Journal* on the first business day of the month in which the loan application is submitted to the Committee, plus 1%. Effective on and after June 1, 2002, the rate of interest charged on a loan shall be the prime rate listed on the Internet website http://www.bloomberg.com on the first business day of the month in which the loan application is submitted to the Committee, plus 1%.

Loan Term. The term of a loan may be 12, 24, 36, 48, or 60 months.

Repayment. All loans shall be repaid, with interest, in substantially level amortized payments made not less frequently than monthly. Loans shall be repaid through payroll withholding unless the Employee is pre-paying some or all of the Employee's loan, or the Employee is not receiving a paycheck (because, for example, the Employee is on an unpaid leave of absence or has incurred a Disability), in which case the pre-payment need not be through payroll withholding. Payment other than through payroll withholding must be made by certified check or cashier's check. Prepayment of a loan in full or in part may be made at any time without penalty.

Repayment Upon Termination of Employment. If a Borrower terminates employment for any reason (including death or retirement), the outstanding loan balance is due and payable upon the Borrower's termination of employment. Effective prior to January 1, 2002, the outstanding loan balance shall be in default, if the loan is not paid within 30 days of employment termination. Effective on and after January 1, 2002, the outstanding loan balance shall be in default upon the Borrower's termination of employment.

Loan Repayments During Unpaid Leave of Absence. If the Borrower begins an unpaid leave of absence, the Borrower may submit monthly loan payments to avoid the loan being in default. Effective January 1, 2002, upon the Borrower's request in writing, the Borrower's loan payments shall be suspended for 12 months following the date the Borrower begins an unpaid leave of absence, or until the date the Borrower returns to employment from the unpaid leave of absence, if earlier. The Borrower's loan repayments shall be reamortized and shall resume immediately upon the expiration of the suspension period. The loan shall not be in default if the unpaid balance of the loan, which shall include the interest accrued during the period of leave, is repaid in substantially level payments amortized at least quarterly over a period not longer than sixty months from the date of the original loan. After the expiration of the suspension period, the Borrower is required to submit monthly loan payments. If the Borrower returns to active employee status, payroll deductions for loan payments are reactivated.

Loan Repayments During Disability. If a Borrower qualifies for the Employer's long-term disability plan, he has the following options regarding the payments on his loan: (A) to have loan payments deducted from the Borrower's disability paychecks, to the extent permitted by the payor of the disability benefits; (B) to submit monthly payments; (C) to pay the entire loan balance; or (D) to request that the remaining loan balance be deducted from his 401(k) Contribution Account and Post-1986 Employer Matching Contribution Account.

Loan Repayments During Military Leave. If a Borrower takes a military leave within the meaning of Code § 414(u), the Borrower's loan payments shall be suspended during the period of the military leave. The Borrower's loan payments shall be reamortized and shall resume immediately upon the Borrower's return to employment with the Employer. The loan shall not be in default if the unpaid

balance of the loan, which shall include the interest accrued during the period of military leave, is repaid in substantially level payments amortized at least quarterly over a period not longer than the latest permissible term of the loan plus the period of military service. Notwithstanding the preceding sentence, the Borrower may elect to increase the installment payments to an amount that will repay the loan in full by the last day of the latest permissible term of the loan plus the period of military service or the Borrower may elect to make installment payments that are at least equal to the installment payments that were made immediately prior to the period of military service with a balloon payment at the end of the term. If the Borrower does not return to employment with the Employer following the period of military service within the time prescribed by Code § 414(u), the loan shall be in default on the day following the last day of the reemployment period.

