# EXHIBIT 11



# FORM 10-K

## MOLSON COORS BREWING CO – TAP

Filed: March 10, 2006 (period: December 25, 2005)

Annual report which provides a comprehensive overview of the company for the past year

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Fiscal year ended December 25, 2005

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to         .

Commission file number 1-14829

# MOLSON COORS BREWING COMPANY
(Exact name of registrant as specified in its charter)

| DELAWARE | 84-0178360 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1225 17th Street, Denver, Colorado | 80202 |
| 1555 Notre Dame Street East, Montréal, Québec, Canada | H2L 2R5 |
| (Address of principal executive offices) | (Zip Code) |

303-279-6565 (Colorado)
514-521-1786 (Québec)
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Class A Common Stock (voting), $0.01 par value | New York Stock Exchange<br>Toronto Stock Exchange |
| Class B Common Stock (non-voting), $0.01 par value | New York Stock Exchange<br>Toronto Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

**Title of class**
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☒ NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. YES ☐ NO ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☒ NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer ☒, an accelerated filer ☐, or a non-accelerated filer ☐ (check one). See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). ☐ Yes ☒ No

The aggregate market value of the registrant's publicly-traded stock held by non-affiliates of the registrant at the close of business on June 26, 2005, was $4,075,391,702 based upon the last sales price reported for such date on the New York Stock Exchange. For purposes of this disclosure, shares of common and exchangeable stock held by persons holding more than 5% of the outstanding shares of stock and shares owned by officers and directors of the registrant as of June 26, 2005 are excluded in that such persons may be deemed to be affiliates. This determination is not necessarily conclusive of affiliate status.

The number of shares outstanding of each of the registrant's classes of common stock, as of February 28, 2006:
Class A Common Stock—1,364,867 shares
Class B Common Stock—62,412,173 shares

*Exchangeable shares:*

As of February 28, 2006, the following number of exchangeable shares was outstanding for Molson Coors Canada, Inc.:
Class A Exchangeable Shares—1,839,140
Class B Exchangeable Shares—20,051,909

In addition, the registrant has outstanding one share of special Class A voting stock, through which the holders of Class A Exchangeable shares and Class B exchangeable shares of Molson Coors Canada Inc. (a subsidiary of the registrant), respectively, may exercise their voting rights with respect to the registrant. The special Class A and Class B voting stock are entitled to one vote for each of the exchangeable shares, excluding shares held by the registrant or its subsidiaries, and generally vote together with the Class A common stock and Class B common stock, respectively, on all matters on which the Class A common stock and class B common stock are entitled to vote. The trustee holder of the special class A voting stock and the special Class B voting stock has the right to cast a number of votes equal to the number of then outstanding Class A exchangeable shares and Class B exchangeable shares, respectively.

Documents Incorporated by Reference: Portions of the registrant's definitive proxy statement for the registrant's 2006 annual meeting of stockholders are incorporated by reference under Part III of this Annual Report on Form 10-K.

# MOLSON COORS BREWING COMPANY AND SUBSIDIARIES
# INDEX

|  |  | Page(s) |
|---|---|---|
| **PART I.** | | 3 |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 13 |
| Item 1B. | Unresolved Staff Comments | 17 |
| Item 2. | Properties | 17 |
| Item 3. | Legal Proceedings | 18 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 19 |
| **PART II.** | | 19 |
| Item 5. | Market for the Registrant's Common Equity and Issuer Purchases of Equity Securities | 19 |
| Item 6. | Selected Financial Data | 21 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 22 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 46 |
| Item 8. | Financial Statements and Supplementary Data | 49 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 108 |
| Item 9A. | Controls and Procedures | 108 |
| Item 9B. | Other Information | 110 |
| **PART III.** | | 110 |
| Item 10. | Directors and Executive Officers of the Registrant | 110 |
| Item 11. | Executive Compensation | 110 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 110 |
| Item 13. | Certain Relationships and Related Transactions | 111 |
| Item 14. | Principal Accounting Fees and Services | 111 |
| **PART IV.** | | 111 |
| Item 15. | Exhibits and Financial Statement Schedules | 111 |
| Signatures | | 116 |

# PART I

**ITEM 1. Business**

On February 9, 2005, Adolph Coors Company merged with Molson Inc. (the Merger). In connection with the Merger, Adolph Coors Company became the parent of the merged company and changed its name to Molson Coors Brewing Company. Unless otherwise noted in this report, any description of us includes Molson Coors Brewing Company (MCBC) (formerly Adolph Coors Company), principally a holding company, and its operating subsidiaries: Coors Brewing Company (CBC), operating in the United States (US); Coors Brewers Limited (CBL), operating in the United Kingdom (UK); Molson Inc. (Molson), operating in Canada; Cervejarias Kaiser S.A. (Kaiser), operated in Brazil and presented as a discontinued operation in this report; and our other corporate entities. Any reference to "Coors" means the Adolph Coors Company prior to the Merger. Any reference to Molson Inc. means Molson prior to the Merger. Any reference to "Molson Coors" means MCBC, after the Merger.

Unless otherwise indicated, information in this report is presented in US Dollars (US $).

(a) **General Development of Business**

Molson was founded in 1786 and Coors was founded in 1873. Since each company was founded, they have been committed to producing the highest-quality beers. Our brands are designed to appeal to a wide range of consumer tastes, styles and price preferences. Until Coors' acquisition of CBL in February 2002, and Molson Inc.'s acquisition of Kaiser in March 2002, we operated and sold our beverages predominately in North America and in a few international markets. As a result of the Merger, we became the fifth-largest brewer by volume in the world.

*The Merger*

The Merger was effected by the exchange of Coors stock for Molson stock in a transaction that was valued at approximately $3.6 billion. Coors is considered the acquirer for accounting purposes, although the transaction was viewed as a merger of equals by the two companies. The transaction is discussed in Note 2 to the accompanying Consolidated Financial Statements in Item 8 on page 76.

*Sale of Kaiser—Event Subsequent to Balance Sheet Date*

On January 13, 2006, we sold a 68% equity interest in Kaiser to FEMSA Cerveza S.A. de C.V. (FEMSA). Kaiser is the third largest brewer in Brazil. Kaiser's key brands include Kaiser Pilsen®, and Bavaria®. We have retained a 15% ownership interest in the operations, which will be reflected as a cost method investment for accounting purposes. Our financial statements accompanying this report present Kaiser as a discontinued operation.

*Joint Ventures and Other Arrangements*

To focus on our core competencies in manufacturing, marketing and selling malt beverage products, we have entered into joint venture arrangements with third parties over the past decade to leverage their strengths in areas like can and bottle manufacturing, transportation, distribution, packaging, engineering, energy production and information technology. Additionally, before the Merger, Coors and Molson participated in joint ventures to market Coors products in Canada (Molson Coors Canada), and Molson Inc. products in the United States (Molson USA).