Default. All loans shall be payable in full on the expiration of the "cure period," which is, effective prior to January 1, 2002, sixty days after a default unless the default is cured within those sixty days or effective on and after January 1, 2001, the calendar quarter following the calendar quarter in which the default occurs unless the default is cured prior to the last day of the calendar quarter following the calendar quarter in which the default occurs. A loan shall be considered to be in default upon the earliest of the following: (i) non-payment of a loan installment on its due date; (ii) effective on and after January 1, 2002, the Borrower's death; (iii) effective on and after January 1, 2002, the Borrower's separation from service, unless the Borrower is laid off, on an approved leave of absence, or has incurred a Disability, and (iv) if the Participant does not return to employment following a period of military service under Code § 414(u), the day following the last day of the reemployment period. If a default is not cured before the expiration of the cure period, the entire outstanding balance of the loan (determined as of the last day of the cure period) shall be treated as a deemed distribution and shall be taxable to the Borrower. The Committee may, in addition to all other remedies, apply the Borrower's Accounts toward payment of the loan; however, the Trustee may not exercise such right of set-off with respect to the 401(k) Contribution Account or Post-1986 Employer Matching Contribution Account until such accounts have become payable pursuant to Section 6.5.

Administration. A Borrower shall apply for a loan by submitting an application to the Committee specifying the amount of the loan, which must be in whole dollars. The loan shall be processed as quickly as administratively possible after the Committee has received the Borrower's application. The Committee may impose a loan application fee, loan origination fee, and loan maintenance fees. All loans shall be evidenced by a promissory note and shall be fully secured by the Borrower's Account pro rata. No Borrower whose Accounts are so pledged may obtain distribution of any portion of the Borrower's Accounts that has been pledged. The rights of the Trustee under such pledge shall have priority over all claims of the Borrower, the Borrower's Beneficiaries, and creditors. Loans shall be treated as a directed investment of the Borrower. The loan shall remain a part of the Trust, but, to the extent of the loan outstanding at any time, the Borrower's Account alone shall share in any interest paid on the loan, and it alone shall bear any expense or loss it incurs in connection with the loan. The Trustee may retain any principal or interest paid on the Borrower's loan in an interest bearing segregated investment Account on behalf of the Borrower until the Trustee deems it appropriate to add the amount paid to the Participant's Accounts under the Plan.

Other Federal Laws. The terms of any loan shall be modified, if necessary, to comply with any federal law (including, but not limited to, the Soldiers' and Sailors' Civil Relief Act, as amended, that limits the interest rate on loans to individuals in military service if the loan was made before the individual's entry into military service).

G.   <u>Arbitration</u>. **Effective January 1, 2003, Section 13.3(f) of the Plan shall be amended by replacing the existing Section 13.3(f) with the following Section 13.3(f):**

    (f)   <u>Binding Arbitration</u>. Effective January 1, 2003, this subsection (f) shall no longer apply. Effective prior to January 1, 2003, if, after the completion of the claims procedure set forth in the preceding paragraphs, the claimant wishes to further pursue the claim, the claim shall be submitted to, and determined through, binding arbitration in the metropolitan area in which the claimant's work place is located in accordance with the employment arbitration procedures of the American Arbitration Association ("AAA") existing at the time the arbitration is conducted, before a single arbitrator chosen in accordance with AAA procedures. The decision of the arbitrator shall be enforceable as a court judgment.

H.   <u>Statute of Limitations and Exhaustion of Remedies</u>. **Effective January 1, 2002, a new Section 13.3(g) shall be added to the Plan as follows:**

    (g)   <u>Statute of Limitations and Exhaustion of Remedies</u>. Effective for claims for which the Appeals Committee's final decision on review is received by the claimant on or after January 1, 2002, the claimant must file suit on the claim in a court of competent jurisdiction within 365 days after the claimant receives the Appeals Committee's final decision on review, or the claim shall be forever barred and the Appeals Committee's decision on review will become permanent. A claimant is required to exhaust the claims procedures under the Plan before bringing suit on any claim.

3.   <u>Effective Date</u>: The effective date of this Third Amendment shall be as stated in each paragraph.

5.   <u>Terms and Conditions of Plan</u>: Except for the above Amendment, all terms and conditions of the Plan are unamended and shall remain in full force and effect.

Coors Savings and Investment Plan          (901797)        12/5/2003        9

4.    **Execution:** The Plan Sponsor has executed this Third Amendment as of the date set forth below.