(b) **Financial Information About Segments**

Our reporting segments have been realigned as a result of the Merger. We have three operating segments: United States, Canada and Europe. Prior to being segregated and reported as a discontinued operation, and subsequent to the Merger in 2005, Brazil was a segment. A separate operating team manages each segment, and each segment consists of manufacturing, marketing and sale of beer and other beverage products.

See Note 6 in Item 8, Financial Statements and Supplementary Data on page 84, for financial information relating to our segments and operations, including geographic information.

(c)  **Narrative Description of Business**

*Some of the following statements may describe our expectations regarding future products and business plans, financial results, performance and events. Actual results may differ materially from any such forward-looking statements. Please see Cautionary Statement Pursuant to Safe Harbor Provisions of the Private Securities Litigation Reform Act of 1995 on page 14, for some of the factors that may negatively impact our performance. The following statements are made, expressly subject to those and other risk factors.*

*Our Products*

Brands sold primarily in the United States include: Coors Light®, Coors®, Coors® Non-Alcoholic, Extra Gold®, Zima XXX®, Aspen Edge™, George Killian's® Irish Red™ Lager, Keystone®, Keystone Light®, Keystone Ice®, and Blue Moon™ Belgian White Ale. We also sell the Molson family of brands in the United States.

Brands sold primarily in Canada include Molson Canadian®, Coors Light, Molson Dry®, Molson Export®, Creemore Springs®, Rickard's Red Ale®, Carling® and Pilsner®. We also brew or distribute under license the following brands: Amstel Light® under license from Amstel Brouwerij B.V., Heineken® and Murphy's® under license from Heineken Brouwerijen B.V., Asahi® and Asahi Select® under license from Asahi Beer USA Inc., and Asahi Breweries, Ltd., Corona® under license from Cerveceria Modelo S.A. De C.V. and Canacermex, Inc., Miller Lite®, Miller Genuine Draft®, Milwaukee's Best® and Milwaukee's Best Dry® under license from Miller Brewing Company, and Foster's® and Foster's Special Bitter® under license from Carlton & United Beverages Limited.

Brands sold primarily in the United Kingdom include: Carling®, Coors Fine Light Beer®, Worthington's®, Caffrey's®, Reef®, Screamers™ and Stones®. We also sell Grolsch® in the United Kingdom through a joint venture. We also sell factored brands in our UK segment.

We sold approximately 56% of our 2005 reported volume in the United States segment, 18% in the Canada segment and 26% in the Europe segment. In 2005, our largest brands accounted for the following percentage of total consolidated volume: Coors Light accounted for approximately 39% of reported volume, Carling for approximately 17%, and Molson Canadian for approximately 4%.

Our sales volume from continuing operations totaled 40.4 million barrels in 2005 and 32.7 million barrels in both 2004 and 2003. Brazil volume was 5.5 million barrels in 2005. The barrel sales figures for periods prior to our Merger on February 9, 2005, do not include barrel sales of our products sold in Canada or the United States through the Molson Coors Canada or Molson USA joint ventures. An additional 1.6 and 1.5 million barrels of beer were sold by Molson Coors Canada in 2004 and 2003, respectively. Our Molson USA venture sold 0.8 and 0.9 million barrels in 2004 and 2003, respectively. Our reported sales volumes also do not include the CBL factored brands business.

No single customer accounted for more than 10% of our consolidated or segmented sales in 2005, 2004 or 2003.

### United States Segment

The United States (US) segment produces, markets, and sells the Coors portfolio of brands in the United States and its territories and includes the results of the Rocky Mountain Metal Corporation (RMMC) and Rocky Mountain Bottle Corporation (RMBC) joint ventures consolidated beginning in 2004 under FIN 46R. The US segment also includes a small amount of Coors brand volume that is sold outside of the United States and its territories, including primarily Mexico and the Caribbean, as well as sales of Molson products in the United States.

**Sales and Distribution**

In the United States, beer is generally distributed through a three-tier system consisting of manufacturers, distributors and retailers. A national network of over 500 independent distributors purchases our products and distributes them to retail accounts. We also own three distributorships which collectively handled less than 3% of our total US segments volume in 2005. In Puerto Rico, we market and sell Coors Light through an independent distributor. We have a team of employees managing the marketing and promotional efforts in this market, where Coors Light is the leading brand. We also sell our products in a number of other Caribbean markets. During the second quarter of 2004, Cerveceria Cuauhtemoc Moctezuma, S.A. de C.V., a subsidiary of FEMSA Cerveza, became the sole and exclusive importer, marketer, seller and distributor of Coors Light in Mexico.

**Manufacturing, Production and Packaging in the United States**

*Brewing Raw Materials*

We use the highest-quality water, barley and hops to brew our products. We have acquired water rights to provide for long-term strategic growth and to sustain brewing operations in case of a prolonged drought in Colorado. We buy barley under long-term contracts from a network of independent farmers located in five regions in the United States.

*Brewing and Packaging Facilities*

We have three domestic production facilities and one small brewery, which we plan to sell, located in Mexico. We own and operate the world's largest single-site brewery located in Golden, Colorado. In addition, we have a packaging and brewing facility in Memphis, Tennessee, and a packaging facility located in the Shenandoah Valley in Virginia. We brew Coors Light, Coors, Extra Gold, Killian's and the Keystone brands in Golden, and package in Golden approximately 66% of the beer brewed in Golden. The remainder is shipped in bulk from the Golden brewery to either our Memphis or Shenandoah facility for packaging. We are in the process of adding brewing capability to our Virginia facility which we expect to have operational by 2007 and are in the process of closing our Memphis facility which we expect to complete by the end of 2006.

**Packaging Materials**

*Aluminum Cans*

Approximately 61% of our domestic products were packaged in aluminum cans in 2005. We purchased a substantial portion of those cans from RMMC, our joint venture with Ball Corporation (Ball). In addition to our supply agreement with RMMC, we also have commercial supply agreements with Ball and other third-party can manufacturers to purchase cans and ends in excess of what is supplied through RMMC.

*Glass Bottles*

We used glass bottles for approximately 28% of our products in 2005. RMBC, our joint venture with Owens-Brockway Glass Container, Inc. (Owens), produces glass bottles at our glass manufacturing facility. On July 29, 2003, we extended our joint venture with Owens for 12 years, as well as a supply agreement with Owens for the glass bottles we require in excess of joint venture production.

*Other Packaging*

Most of the remaining 11% of volume we sold in 2005 was packaged in quarter and half-barrel stainless steel kegs.