**ADOLPH COORS COMPANY**
**Plan Sponsor**

By: _____
W. Leo Kiely, III, Chief Executive Officer
Coors Brewing Company

Date: _____12/19/03_____

By: _____
Timothy V. Wolf, Chief Financial Officer
Coors Brewing Company

Date: _____12/19/03_____

By: _____
Mara E. Swan, Chief People Officer
Coors Brewing Company

Date: _____12-16-03_____

**FOURTH AMENDMENT**
**to the**
**COORS SAVINGS AND INVESTMENT PLAN**
(As Amended and Restated Effective January 1, 1997)

1.    **Plan Sponsor**:  Adolph Coors Company ("Plan Sponsor")

2.    **Amendment of Plan**:  Pursuant to the authority of the two most senior executive officers and the most senior Human Resources executive of Coors Brewing Company and the provisions of Section 10.4 of the Coors Savings and Investment Plan (the "Plan"), the following Amendments to the Plan are adopted, effective January 1, 2004.

A.    **Beneficiaries. Section 6.1 of the Plan shall be amended by replacing the existing Section 6.1 with the following Section 6.1:**

6.1 **Beneficiaries.**  Each Participant shall, in accordance with procedures designated by the Committee from time to time, designate the Beneficiaries and contingent Beneficiaries to whom the Distributable Amount shall be paid in the event of his death.  A Beneficiary designation may be changed by the Participant at any time and without the consent of any previously designated Beneficiary; however, if the Participant is married, his Spouse shall be the Beneficiary designated to receive the benefits payable under this Article VI unless his Spouse has consented to the designation of a different Beneficiary.  To be effective, the Spouse's consent must be in writing, witnessed by a notary public, filed with the Committee, and properly completed.  An election shall be effective only as to the Spouse who signed the election.  Effective February 28, 2002, if a Participant has designated the Participant's Spouse as the Participant's Beneficiary, and the Participant and this Spouse subsequently divorce, then for purposes of the Beneficiary designation, the Spouse shall be treated as having died on the day the divorce is final.  In the absence of an effective Beneficiary designation as to any portion of the Distributable Amount of the deceased Participant's Accounts, the amount shall be paid to the Participant's surviving Spouse; or if none, to the Participant's estate.  If a Beneficiary dies within 120 hours after the Participant died, the Beneficiary shall be treated as having pre-deceased the Participant; if a contingent Beneficiary dies within 120 hours after the primary Beneficiary died, the contingent Beneficiary shall be treated as having pre-deceased the primary Beneficiary.

B.    **Minimum Installment Payments. Section 6.4 of the Plan shall be amended by replacing paragraph (b) under "Distribution Options" with the following paragraph(b) and adding a new paragraph (c):**

(b)    monthly, quarterly, semi-annual, or annual installments (which need not be equal in amount) over a specified period.  Effective before January 1, 2004, the minimum installment payment is $25.  Effective on and after January 1, 2004, there is no minimum amount for an installment payment.  The

Committee may establish limits on the number of times per year that a Participant or Beneficiary may change the amount of his installment payments. An individual receiving installment payments may elect to receive a partial lump sum payment. Effective before January 1, 2004, the partial lump sum payment must be an amount not less than $100. The specified period may not exceed the joint life expectancy of the Participant and the Participant's Beneficiary, calculated according to the regulations issued under Code § 401(a)(9). The amount distributed each calendar year shall be at least the minimum amount required to be distributed pursuant to the regulations issued under Code § 401(a)(9).

(c)     a partial lump sum payment.

C.     **In-Service Withdrawals. Sections 7.1 of the Plan shall be amended by replacing subsections (a), (b), (c), (d), and (e) with the following:**

(a)     Savings and Investment Contribution Account. An Employee may withdraw all or any portion of the balance in the Employee's Savings and Investment Contribution Account at any time.