We purchase most of our paperboard and label packaging from a subsidiary of Graphic Packaging Corporation (GPC), a related party. These products include paperboard, multi-can pack wrappers, bottle labels and other secondary packaging supplies.

**Seasonality of the Business**

Our US sales volumes are normally lowest in the first and fourth quarters and highest in the second and third quarters.

**Competitive Conditions**

*Known Trends and Competitive Conditions*

Industry and competitive information in this section and elsewhere in this report was compiled from various industry sources, including beverage analyst reports (*Beer Marketer's Insights, Impact Databank and The Beer Institute*). While management believes that these sources are reliable, we cannot guarantee the accuracy of these numbers and estimates.

*2005 US Beer Industry Overview*

The beer industry in the United States is competitive and concentrated, with three major brewers controlling about 78% of the market. Growing or even maintaining market share has required increasing investments in marketing and sales. US beer industry shipments had an annual growth rate during the past 10 years of less than 1%. Pricing in the US beer industry became

5

increasingly competitive in 2005. While front line price increases were similar to recent history, discounting activity increased approximately 30% in 2005, compared to 2004.

The beer market in Puerto Rico had extraordinary growth in the "70s and "80s. Since then, the market has experienced periodic growth and decline cycles. This market has traditionally been split among local brewers, US imports, and other imports. Coors Light is the market leader in Puerto Rico with approximately half the market.

*Our Competitive Position*

Our malt beverages compete with numerous above-premium, premium, low-calorie, low-carbohydrate, popular-priced, non-alcoholic and imported brands. These competing brands are produced by national, regional, local and international brewers. We compete most directly with Anheuser-Busch and SABMiller (SAB), the dominant beer companies in the United States. According to *Beer Marketer's Insights* estimates, we are the nation's third-largest brewer, selling approximately 11% of the total 2005 US brewing industry shipments (including exports and US shipments of imports). This compares to Anheuser-Busch's 49% share and SAB's 18% share.

Our malt beverages also compete with other alcohol beverages, including wine and spirits, and thus our competitive position is affected by consumer preferences between and among these other categories.

## Canada Segment

Molson is Canada's largest brewer by volume and North America's oldest beer company. Molson brews, markets, sells and nationally distributes a wide variety of beer brands. Molson's portfolio consists of strength or leadership in all major product and price segments. Molson's strong market share and visability are consistent across retail and on-premise channels. Priority focus and investment is leveraged behind key owned brands (Coors Light, Molson Canadian, Molson Export and Rickard's) and key strategic distribution partnerships (including Heineken, Corona and Miller).

Before the Merger, the Canada segment consisted of Coors' 50.1% interest in the Molson Coors Canada joint venture through which Coors Light was sold in Canada. The joint venture contracted with Molson for the brewing, distribution and sale of our products. Molson Coors Canada managed all marketing activities for our products in Canada. In connection with the Merger, Molson Coors Canada was dissolved into the Canadian business. Coors Light currently has a 10% market share, and is the largest-selling light beer and the second-best selling beer brand overall in Canada. Molson Canadian currently has a 9% market share and is the third-largest selling beer in Canada.

Following the Merger, our Canada segment consists primarily of Molson's beer business including the production and sale of the Molson brands, principally in Canada, our joint venture arrangements related to the distribution of beer in Ontario and the Western provinces, Brewers Retail, Inc. (BRI) (consolidated under FIN 46R), and Brewers Distribution Limited (BDL); and the Coors Light business in Canada.

**Sales and Distribution**

*Canada*

In Canada, provincial governments have historically had a high degree of involvement in the regulation of the beer industry, particularly the regulation of the pricing, mark-up, container management, sale, distribution and advertising of beer.

Distribution and retailing of products in Canada involves a wide range and varied degree of government control through provincial liquor boards.

*Ontario*

Consumers in Ontario can purchase beer only at retail outlets operated by BRI, at government-regulated retail outlets operated by the Liquor Control Board of Ontario, approved agents of the Liquor Control Board of Ontario or at any bar, restaurant or tavern licensed by the Liquor Control Board of Ontario to sell liquor for on premise consumption. All brewers pay a service fee, based on their sales volume, through BRI. Molson, together with certain other brewers, participates in the ownership of BRI in proportion to its provincial market share relative to other brewers. Ontario brewers may deliver directly to BRI's outlets or may choose to use BRI's distribution centers to access retail in Ontario, the Liquor Control Board of Ontario system and licensed establishments.

6

*Québec*

In Québec, beer is distributed directly by each brewer or through independent agents. Molson is the agent for the licensed brands it distributes. The brewer or agent distributes the products to permit holders for retail sales for on-premise consumption. Québec retail sales for home consumption are made through grocery and convenience stores as well as government operated stores.

***British Columbia***

In British Columbia, the government's Liquor Distribution Branch currently controls the regulatory elements of distribution of all alcohol products in the province. Brewers Distributors, Ltd. (BDL), which Molson co-owns with a competitor, manages the distribution of Molson's products throughout British Columbia. Consumers can purchase beer at any Liquor Distribution Branch retail outlet, at any independently owned and licensed wine or beer retail store or at any licensed establishment for on-premise consumption. Liquor-primary licensed establishments for on-premise consumption may also be licensed for off-premise consumption. The British Columbia government announced in 2002 that the Liquor Distribution Branch would shift its role from managing distribution and retail operation to regulating these areas. A further announcement postponed this initiative indefinitely.

*Alberta*

In Alberta, the distribution of beer is managed by independent private warehousing and shipping companies or by a government sponsored system in the case of US sourced products. All sales of liquor in Alberta are made through retail outlets licensed by the Alberta Gaming and Liquor Commission or licensees, such as bars, hotels and restaurants. BDL manages the distribution of Molson's products in Alberta.

*Other Provinces*

Molson's products are distributed in the provinces of Manitoba and Saskatchewan through local liquor boards. Manitoba and Saskatchewan also have licensed private retailers. BDL manages the distribution of Molson's products in Manitoba and Saskatchewan. In the Maritime Provinces (other than Newfoundland), local liquor boards distribute and retail Molson's products. Yukon, Northwest Territories and Nunavat manage distribution and retail through government liquor commissioners.

**Manufacturing, Production and Packaging**

***Brewing Raw Materials***

Molson's goal is to procure quality materials and services at the lowest prices available. Molson works with the supplier community to select global suppliers for materials and services which best meet this goal. Molson also uses low risk hedging instruments to protect from pricing volatility in the commodities market.

Molson single sources cans, glass bottles, crowns and labels. Availability of these products has not been an issue and Molson does not expect any difficulties in accessing any of these products. However, the risk of glass bottle supply disruptions has increased with the reduction of local supply alternatives due to the consolidation of the glass bottle industry in North America.