(b)     Pre-1987 Employer Matching Contribution Account. An Employee may withdraw all or any portion of the balance in the Employee's Pre-1987 Employer Matching Contribution Account at any time after the Employee has completed five full years of participation in the Plan.

(c)     Post-1986 Employer Matching Contribution Account. An Employee may withdraw all or any portion of the balance in the Employee's Post-1986 Employer Matching Contribution Account at any time after attaining age 59½.

(d)     401(k) Contribution Account. An Employee may withdraw all or any portion of the Employee's Participant 401(k) Contributions from the Employee's 401(k) Contribution Account at any time after attaining age 59½.

(e)     Rollover Contribution Account. An Employee may withdraw all or any portion of the balance in the Employee's Rollover Contribution Account at any time.

D.     **Loans. Section 7.2 of the Plan shall be amended by replacing the paragraphs entitled "Loan Repayments During Unpaid Leave of Absence" and "Loan Repayments During Disability" with the following:**

Loan Repayments During Unpaid Leave of Absence. If the Borrower begins an unpaid leave of absence, including a leave of absence during which the Borrower qualifies for payments from the Employer's long-term disability plan, the Borrower's loan payments shall be suspended until the earliest of

(1) the date that is 12 months following the date the Borrower begins an unpaid leave of absence, (2) the date the Borrower returns to employment from the unpaid leave of absence, and (3) the date that is sixty months from the date of the original loan. The Borrower's loan repayments shall be reamortized and shall resume immediately upon the expiration of the suspension period. The unpaid balance of the loan, including interest accrued during the period of the leave, shall be reamortized to require substantially level payments at least quarterly over a period equal to the original period of the loan plus the period of the suspension; however, the end of the reamortization period shall not be later than the date that is sixty months from the date of the original loan. After the expiration of the suspension period, the Borrower is required to submit monthly loan payments pursuant to the reamortization schedule. If the Borrower returns to active employee status, payroll deductions for loan payments shall be reactivated.

E.    **Amendment Authority.** **Section 10.4 of the Plan shall be amended by replacing the existing Section 10.4 with the following Section 10.4:**

10.4 **Amendment by the Plan Sponsor.** The Plan Sponsor may at any time amend the Plan in any respect, subject to Section 10.5, but no amendment shall be made that would have the effect of vesting in the Employer any part of the Trust or of diverting any part of the Trust to purposes other than for the exclusive benefit of Participants, Alternate Payees, or their Beneficiaries, and the rights of any Participant, Alternate Payee, or Beneficiary with respect to contributions previously made shall not be adversely affected by any amendment. The two most senior executive officers of Coors Brewing Company and the most senior Human Resources executive of Coors Brewing Company shall jointly have the authority to amend the Plan upon the unanimous action of the three designated officers if: (a) the amendment does not result in a significant cost to an Employer, (b) the amendment does not have a material effect on the benefits provided under the Plan, (c) the amendment effects either a technical or administrative change to the Plan, or (d) the amendment is recommended by counsel as necessary or desirable to comply with applicable law. All other amendments must be approved by the Board of Directors of the Plan Sponsor and signed by an officer of the Plan Sponsor or of Coors Brewing Company. Upon any amendment of the Plan, the Plan Sponsor shall furnish a copy of the amendment to each Participating Employer.

3.    **Terms and Conditions of Plan:** Except for the above Fourth Amendment, all terms and conditions of the Plan are unamended and shall remain in full force and effect.

    4.    **Execution:** The Plan Sponsor has executed this Fourth Amendment as of the date set forth below.

**ADOLPH COORS COMPANY**
**Plan Sponsor**

By: _____

       W. Leo Kiely, III, Chief Executive Officer
       Coors Brewing Company

Date: _____9/23/04_____

By: _____

       Timothy V. Wolf, Chief Financial Officer
       Coors Brewing Company

Date: _____9/12/04_____

By: _____

       Mara E. Swan, Chief People Officer
       Coors Brewing Company

Date: _____September 9, 2004_____

# FIFTH AMENDMENT

## COORS SAVINGS AND INVESTMENT PLAN

1. **Plan Sponsor:** Adolph Coors Company (the "Company").