***Brewing and Packaging Facilities***

Molson has six breweries, strategically located throughout Canada, which brew, bottle, package, market and distribute all owned and licensed brands sold in and exported from Canada: St. John's (Newfoundland), Montréal (Québec), Toronto (Ontario), Edmonton (Alberta), and Vancouver (British Columbia), and Creemore (Ontario).

Molson plans to complete the construction of a Cdn $35 million brewery in Moncton, New Brunswick by January 2007. The new brewery will feature bottling and keg lines and have the flexibility for the future installation of a canning line. Brewing capacity will be more than 6 million 12-packs annually or 250,000 hectoliters.

**Packaging Materials**

The distribution systems in each province generally provide the collection network for returnable bottles and cans. The standard container for beer brewed in Canada is the 341 ml returnable bottle, which represents approximately 69% of domestic sales in Canada, with cans accounting for 19% and draught for 12%.

**Seasonality of Business**

Total industry volume in Canada is sensitive to factors such as weather, changes in demographics and consumer preferences. Consumption of beer in Canada is also seasonal with approximately 40% of industry sales volume occurring during the four months from May through August.

**Competitive Conditions**

*2005 Canada Beer Industry Overview*

In the Canadian beer market, volumes have been gradually migrating from premium brands to super premium brands and value brands since 2001. After significant growth in 2004, the value segment in Canada began to stabilize in 2005. The national price gap between premium brands and value brands narrowed as value prices stabilized in all markets and increased in key markets. Brands in the premium segment held regular selling prices but used targeted feature price activity to generate growth.

The Canadian brewing industry is a mature market. It is characterized by aggressive competition for volume and market share from regional brewers, microbrewers and certain foreign brewers, as well as Molson's main domestic competitor. These competitive pressures require significant annual investment in marketing and selling activities.

There are three major beer segments based on price: super premium, which includes imports and represents 16% of total sales of the industry and 13% of total sales of Molson; premium, which includes the majority of domestic brands and the light sub-segment and represents 60% of total sales of the industry and 65% of total sales of Molson; and the discount segment which represents 22% of total sales of the industry and 21% of total sales of Molson.

During 2005, estimated industry sales volume in Canada, including sales of imported beers, increased by approximately 2%.

*Our Competitive Position*

The Canada brewing industry is comprised principally of two major brewers, Molson and Labatt, whose combined market share is approximately 83% of beer sold in Canada.

The Ontario and Québec markets account for approximately 63% of the total beer market in Canada. The top ten brands in Canada account for approximately 56% of the packaged market in Canada in fiscal 2005.

## Europe Segment

The Europe segment consists of our production and sale of the CBL brands principally in the United Kingdom, our joint venture arrangement for the production and distribution of Grolsch in the United Kingdom and Republic of Ireland (consolidated under FIN 46R beginning in 2004), factored brand sales (beverage brands owned by other companies, but sold and delivered to retail by us), and our joint venture arrangement with Exel Logistics for the distribution of products throughout Great Britain (Tradeteam). Our Europe segment also includes a small volume of sales in Asia, Russia and other export markets.

**Sales and Distribution**

CBL has headquarters in Burton-on-Trent, England, and is the United Kingdom's second-largest beer company with unit volume sales of approximately 10.3 million US barrels in 2005. CBL has an approximate 21% share of the UK beer market, Western Europe's second-largest market. Sales are primarily in England and Wales, with the Carling brand (a mainstream lager) representing approximately 75% of CBL's total beer volume.

8

*United Kingdom*

Over the past three decades, volumes have shifted from the on-premise channel, where products are consumed in pubs and restaurants, to the off-premise channel, also referred to as the "take-home" market. Unlike the United States, where manufacturers are generally not permitted to distribute beer directly to retail, the large majority of our beer in the United Kingdom is sold directly to retailers.

Distribution activities for CBL are conducted by Tradeteam, which operates a system of satellite warehouses and a transportation fleet. Tradeteam also manages the transportation of certain raw materials, such as malt, to the CBL breweries.

*Asia*

We continue to develop markets in Japan and China, which are managed by the Europe segment's management team. The Japanese business is currently focused on the Zima and Coors brands. We also sell Coors Light and Coors in China. We have closed our operations in Taiwan.

*On-premise*

The on-premise channel accounted for approximately 63% of our UK sales volumes in 2005. The installation and maintenance of draught beer dispensing equipment in the on-premise channel is generally the responsibility of the brewer in the United Kingdom. CBL, therefore, owns equipment used to dispense beer from kegs to consumers. This includes beer lines, line cooling equipment, taps and countermounts.

Similar to other UK brewers, CBL has traditionally used loans to secure supply relationships with customers in the on-premise market. Loans have been granted at below-market rates of interest, with the outlet purchasing beer at lower-than-average discount levels to compensate. We reclassify a portion of sales revenue as interest income to reflect the economic substance of these loans.

*Off-premise*

The off-premise channel accounted for approximately 37% of our UK sales volume in 2005. The off-premise market includes sales to supermarket chains, convenience stores, liquor store chains, distributors and wholesalers.

**Manufacturing, Production and Packaging**

*Brewing Raw Materials*

We use the highest-quality water, barley and hops to brew our products. We assure the highest-quality water by obtaining our water from private water sources which are carefully chosen for their purity and which are regularly tasted and tested both analytically and microbiologically to ensure their ongoing purity and to confirm that all the requirements of the UK private water regulations are met. Public supplies are used as back-ups to the private supplies in some breweries and these are again tasted and tested regularly to ensure their ongoing purity. For agricultural crops such as barley and hops, we place forward contracts to ensure we have availability of the volume and varieties we require.

*Brewing and Packaging Facilities*

We operate three breweries in the United Kingdom. The Burton-on-Trent brewery, located in the Midlands, is the largest brewery in the United Kingdom. The other smaller breweries are located in Tadcaster and Alton.

**Packaging Materials**

*Kegs*

We used kegs and casks for approximately 57% of our UK products in 2005, reflecting a high percentage of product sold on-premise.

*Cans*

Approximately 34% of our UK products were packaged in cans in 2005. Virtually all of our cans were purchased through supply contracts with Ball.

*Other Packaging*

The remaining 9% of our UK products are packaged in glass bottles purchased through supply contracts with third-party suppliers.

**Seasonality of Business**

In the UK, the beer industry is subject to seasonal sales fluctuation primarily influenced by holiday periods, weather and by certain major televised sporting events. There is a peak during the summer and during the Christmas and New Year period. The Christmas/New Year holiday peak is most pronounced in the off-premise channel. Consequently, our largest quarters by volume are the third and fourth quarters, and the smallest are the first and second.