2. **Amendment of Plan:** Pursuant to Section 10.4 of the Coors Savings and Investment Plan (the "Plan"), the Company hereby adopts the following amendments to the Plan.

   A. Section 1.6 of the Plan is deleted and "[Reserved.]" is inserted in lieu thereof.

   B. Section 1.9 of the Plan is amended by deleting the existing Section 1.9 and inserting in lieu thereof the following:

   > "1.9  *Committee* means the U.S. Pension Committee."

   C. Section 1.42 of the Plan is amended by deleting the existing Section 1.42 and inserting in lieu thereof the following:

   > "1.42  *Plan Administrator* means the Committee or such other person or committee as may be appointed by the Plan Sponsor."

   D. Article VIII of the Plan is amended by deleting the existing Article VIII and inserting in lieu thereof the following:

### "ARTICLE VIII
### ADMINISTRATION

8.1  **Plan Administrator.** The Plan will be administered by the Plan Administrator, which will be a "named fiduciary" for purposes of § 402(a)(1) of ERISA with full discretionary authority to control and manage the operation and administration of the Plan, and will be responsible for complying with all of the reporting and disclosure requirements of Part 1 of Subtitle B of Title I of ERISA. The Plan Administrator shall have full discretion and authority to exercise such powers as may be necessary to discharge its duties under the Plan, including, but not by way of limitation, the following the authority:

(a)  To make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan;

(b)  To construe and interpret the Plan and any rules or regulations relating to the administration of the Plan;

(c)    To decide all questions concerning the Plan and the eligibility of any person to participate in the Plan;

(d)    To compute the amounts to be distributed under the Plan, to determine the person or persons to whom such amounts will be distributed, to determine the manner and time of any distribution, and to authorize the payment of distributions;

(e)    To keep such records and submit such filings, elections, applications, returns or other documents or forms as may be required under the Code or under other federal, state or local law and regulations;

(f)    To appoint, remove or replace investment managers at any time and for any reason and to take such actions as it deems appropriate to monitor the performance of such persons;

(g)    To review all matters relating to investment policy, asset allocation, investment guidelines and monitoring procedures;

(h)    To decide all claims and appeals relating to benefits under the Plan;

(i)    To delegate its ministerial duties and responsibilities to such agents, counsel, accountants and consultants as may be required or desired to assist in administering the Plan; and

(j)    To allocate or delegate by written instrument its fiduciary responsibilities in accordance with § 405 of ERISA.

8.2    **Effect of Interpretation or Determination.** Any interpretation of the Plan or other determination with respect to the Plan by the Plan Administrator shall be final and conclusive on all persons.

8.3    **Reliance on Tables, Etc.** In administering the Plan, the Plan Administrator will be entitled to the extent permitted by law to rely conclusively on all tables, valuations, certificates, opinions and reports which are furnished by an actuary, accountant, trustee, counsel or other expert who is employed or engaged by the Plan Administrator.

8.4    **Payment of Plan Expenses.** The Plan Administrator may direct the Trustee to pay from the Trust Fund any and all expenses of administering the Plan, to the extent such expenses are reasonable. The Plan Administrator will determine in its sole discretion what constitutes a reasonable expense of administering the Plan, and whether such expenses shall be paid from the Trust Fund. Any such expenses not paid from the Trust Fund shall be paid by the Employer as determined by the Plan Administrator; provided, however, that to the extent permitted by ERISA, the Plan Administrator may direct the Trustee to

reimburse the Employer from the Trust Fund for a reasonable expense of administering the Plan which is paid by the Employer prior to a determination with respect to such expense.

8.5  **Authority to Correct Operational Defects.**  The Plan Administrator shall have the authority to correct any "operational defect" in any manner or by any method it deems appropriate in its sole discretion in order to cause the Plan (a) to operate in accordance with its terms, or (b) to maintain its tax-qualified status under the Code.  For purposes of the preceding sentence, an "operational defect" is any operational or administrative action (or inaction) in connection with the Plan which, in the judgment of the Plan Administrator, fails to conform with the terms of the Plan or causes or could cause the Plan to lose its tax-qualified status under the Code.