**Competitive Conditions**

*2005 UK Beer Industry Overview*

Beer consumption in the United Kingdom declined by an average of 0.9% per annum between 1980 and 2000. Over the last 5 years, volume has reached a plateau, providing some stability. The longer-term decline has been mainly attributable to the on-premise channel, where volumes are now approximately 44% lower than in 1980. Over the same period, off-premise volume has increased by approximately 210%. This trend is expected to continue and has been influenced by a number of factors, including changes in consumers' lifestyles and an increasing price difference between beer prices in the on- and off-premise channels. Both trends continued in 2005 with off-premise market growth of 0.9% and a decline in the on-premise market of 3.8%.

There has also been a steady trend away from ales and towards lager, driven predominantly by the leading lager brands. In 1980, lagers accounted for 31% of beer sales, and in 2005 lagers accounted for over 72%, up from 71% in 2004. While lager volume has been growing, ales, including stouts, have declined during this period, and this trend has accelerated in the last few years. The leading beer brands are generally growing at a faster rate than the market. The top 10 brands now represent approximately 65% of the total market, compared to only 34% in 1995.

*Our Competitive Position*

Our beers and flavored alcohol beverages compete not only with similar products from competitors, but also with other alcohol beverages, including wines and spirits. With the exception of stout, where we do not have our own brand, our brand portfolio gives us strong representation in all major beer categories. Our strength in the growing lager category with Carling, Grolsch and Coors Fine Light Beer positions us well to take advantage of the continuing trend toward lagers.

Our principal competitors are Scottish & Newcastle UK Ltd., Inbev UK Ltd. and Carlsberg UK Ltd. We are Great Britain's second-largest brewer, with a market share of approximately 21% (excluding factored brands sales), based on AC Nielsen information. This compares to Scottish & Newcastle UK Ltd.'s share of approximately 24%, Inbev UK Ltd.'s share of approximately 20% and Carlsberg UK Ltd.'s share of approximately 13%. Two of our three core brands—Carling, and Coors Fine Light Beer—increased their product category share in 2005.

**Global Intellectual Property**

We own trademarks on the majority of the brands we produce and have licenses for the remainder. We also hold several patents on innovative processes related to product formula, can making, can decorating and certain other technical operations. These patents have expiration dates through 2021. These expirations are not expected to have a significant impact on our business.

**Inflation**

General inflation is not normally a factor in any of the segments in which we operate, although we periodically experience inflationary trends in specific areas, such as fuel costs, which were significantly higher in 2005 when compared to prior years.

**Regulation**

*United States*

Our business in the United States and its territories is highly regulated by federal, state and local governments. These regulations govern many parts of our operations, including brewing, marketing and advertising, transportation, distributor relationships, sales and environmental issues. To operate our facilities, we must obtain and maintain numerous permits, licenses and approvals from various governmental agencies, including the US Treasury Department; Alcohol and Tobacco Tax and Trade Bureau; the US Department of Agriculture; the US Food and Drug Administration; state alcohol regulatory agencies as well as state and federal environmental agencies.

Governmental entities also levy taxes and may require bonds to ensure compliance with applicable laws and regulations. US federal excise taxes on malt beverages are currently $18 per barrel. State excise taxes also are levied at rates that ranged in 2005 from a high of $33 per barrel in Hawaii to a low of $0.60 per barrel in Wyoming.

*Canada*

In Canada, provincial governments regulate the production, marketing, distribution, sale and pricing of beer and impose commodity taxes and license fees in relation to the production and sale of beer. In 2005, Canada excise taxes totaled $452 million or $61 per barrel sold. In addition, the federal government regulates the advertising, labeling, quality control, and international trade of beer, and also imposes commodity taxes, consumption taxes, excise taxes and in certain instances, custom duties on imported beer. Further, certain bilateral and multilateral treaties entered into by the federal government, provincial governments and certain foreign governments, especially with the government of the United States, affect the Canadian beer industry. While the beer industry in many countries, including the United States, is subject to government regulation, Canadian brewers have historically been subject to even greater regulation.

*Europe*

In the United Kingdom, regulations apply to many parts of our operations and products, including brewing, food safety, labeling and packaging, marketing and advertising, environmental, health and safety, employment, and data protection regulations. To operate our breweries and carry on business in the United Kingdom, we must obtain and maintain numerous permits and licenses from local Licensing Justices and governmental bodies, including HM Customs & Excise; the Office of Fair Trading; the Data Protection Commissioner and the Environment Agency.

The UK government levies excise taxes on all alcohol beverages at varying rates depending on the type of product and its alcohol content by volume. In 2005, we incurred approximately $1.1 billion in excise taxes on gross revenues of approximately $2.6 billion, or approximately $102 per barrel.

**Environmental Matters**

*United States*

We are one of a number of entities named by the Environmental Protection Agency (EPA) as a potentially responsible party (PRP) at the Lowry Superfund site. This landfill is owned by the City and County of Denver (Denver), and is managed by Waste Management of Colorado, Inc. (Waste Management). In 1990, we recorded a pretax charge of $30 million, a portion of which was put into a trust in 1993 as part of a settlement with Denver and Waste Management regarding the then outstanding litigation. Our settlement was based on an assumed remediation cost of $120 million (in 1992 adjusted dollars). The settlement requires us to pay a portion of future costs in excess of that amount.

Considering uncertainties at the site, including what additional remedial actions may be required by the EPA, new technologies, and what costs are included in the determination of when the $120 million threshold is reached, the estimate of our liability may change as facts further develop. We cannot predict the amount or timing of any such change, but additional accruals could be required in the future.

We are aware of groundwater contamination at some of our properties in Colorado resulting from historical, ongoing or nearby activities. There may also be other contamination of which we are currently unaware.

From time to time, we have been notified that we are or may be a PRP under the Comprehensive Environmental Response, Compensation and Liability Act or similar state laws for the cleanup of other sites where hazardous substances have allegedly been released into the environment. While we cannot predict our eventual aggregate cost for the environmental and related matters in which we may be or are currently involved, we believe that any payments, if required, for these matters would be made over a period of time in amounts that would not be material in any one year to our operating results, cash flows or our financial or competitive position. We believe adequate reserves have been provided for losses that are probable and estimable. See Note 19 to our consolidated financial statements in Item 8 on page 118.

*Canada*

Our Canadian brewing operations are subject to provincial environmental regulations and local permit requirements. Each of our Canadian breweries, other than the St. John's brewery, either has water pre-treatment capabilities or are permitted to discharge into the public sewer system. We have comprehensive environmental programs in Canada including organization, monitoring and verification, regulatory compliance, reporting, education and training, and corrective action.