8.6  **Indemnification.**  The Plan Sponsor shall indemnify and defend to the fullest extent permitted by law any person currently or formerly serving as Plan Administrator and any current or former member of the Committee and any current or former employee of the Plan Sponsor who has assisted the Plan Administrator against all liabilities, damages, costs and expenses (including attorneys' fees and amounts paid in settlement of any claims approved by the Plan Sponsor) occasioned by any act or omission to act in connection with the performance of duties hereunder, if such act or omission is in good faith.

8.7  **Agent for Process.**  The Chair of the Committee shall be agent of the Plan for service of all process.

* * * End of Article VIII * * * "

E.    Section 10.4 of the Plan is amended by deleting the existing Section 10.4 and inserting in lieu thereof the following:

"10.4  **Amendments.**  The Plan Sponsor or its authorized delegate may at any time amend the Plan in any respect, subject to Section 10.5, but except as permitted or required by law, regulation or other applicable guidance, no amendment shall be made that would have the effect of vesting in the Plan Sponsor or any Participating Employer any part of the Trust Fund or of diverting any part of the Trust Fund to purposes other than for the exclusive benefit of Participants and their beneficiaries, or that would reduce a Participant's accrued benefit to the extent such reduction would be prohibited by Code § 411(d)(6). The two most senior executive officers of Coors Brewing Company and the most senior Human Resources executive of Coors Brewing Company shall jointly have the authority to amend the Plan upon the unanimous action of the three designated officers if (a) the amendment does not result in a significant financial impact to an Employer, (b) the amendment effects either a technical or administrative change to the Plan, or (c) the amendment is recommended by counsel as necessary or desirable to comply with applicable law. All other amendments must be approved

Case 1:05-cv-00604-GMS    Document 45-7    Filed 05/31/2006    Page 39 of 42

by the Plan Sponsor or its authorized delegate and signed by an officer of the Plan Sponsor or of Coors Brewing Company."

F.    Section 13.2 of the Plan is amended by deleting the existing Section 13.2 and inserting in lieu thereof the following:

"13.2   **Claims Procedure for Claims Filed Before July 1, 2004.** Any claim filed before July 1, 2004 shall be decided in accordance with the claims procedure in effect under the Plan at the time the claim was filed."

G.    Section 13.3 of the Plan is amended by deleting the existing Section 13.3 and inserting in lieu thereof the following:

"13.3   **Claims Procedure for Claims Filed On or After July 1, 2004.** All claims filed on or after July 1, 2004 shall be decided in accordance with the claims procedure set forth in this subsection 13.3, except that, to the extent the claim relates to disability benefits, the claim will be decided in accordance with such claims procedures as may be required by law for plans providing disability benefits.

(a)    Filing a Claim.   All applications and claims for benefits shall be filed in writing with the Plan Administrator or its delegate.

(b)    Review of Claim.   The Plan Administrator or its delegate shall review all applications and claims for benefits and shall decide whether to approve or deny the claim in whole or in part. If a claim is denied in whole or in part, the Plan Administrator or its delegate shall furnish written notice of denial to the claimant within a reasonable period of time no later than 90 days after receiving the claim, unless special circumstances require an extension of time for processing the claim. If an extension is required, the Plan Administrator or its delegate shall notify the claimant in writing before the end of the initial 90 day period and indicate the special circumstances requiring an extension of time and the date by which the Plan Administrator or its delegate expects to render a decision on the claim. The extension shall not exceed an additional 90 days. The notice of denial shall be written in a manner calculated to be understood by the claimant and shall include the following:

(i)     specific reasons for the denial;

(ii)    specific references to pertinent Plan provisions;

(iii)   a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such information is necessary; and

(iv)    appropriate information as to the steps the claimant should take if the claimant wishes to submit the denied claim for review, including any applicable time limits and a statement of the claimant's right to bring a civil action under § 502(a) of ERISA following a denied claim on review.