MCBC remains responsible for sites relating to discontinued operations of Molson's chemical specialties business sold in 1996, which require environmental remediation programs. These programs are either under way or are planned. Most of these sites relate to properties associated with previously owned business of chemicals and we have established provisions for the costs of these remediation programs. Some of them involve sites in the United States.

*Europe*

We are subject to the requirements of government and local environmental and occupational health and safety laws and regulations. Compliance with these laws and regulations did not materially affect our 2005 capital expenditures, earnings or competitive position, and we do not anticipate that they will do so in 2006.

**Employees and Employee Relations**

*United States*

We have approximately 4,200 employees in our US segment. Memphis hourly employees, who constitute approximately 9% of our US work force, are represented by the Teamsters union; and a small number of other employees are represented by other unions. The Memphis union contract was renegotiated in 2005, which included provisions impacted by our plans to close the Memphis facility. We believe that relations with our US employees are good.

*Canada*

We have approximately 3,000 full-time employees in our Canada segment. Approximately 67% of this total workforce is represented by trade unions. Workplace change initiatives are continuing and as a result, joint union and management steering committees established in most breweries are focusing on customer service, quality, continuous improvement, employee training and a growing degree of employee involvement in all areas of brewery operations. We believe that relations with our Canada employees are good.

*Europe*

We have approximately 3,000 employees in our Europe segment. Approximately 29% of this total workforce is represented by trade unions, primarily at our Burton-on-Trent and Tadcaster breweries. Separate negotiated agreements are in place with the Transport and General Workers Union at the Tadcaster Brewery and the Burton-on-Trent Brewery. The agreements do not have expiration dates, and negotiations are conducted annually. We believe that relations with our Europe employees are good.

(d)    **Financial Information about Foreign and Domestic Operations and Export Sales**

See Item 8, Financial Statements and Supplementary Data, for discussion of sales, operating income and identifiable assets attributable to our country of domicile, the United States, and all foreign countries.

12

(e)     **Available Information**

Our internet website is http://www.molsoncoors.com. Through a direct link to our reports at the SEC's website at http://www.sec.gov, we make available, free of charge on our website, our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports as soon as reasonably practicable after we electronically file or furnish such materials to the SEC.

**Cautionary Statement Pursuant to Safe Harbor Provisions of the Private Securities Litigation Reform Act of 1995**

This document and the documents incorporated in this document by reference contain forward-looking statements that are subject to risks and uncertainties. All statements other than statements of historical fact contained in this document and the materials accompanying this document are forward-looking statements.

Forward-looking statements are based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management. Frequently, but not always, forward-looking statements are identified by the use of the future tense and by words such as "believes," "expects," "anticipates," "intends," "will," "may," "could," "would," "projects," "continues," "estimates," or similar expressions. Forward-looking statements are not guarantees of future performance and actual results could differ materially from those indicated by forward-looking statements. Forward-looking statements involve known and unknown risks, uncertainties, and other factors that may cause our or our industry's actual results, level of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by the forward-looking statements.

The forward-looking statements contained or incorporated by reference in this document are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 (the Exchange Act) and are subject to the safe harbor created by the Private Securities Litigation Reform Act of 1995. These statements include declarations regarding our plans, intentions, beliefs or current expectations.

Among the important factors that could cause actual results to differ materially from those indicated by forward-looking statements are the risks and uncertainties described under "Risk Factors" and elsewhere in this document and in our other filings with the SEC.

Forward-looking statements are expressly qualified in their entirety by this cautionary statement. The forward-looking statements included in this document are made as of the date of this document and we do not undertake any obligation to update forward-looking statements to reflect new information, subsequent events or otherwise.

**ITEM 1A. Risk Factors**

The reader should carefully consider the following factors and the other information contained within this document. The most important factors that could influence the achievement of our goals, and cause actual results to differ materially from those expressed in the forward-looking statements, include, but are not limited to, the following:

*Risks specific to the Molson Merger*

*We may not realize the cost savings and other benefits we currently anticipate due to challenges associated with integrating the operations, technologies, sales and other aspects of the businesses of Molson and Coors.* Our success will depend in large part on management's success in integrating the operations, technologies and personnel of Molson and Coors. If we fail to integrate the operations of Molson and Coors or otherwise fail to realize any of the anticipated benefits of the Merger transaction, including the estimated cost savings of approximately $175 million annually by the third year following the Merger, our results of operations could be impaired. In addition, the overall integration of the two companies may result in unanticipated operations problems, expenses and liabilities, and diversion of management's attention.

*If Pentland and the Coors Trust do not agree on a matter submitted to stockholders, generally the matter will not be approved, even if beneficial to the Company or favored by other stockholders.* Pentland and the Coors Trust, which together control more than two-thirds of the Company's Class A Common and Exchangeable stock, have voting trust agreements through which they have combined their voting power over the shares of our Class A common stock and the Class A exchangeable shares that they own. However, in the event that these two stockholders do not agree to vote in favor of a matter submitted to a stockholder vote (other than the election of directors), the voting trustees will be required to vote all of the Class A common stock and Class A exchangeable shares deposited in the voting trusts against the matter. There is no other mechanism in the voting trust agreements to resolve a potential deadlock between these stockholders. Therefore, if either Pentland or the Coors

13

Trust is unwilling to vote in favor of a transaction that is subject to a stockholder vote, we may be unable to complete the transaction even if our board, management or other stockholders believe the transaction is beneficial for Molson Coors.

*Risks specific to our Discontinued Operations*

*Indemnities provided to the purchaser of 68% of the Kaiser business in Brazil could result in future cash outflows and income statement charges.* On January 13, 2006, we sold a 68% equity interest in Kaiser to FEMSA for $68 million cash, including the assumption by FEMSA of Kaiser-related debt and contingencies. The terms of the agreement require us to indemnify FEMSA for exposures related to certain tax, civil and labor contingencies. The ultimate resolution of these claims is not under our control, and we cannot predict the outcomes of administrative and judicial proceedings that will occur with regard to these claims. It is possible that we will have to make cash outlays to FEMSA with regard to these indemnities. While the fair values of these indemnity obligations will be recorded on our balance sheet in conjunction with the sale, we could incur future income statement charges as facts further develop resulting in changes to our fair value estimates.

*Risks specific to our Company*

*Our success as an enterprise depends largely on the success of three primary products; the failure or weakening of one or more could materially adversely affect our financial results.* Although we currently have 14 products in our US portfolio, Coors Light represented more than 72% of our US sales volume for 2005. Carling lager is the best-selling brand in the United Kingdom and represented approximately 75% of CBL sales volume in 2005. The combination of the Molson Canadian and Coors Light brands represented approximately 45% of our Canada segment's sales volume for the year ended December 25, 2005. Consequently, any material shift in consumer preferences away from these brands would have a disproportionately large adverse impact on our business.