(c)    <u>Appealing a Claims Denial</u>.  If the claimant wishes to seek a review of the denied claim, the claimant shall notify the Plan Administrator in writing within 60 days of the claimant's receipt of notification of the denied claim. The claimant or the claimant's representative may review pertinent Plan documents and may submit issues or comments to the Plan Administrator in writing.  The claimant or the claimant's representative may provide the Plan Administrator with a written statement of his position and with a written statement in support of the claimant's position, including document, records and other information relating to the claim.  The claimant or claimant's representative may have, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim.  A document, record or other information shall be considered relevant to the claim if such document, record or other information (i) was relied upon in making the benefit determination, (ii) was submitted, considered or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination, or (iii) demonstrates compliance with the administrative processes and safeguards designed to ensure and verify that benefit claim determinations are made in accordance with the Plan and that, where appropriate, the Plan provisions have been consistently applied with respect to similarly situated claimants.

(d)    <u>Review of Appeal</u>.  The Plan Administrator shall review all appeals relating to any denial of a claim for benefits, and shall make its decision on review solely on the basis of the written record, including documents and written materials submitted by the claimant and/or the claimant's representative.  The Plan Administrator shall make a decision on review within a reasonable period of time, not later than 60 days after receiving the claimant's written request for review unless special circumstances require additional time for review of the claim.  If the Plan Administrator needs an extension of time to review the claim, it shall notify the claimant in writing before the end of the initial 60 day period, and shall indicate the special circumstances requiring an extension of time and the date by which it expects to render the determination on review.  The extension shall not be longer than an additional 60 days.  Notwithstanding the foregoing, if the Plan Administrator is a committee that holds regularly scheduled meetings on a quarterly or more frequent basis, the Plan Administrator may make its decision on review at its next regularly scheduled meeting (if the Plan Administrator receives the written request

for review more than 30 days prior to its next regularly scheduled meeting) or at the regularly scheduled meeting immediately following the next regularly scheduled meeting (if the Plan Administrator receives the written request for review within 30 days prior to the next regularly scheduled meeting). If special circumstances require an extension, the decision may be postponed to the third regularly scheduled meeting following the Plan Administrator's receipt of the written request for review if, prior to the expiration of the initial time period for review, the claimant is provided with written notice indicting the special circumstances requiring an extension and the date by which the Plan Administrator expects to render a decision. If the extension is required because the claimant has not provided information that is necessary to decide the claim, the Plan Administrator may toll the review period from the date on which notice of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information.

The decision on review will be written in a manner calculated to be understood by the claimant. If the claim is denied, the written notice shall include specific reasons for the decision as well as specific references to the pertinent Plan provisions on which the decision is based, a statement of the claimant's right to bring a civil action under § 502(a) of ERISA, and a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits. A document, record or other information shall be considered relevant to the claim if such document, record or other information (i) was relied upon in making the benefit determination, (ii) was submitted, considered or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination, or (iii) demonstrates compliance with the administrative processes and safeguards designed to ensure and verify that benefit claim determinations are made in accordance with the Plan and that, where appropriate, the Plan provisions have been consistently applied with respect to similarly situated claimants."

     H.    Section 13.11 of the Plan is deleted and "[Reserved.]" is inserted in lieu thereof.

3.    **Effective Date:** The effective date of this Fifth Amendment shall be July 1, 2004.

4.    **Terms and Conditions of Plan:** Except for the amendments set forth herein, all terms and conditions of the Plan are unamended and shall remain in full force and effect.

5.    **Execution:** Pursuant to the amendment authority delegated by the Company to the Global Pension Governance Committee, the undersigned has executed this Fifth Amendment as of the date set forth below.

**ADOLPH COORS COMPANY**

By: _Annita M. Menogue_

Title: _Secretary_

Date: _12/17/2004_