*We have indebtedness that is substantial in relation to our stockholders' equity, which could hinder our ability to adjust to rapid changes in market conditions or to respond to competitive pressures.* As of December 25, 2005, we had $850 million in debt primarily related to our acquisition of CBL, and $1.4 billion of debt primarily related to our Merger with Molson. As a result, we must use a substantial portion of our cash flow from operations to pay principal and interest on our debt. If our financial and operating performance is insufficient to generate sufficient cash flow for all of our activities, our operations could be adversely impacted.

*We rely on a small number of suppliers to obtain the packaging we need to operate our business, of which the loss or inability to obtain materials could negatively affect our ability to produce our products.* For our US business, we purchase most of our paperboard and container supplies from a single supplier or a small number of suppliers. This packaging is unique and is not produced by any other supplier. Additionally, we are contractually obligated to purchase substantially all our can and bottle needs in the United States from our container joint ventures or from our partners in those ventures, Ball Corporation (RMMC) and Owens-Brockway Glass Container, Inc. (RMBC). Consolidation of the glass bottle industry in North America has reduced local supply alternatives and increased risks of glass bottle supply disruptions. CBL has only a single source for its can supply (Ball). The inability of any of these suppliers to meet our production requirements without sufficient time to develop an alternative source could have a material adverse effect on our business.

*Our primary production facilities in Europe and the United States are located at single sites, so we could be more vulnerable than our competitors to transportation disruptions, fuel increases and natural disasters.* Our primary production facility in the United States is in Golden, Colorado and in Europe, our primary production facility is located in Burton-on-Trent, England. In both countries, our competitors have multiple geographically dispersed breweries and packaging facilities. As a result, we must ship our products greater distances than some of our competitors, making us more vulnerable to fluctuations in costs such as fuel, as well as the impact of any localized natural disasters should they occur.

*The termination of one or more manufacturer/distribution agreements could have a material adverse effect on our business.* We manufacture and/or distribute products of other beverage companies, including those of one or more competitors, through various licensing, distribution or other arrangements in Canada and the United Kingdom. The loss of one or more of these arrangements could have a material adverse effect on the results of one or more reporting segments.

*Because we will continue to face intense global competition, operating results may be negatively impacted.* The brewing industry is highly competitive and requires substantial human and capital resources. Competition in our various markets could cause us to reduce prices, increase capital and other expenditures or lose sales volume, any of which could have a material adverse effect on our business and financial results. In addition, in some of our markets, our primary competitors have substantially greater financial, marketing, production and distribution resources than Molson Coors has. In all of the markets

where Molson Coors operates, aggressive marketing strategies by our main competitors could adversely affect our financial results.

*Changes in tax, environmental or other regulations or failure to comply with existing licensing, trade and other regulations could have a material adverse effect on our financial condition.* Our business is highly regulated by federal, state, provincial and local laws and regulations in various countries regarding such matters as licensing requirements, trade and pricing practices, labeling, advertising, promotion and marketing practices, relationships with distributors, environmental matters and other matters. Failure to comply with these laws and regulations could result in the loss, revocation or suspension of our licenses, permits or approvals. In addition, changes in tax, environmental or any other laws or regulations could have a material adverse effect on our business, financial condition and results of operations.

*We are subject to fluctuations in foreign exchange rates, most significantly the British pound and the Canadian dollar.* We hold assets and incur liabilities, earn revenues and pay expenses in different currencies, most significantly sales of Coors Light in Canada, and sales of the Carling brand in the United Kingdom. Since our financial statements are presented in US dollars, we must translate our assets, liabilities, income and expenses into US dollars at current exchange rates. Increases and decreases in the value of the US dollar will affect, perhaps adversely, the value of these items in our financial statements, even if their local currency value has not changed.

*Our operations face significant commodity price change and foreign exchange rate exposure which could materially and adversely affect our operating results.* We will use a large volume of agricultural and other raw materials to produce our products, including malt, hops, water and packaging materials. The supply and price of these raw materials can be affected by a number of factors beyond our control, including frosts, droughts and other weather conditions, economic factors affecting growth decisions, plant diseases, theft and market demand. To the extent any of the foregoing factors affect the prices of ingredients or packaging; our results of operations could be materially and adversely impacted. We have active hedging programs to address commodity price and foreign exchange rate changes. However, to the extent we fail to adequately manage the foregoing risks, including if our hedging arrangements do not effectively or completely hedge changes in foreign currency rates or commodity price risks, our results of operations may be adversely impacted.

*We could be adversely affected by overall declines in the beer market.* Industry trends in many global markets indicate increases in consumer preference for wine and spirits, as well as for lower priced, value segment beer brands in some Canada markets, which could result in loss of volume or operating margins.

*Because of our reliance on a limited number of technical service suppliers, we could experience significant disruption to our business.* We rely exclusively on one information technology services provider for our network, help desk, hardware, and software configuration for our US and UK businesses. Additionally, we rely on a single provider in Canada. If the service providers fail and we are unable to find a suitable replacement in a timely manner, we could be unable to properly administer our information technology systems.

*Due to a high concentration of unionized workers in the United Kingdom and Canada, we could be significantly affected by labor strikes, work stoppages or other employee-related issues.* Approximately 29% of CBL's total workforce and approximately 67% of Molson's total workforce is represented by trade unions. Although we believe relations with our employees are good, more stringent labor laws in the United Kingdom expose us to a greater risk of loss should we experience labor disruptions in that market.

*Changes to the regulation of the distribution systems for our products could adversely impact our business.* The US Supreme Court recently ruled that certain state regulations of interstate wine shipments are unlawful. As a result of this decision, states may alter the three-tier distribution system that has historically applied to the distribution of our products. Although it is too early to tell what, if any, changes states may make as a result of this decision, changes to the three-tier distribution system could have a materially adverse impact on our business. Further, in certain Canadian provinces, our products are distributed through joint venture arrangements that are mandated and regulated by provincial government regulators. If provincial regulation should change, effectively eliminating the distribution channels, the costs to adjust our distribution methods could have a material adverse impact on our business.

*Risks specific to the US Segment*

*Litigation directed at the alcohol beverage industry may adversely affect our sales volumes, our business and our financial results.* Molson Coors and many other brewers and distilled spirits manufacturers have been sued in several courts regarding advertising practices and underage consumption. The suits allege that each defendant intentionally marketed its products to "children and other underage consumers." In essence, each suit seeks, on behalf of an undefined class of parents and

15

guardians, an injunction and unspecified money damages. We will vigorously defend these lawsuits and it is not possible at this time to estimate the possible loss or range of loss, if any, in these lawsuits.

*We are highly dependent on independent distributors in the United States to sell our products, with no assurance that these distributors will effectively sell our products.* We sell all of our products in the United States to distributors for resale to retail outlets. Some of our distributors are at a competitive disadvantage because they are smaller than the largest distributors in their markets. Our distributors also sell products that compete with our products. These distributors may give our competitors' products higher priority, thereby reducing sales of our products. In addition, the regulatory environment of many states makes it very difficult to change distributors. Consequently, if we are not allowed or are unable to replace unproductive or inefficient distributors, our business, financial position, and results of operation may be adversely affected.

*Risks specific to the Canada Segment*

*We may be required to provide funding to or exercise control over the entity that owns the entertainment business and the Montréal Canadiens pursuant to the guarantees given to its lenders and the NHL.* Pursuant to certain guarantees given to the lenders and the NHL in support of the entity that owns the majority of the entertainment business and the Montréal Canadiens professional hockey club (purchased from Molson in 2001), Molson shall provide funding to the entity to meet its obligations to the lenders and the entity's operating expenses and Molson shall exercise control over the entity that owns the hockey club at predetermined conditions, subject to NHL approval, if the entity does not meet its obligations under various agreements.

*An adverse result in a lawsuit brought by Miller could have an adverse impact on our business.* In December 2005, Miller Brewing Company sued the Company and several subsidiaries in a Wisconsin federal court. Miller seeks to invalidate a licensing agreement allowing Molson Canada the sole distribution of Miller products in Canada. Miller claims US and Canadian antitrust violations, and violations of the Agreement's confidentiality provisions. Miller also claims that the Agreement's purposes have been frustrated as a result of the Molson Coors merger. If Miller were to prevail in this action, it could have an adverse impact on our business.

*If we are unsuccessful in renegotiating licensing, distribution and related agreements, our business could suffer adverse effects.* We manufacture and/or distribute products of other beverage companies in Canada, including those of one or more competitors, through various licensing, distribution or other arrangements. We are currently in negotiations with two of such companies to enter into new agreements. The loss of one or more of these arrangements could adversely impact our business.

*If regulatory authorities determine that industry understandings regarding the bottle standards are invalid, our business could be adversely impacted.* The Canadian Competition Bureau is currently reviewing the validity of industry arrangements regarding industry bottle standards. If the Bureau were to determine that the agreement is anticompetitive, we may be required to use multiple bottle types which could significantly increase our production and other related costs.

*Risks specific to the Europe Segment*

*Consolidation of pubs and growth in the size of pub chains in the United Kingdom could result in less ability to achieve pricing.* The trend toward consolidation of pubs, away from independent pub and club operations, is continuing in the United Kingdom. These larger entities have stronger price negotiating power, which could impact CBL's ability to obtain favorable pricing in the on-premise channel (due to spillover effect of reduced negotiating leverage) and could reduce our revenues and profit margins. In addition, these larger customers are beginning to purchase directly more of the products that, in the past, we have provided as part of our factored business. This consolidation could impact us adversely.

*We depend exclusively on one logistics provider in England, Wales and Scotland for distribution of our CBL products.* We are involved in a joint venture with Exel Logistics called Tradeteam. Tradeteam handles all of the physical distribution for CBL in England, Wales and Scotland, except where a different distribution system is requested by a customer. If Tradeteam were unable to continue distribution of our product and we were unable to find a suitable replacement in a timely manner, we could experience significant disruptions in our business that could have an adverse impact on our operations.

*We are reliant on a single third party as a supplier for kegs in the United Kingdom.* We do not own our kegs in the United Kingdom; rather we source our kegs from a logistics provider who is responsible for their ownership, upkeep, and to maintain an adequate stock. If this third party provider were to have a business failure, we may be required to purchase a stock of kegs, the estimated cost of which would be $61 million.

*Sales volumes in the United Kingdom brewing industry have been moving from on-premise locations to off-premise locations, a trend which unfavorably impacts our profitability.* We have noted in recent years that beer volume sales in the UK have been shifting from pubs and restaurants (on-premise) to retail stores (off-premise), for the industry in general. Margins on sales to off-premise customers tend to be lower than margins on sales to on-premise customers. A continuation of this trend could adversely impact our profitability.

## ITEM 1B. Unresolved Staff Comments

None.

## ITEM 2. Properties

As of December 25, 2005, our major facilities were:

| Facility | Location | Character |
|---|---|---|
| *United States* | | |
| Corporate office(6) | Denver, CO | Office space |
| Brewery/packaging plants | Golden, CO | Malt beverages/packaged malt beverages |
| | Memphis, TN(1) | |
| | Tecate, Mexico(2) | |
| Packaging plant | Elkton, VA (Shenandoah Valley) | Packaged malt beverages |
| Can and end plant | Golden, CO | Aluminum cans and ends |
| Bottle plant | Wheat Ridge, CO | Glass bottles |
| Distributorship locations | Meridian, ID | Wholesale beer distribution |
| | Glenwood Springs, CO | |
| | Denver, CO | |
| Five distribution warehouses | Throughout the United States | Distribution centers |
| *Europe* | | |
| Brewery/packaging plants | Burton-on-Trent, Staffordshire | Malt and spirit-based beverages/ packaged malt beverages |
| | Tadcaster Brewery, Yorkshire | |
| | Alton Brewery, Hampshire | |
| Distribution warehouse | Burton-on-Trent, Staffordshire | Distribution center |
| *Canada* | | |
| Corporate office | Montréal, Québec | Office space |
| Brewery/packaging plants | St Johns, Newfoundland | Packaged malt beverages |
| | Montréal, Québec | |
| | Toronto, Ontario | |
| | Creemore, Ontario | |
| | Edmonton, Alberta | |
| | Vancouver, British Columbia | |
| Retail stores | Ontario Province(4) | Beer retail stores |
| Distribution warehouses | Montréal, Québec | Distribution centers |
| | Ontario Province(5) | |
| *Brazil(3)* | | |
| Brewery/packaging plants | Araraquara, São Paulo | Malt beverages/packaged malt beverages |
| | Cuiabá, Mato Grosso do Sul | |
| | Feira de Santana, Bahia | |
| | Gravataí, Rio Grande do Sul | |
| | Jacareí, São Paulo | |
| | Manaus, Amazonas | |
| | Pacatuba, Ceará | |
| | Ponta Grossa, Paraná | |

(1) Planned closure in late 2006.

(2) Held for sale at December 25, 2005.

17