# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CURTIS R. MELLOT, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>          v.<br><br>CHOICEPOINT, INC.; CHOICEPOINT INC. GROUP BENEFITS COMMITTEE; COMPENSATION AND BENEFITS COMMITTEE; TERRENCE MURRAY; JOHN J. HAMRE; JOHN B. MCCOY; BONNIE G. HILL; STEVEN W. SURBAUGH; JOHN H. KARR; and JOHN DOES 1-50,<br><br>     Defendants. | CIVIL CASE NO.<br>1:05-CV-1340-JTC |

## O R D E R

This matter is currently before the Court on Defendants' motions to dismiss Plaintiff's Amended Complaint [#33, 34]. For the reasons below, Defendants' motions are **GRANTED**.

## I.    Background

Plaintiff brings this case as a class action[1] under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.,

---

[1]This case has not been certified as a class action, although the Amended Complaint is somewhat styled as one.

in which Plaintiff seeks damages and equitable relief for Defendants' breach of fiduciary duty in connection with ChoicePoint's 401(k) Profit Sharing Plan (the "Plan").

A.    Plaintiff

Plaintiff was an employee of ChoicePoint, was a participant in ChoicePoint's Plan between March 12, 2004, and March 4, 2005 (the "Class Period"), and acquired an interest in ChoicePoint stock through his participation in the Plan. (Am. Compl. ¶¶ 1, 19.)

B.    Defendants

Defendant ChoicePoint is a data collection company that provides information about consumers to businesses, governments, and others who use the information for identification and verification purposes. (Am. Compl. ¶¶ 3, 20.) ChoicePoint is the Plan's sponsor and one of its administrators. (Id. ¶ 20.) ChoicePoint stock trades on the New York Stock Exchange.

Defendants Murray, Hamre, McCoy, and Hill (collectively, the "Director Defendants") were members of the Defendant Compensation and Benefits Committee (the "Director Committee") of ChoicePoint's Board of Directors. (Am. Compl. ¶¶ 22-26.) The Director Committee appoints the members of the Defendant Group Benefits Committee (the "Benefits Committee"). (Am. Compl. ¶ 22.) The Director Committee and Director Defendants are

2

fiduciaries of the Plan and exercise discretionary authority and control with respect to the management, administration, and disposition of the Plan's assets. (Am. Compl. ¶¶ 22, 27.) The Benefits Committee and its individual members are designated fiduciaries of the Plan and exercise discretionary authority and control with respect to management, administration, and disposition of Plan assets. (Am. Compl. ¶ 21.)

Defendant Surbaugh served during the Class Period as ChoicePoint's chief financial officer, a named fiduciary of the Plan and a Plan Administrator. (Am. Compl. ¶ 28.) Defendant Karr was vice president of compensation and benefits at ChoicePoint, a named fiduciary of the Plan and a Plan Administrator. (Id. ¶ 29.) Defendants Surbaugh, Karr, and John Does 1-5 (collectively, the "Plan Defendants") were fiduciaries of the Plan with discretionary authority and control with respect to the management, administration, and disposition of Plan assets. (Id. ¶ 31.)

C.    The Plan

The Plan is an employee benefit plan and is a "defined contribution" plan. (Am. Compl. ¶¶ 34-35.) The Plan covers all eligible salaried ChoicePoint employees who have completed ninety days of service. (Id. ¶ 42.) Participants may make basic contributions from 1% to 6% of their total gross salary through payroll deductions on a pretax or after-tax basis. (Id. ¶ 43.)

3

Contributions are allocated, as directed by the individual participants, among several investment options, such as publicly traded mutual funds and a collective trust, selected by Plan fiduciaries. (Id. ¶¶ 43, 47.) ChoicePoint makes matching contributions to the Plan of 25% of a participant's contributions. (Id. ¶ 44.) All matching contributions are invested in the ChoicePoint Stock Fund (the "Stock Fund"), which is a unitized fund that invests in ChoicePoint common stock and cash. (Id. ¶¶ 44, 48; Defs.' Mot. to Dismiss, Exh. B § 5.2(b)(i), (b)(ii)(A).[2]) Matching contributions are not permitted to be transferred to another investment option unless the participant is separated from service or is over fifty-five years of age. (Am. Compl. ¶ 44.) ChoicePoint, at its discretion, may make additional contributions to a participant's account, in the form of profit sharing contributions and transition benefit contributions, both of which are invested in the Stock Fund. (Id. ¶ 45.) All contributions are vested once they are

---

[2]Section 5.2(b)(i) of the Plan states that the Plan's trustee "shall . . . establish one or more [investment] funds . . . including without limitation an Employer Stock Fund." Plaintiff argues that the Plan provides that matching contributions are invested in assets selected by participants and not automatically invested in the Stock Fund. (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 6 n.3.) However, a close reading of the Plan reveals that the language to which Plaintiff refers, that matching contributions are allocated "based upon" elective or voluntary contribution elections, indicates the amount of the contribution, not how the election will be invested. Section 5.1 of the Plan states that each type of contribution is maintained in a separate account, and § 5.2(b)(ii)(A) directs that matching accounts "shall automatically be invested" in the Stock Fund.

4

posted to a participant's account, and all Plan assets are held in a master trust. (Id. ¶¶ 46, 49.) Approximately half of the Plan's assets are in the Stock Fund. (Id. ¶¶ 50-51.)

Essentially, the Plan consists of two components: (1) a choice-of-investment component, where participants invest a portion of their salary in various investments at their discretion; and (2) an Employee Stock Ownership Plan ("ESOP")-type component, the Stock Fund, in which ChoicePoint matched participant contributions with ChoicePoint common stock.

### D.    Plaintiff's Allegations

Businesses obtain consumer data from ChoicePoint by submitting applications, which include documentation to establish that the applicant is a legitimate business with a lawful purpose for purchasing the data. (Am. Compl. ¶ 86.) ChoicePoint processes the applications before approving or rejecting the account. (Id.) On September 27, 2004, ChoicePoint discovered that an individual posing as several different businesses had fraudulently obtained thousands of consumer records. (Id. ¶¶ 87, 109.) In October 2004, California police informed ChoicePoint that under California law it must notify potential victims of the identity theft. (Id.) In February 2005, ChoicePoint notified approximately 35,000 California consumers of the

5

potential identity theft. (Id. ¶¶ 88, 114.) ChoicePoint later notified an additional 128,000 consumers that their data may have been compromised. (Id.) The persons who fraudulently obtained the consumer information were able to do so because ChoicePoint failed to properly verify or authenticate the identities and qualifications of its business customers. (Id. ¶ 89.) ChoicePoint failed to monitor or otherwise identify unauthorized customer activity despite warnings and subpoenas between 2001 and 2005 alerting it to fraudulent accounts. (Id. ¶ 90.) Beginning on February 14, 2005, media reports detailed the extent of the security breach. (Id. ¶¶ 115-22.) A March 2, 2005, article reported the similarities between the 2004 breach and a prior breach in 2002. (Id. ¶ 127.)

During the Class Period, ChoicePoint and its non-party officers made a number of statements, which Plaintiff alleges are material misrepresentations, regarding ChoicePoint's capabilities and systems in place to enable the responsible use of information while ensuring the protection of personal privacy. (Am. Compl. ¶ 92.) Plaintiff points to statements made on ChoicePoint's website, in customer contracts, and in SEC filings. (Id. ¶¶ 93-108, 110-12.) Plaintiff alleges that the statements were false and misleading when issued. (Id. ¶¶ 108, 113.) Between February 15, 2005, the date of the initial disclosure, and March 4, 2005, the end of the Class Period,

6

ChoicePoint's stock price fell $7.84, more than 17%. (Id. ¶ 130.)

In January 2006, the Federal Trade Commission ("FTC") filed a complaint against ChoicePoint for failure to maintain reasonable procedures to protect confidential data in violation of the Fair Credit Reporting Act and § 5 of the FTC Act. (Am. Compl. ¶ 131.) ChoicePoint and the FTC entered into a final judgment, under which ChoicePoint agreed to pay $10 million to the government as a civil penalty and $5 million to the FTC toward a fund to redress consumer losses. (Id. ¶ 132.) The final judgment also required ChoicePoint to adopt more strenuous measures to protect consumer data and submit to third-party evaluations for twenty years. (Id. ¶¶ 133-35.)

Plaintiff alleges four counts. First, he claims that the Defendants breached their duty to prudently and loyally manage the Plan assets during the Class Period because they knew or should have known that ChoicePoint stock was not a suitable and appropriate investment for the Plan in light of ChoicePoint's "inappropriate accounting."[3] (Am. Compl. ¶ 161.) Specifically, Plaintiff alleges that Defendants failed to remove ChoicePoint stock as an

---

[3]Plaintiff refers several times to "accounting irregularities." (Am. Compl. ¶¶ 136, 139, 140, 161, 184.) While the Court assumes this refers to ChoicePoint's verification procedures and illegal data access, the Court finds it unusual to use the term "accounting" where ChoicePoint's problems had little to do with financial records.

investment option in the Plan.[4]  (Id.)  Second, Plaintiff claims that the

Defendants failed to monitor the Benefits Committee and the Plan

Defendants regarding the Plan's investment in ChoicePoint stock and disclose

relevant financial information regarding ChoicePoint stock to the Benefits

Committee and Plan Defendants.  (Id. ¶¶ 172-74.)  Third, Plaintiff claims that

Defendants failed to provide Plan participants with complete and accurate

information regarding ChoicePoint stock, ChoicePoint's "accounting

improprities," and the soundness and prudence of investing retirement

contributions in ChoicePoint stock.  (Id. ¶ 184.)  Finally, Plaintiff claims that

Defendants operated under a conflict of interest by continuing to allow

ChoicePoint stock as an investment during the Class Period and failing to

engage independent fiduciaries or advisors regarding investment in

ChoicePoint stock.  (Id. ¶ 193.)

## II.    Discussion

### A.    Standard of Review for a Motion to Dismiss

Defendants' Federal Rule of Civil Procedure 12(b)(6) motion does not

test whether Plaintiff will prevail on the merits; it tests merely whether the

---

[4]In his brief opposing Defendants' motion to dismiss, Plaintiff "alleges that
Defendants breached their fiduciary duties by offering, failing to remove and failing
to halt additional investments in the Stock Fund while ChoicePoint stock was
artificially inflated as a result of undisclosed material information about
ChoicePoint."  (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 12.)

Amended Complaint properly states a claim upon which relief may be granted. "The rule is not designed to strike inartistic pleadings or to provide a more definite statement to answer an apparent ambiguity, and the analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto." Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997). A claim should not be dismissed under 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts" which would entitle it to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957). In considering this motion to dismiss, the Court must accept the Complaint's allegations as true and construe them in the light most favorable to Plaintiff. Powell v. United States, 945 F.2d 374, 375 (11th Cir. 1991). However, the Court is not required to accept as true conclusory allegations, unwarranted deductions of facts, or legal conclusions. Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).

The Court may consider evidence outside the pleadings, such as the text of the Plan, that is undisputedly authentic and on which Plaintiff specifically relied in the complaint. Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999). The Court may also take judicial notice of stock prices not included in the pleadings. La Grasta v. First Union Sec., Inc., 358 F.3d 840, 842 (11th Cir. 2004).

9

B.   ERISA

Under ERISA,

> a person is a fiduciary with respect to a plan to the extent (i) he
> exercises any discretionary authority or discretionary control
> respecting management of such plan or exercises any authority or
> control respecting management or disposition of its assets . . . or
> (iii) he has any discretionary authority or discretionary
> responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  ERISA fiduciaries are held to the prudent man

standard of care, which includes four duties: (1) to "discharge his duties with

respect to a plan solely in the interest of the participants and beneficiaries;"

(2) to exercise "care, skill, prudence, and diligence under the circumstances

then prevailing;" (3) to "diversify[] the investments of the plan so as to

minimize the risk of large losses, unless under the circumstances it is clearly

prudent not to do so;" and (4) to act "in accordance with the documents and

instruments governing the plan insofar as such documents and instruments

are consistent with" ERISA.  Id. § 1104(a)(1).

   Under ERISA, an eligible individual account plan ("EIAP"), such as

ChoicePoint's Plan, is an individual account plan which is "(i) a

profit-sharing, stock bonus, thrift, or savings plan [or] (ii) an employee stock

ownership plan," id. § 1107(d)(3)(A), and which "explicitly provides for

acquisition and holding of qualifying employer securities."  Id. § 1107(d)(3)(B).

Generally, ERISA requires fiduciaries to diversify plan investments and hold

no more than ten percent of plan assets in company securities. Id.

§§ 1104(a)(1)(C), 1107(a)(2). However, ERISA exempts EIAPs, which are

designed to primarily hold employer securities, from the percentage

requirement. Id. § 1107(b). ERISA also exempts EIAPs from the

diversification requirement. Specifically, "the diversification

requirement . . . and the prudence requirement (only to the extent that it

requires diversification) . . . is not violated by acquisition or holding

of . . . qualifying employer securities." Id. § 1104(a)(2).

> C.    Count I - Failure to Prudently Manage the Plan's Assets

In the Complaint, Plaintiff claims that the Defendants breached their

duty to prudently and loyally manage the Plan assets during the Class Period

by failing to remove ChoicePoint stock as an investment option in the Plan

because they knew or should have known that ChoicePoint stock was not a

suitable and appropriate investment for the Plan in light of ChoicePoint's

"inappropriate accounting." (Am. Compl. ¶ 161.) Plaintiff, presumably to

avoid the provisions of 29 U.S.C. § 1104(a)(2), later clarifies that "this is an

artificial inflation case, not a failure to diversify case" and that his allegations

are that Defendants "breached their fiduciary duties by offering, failing to

remove and failing to halt additional investments in the Stock Fund while

11

ChoicePoint stock was artificially inflated as a result of undisclosed material adverse information about ChoicePoint." (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 11-12.)

Plaintiff's allegations are similar to the allegations in <u>Smith v. Delta Air Lines, Inc.</u>, 422 F. Supp. 2d 1310 (N.D. Ga. 2006) (Evans, J.). There, the plaintiff asserted that the defendants should have divested the plan of company securities, discontinued or changed the part of the plan calling for matching contributions with company stock, and warned participants not to select the company stock fund as an investment choice. <u>Smith</u>, 422 F. Supp. 2d at 1321. Judge Evans recognized that the plaintiff in <u>Smith</u> did not directly allege that the defendants failed to diversify the company stock fund, but attempted "to argue around ERISA's diversification exemption by alleging that the [plan's] heavy investment in [company] securities was imprudent irrespective of the lack of diversification. At is core, however, [plaintiff's failure to prudently and loyally manage claim] just amounts to another form of diversification argument." <u>Smith</u>, 422 F. Supp. 2d at 1327.

Here, the Court agrees with the assessment in <u>Smith</u> and finds that Plaintiff's characterization of his claim as an "artificial inflation" claim[5]

---

[5]In support of his artificial inflation claim, Plaintiff also points to ERISA's requirement that plan purchases be for adequate consideration and contends that the Plan's purchase of artificially inflated ChoicePoint stock was not prudent under

12

rather than a diversification claim is simply another form of a diversification argument. Plaintiff contends that it was not prudent for the Defendants to continue offering ChoicePoint stock, investing Plan assets in ChoicePoint stock, and failing to remove ChoicePoint stock "as an option." (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 14.) However, if Defendants ceased investing Plan assets in the Stock Fund and ChoicePoint stock, they would presumably invest those assets elsewhere, essentially diversifying the assets, something they were not required to do under ERISA. Further, under Plaintiff's argument, when a company's stock is artificially inflated, it must shut down its company stock fund or ESOP and, perhaps, cannot sell any company stock in the plan until some unknown point in the future when the stock is no longer artificially inflated. As discussed below, imposing liability on Defendants under Plaintiff's theory and in spite of ERISA's diversification exemption would provide little guidance to future fiduciaries and undermine the text and goals of ERISA itself.

Because the Court finds that Plaintiff's claim is a rebadged argument for diversification, a strict application of § 1104(a)(2) ends the inquiry and requires dismissal of the claim. See Wright v. Oregon Metallurgical Corp.,

---

that provision. (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 12-16); 29 U.S.C. § 1108(e)(1).

13

360 F.3d 1090, 1097 (9th Cir. 2004) ("Interpreting ERISA's prudence requirement to subject EIAPs to an albeit tempered duty to diversify arguably threatens to eviscerate congressional intent and the guiding rationale behind EIAPs themselves."); Smith, 422 F. Supp. 2d at 1327; In re McKesson HBOC, Inc. ERISA Litig., 391 F. Supp. 2d 812, 819, 828-29 (N.D. Cal. 2005) ("If there is no duty to diversify ESOP plan assets under the statute, it logically follows that there can be no claim for breach of fiduciary duty arising out of a failure to diversify, or in other words, arising out of allowing the plan to become heavily weighted in company stock.").[6] Further, the Defendants had no discretion under the Plan to remove the Stock Fund or invest matching funds elsewhere.[7] See In re Reliant Energy ERISA Litig., No. Civ. A. H-02-2051, 2006 WL 148898, at *3 (S.D. Tex. Jan. 18, 2006) ("Because the REI Savings Plan was originally designed to require the REI Stock Fund to be offered as an investment option and to require employer

---

[6]ChoicePoint's Stock Fund may not be an ESOP, because it does not "formally designate[] [itself] as such in the plan document," 29 C.F.R. § 2550.407d-6(a)(2); however, § 1104(a)(2)'s diversification exemption applies to EIAPs and ESOPs, see 29 U.S.C. §§ 1104(a)(2), 1107(d)(3)(A). Further, "stock bonus plans, as present in this case, and ESOPs are both EIAPs and are treated the same for the purpose of fiduciary duty analysis." Wright, 360 F.3d at 1098 n.3 (citing cases).

[7]To the extent Plaintiff contends that Defendants should have amended the Plan to discontinue or suspend the Stock Fund, such actions are not fiduciary acts and are not bases for ERISA fiduciary liability. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 443-44, 119 S. Ct. 755, 763 (1999).

matching funds be invested in that fund, REI and its Benefits Committee had no discretion, and therefore no fiduciary duty, to act otherwise.").

However, the Third Circuit has held that "an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities." Moench v. Robertson, 62 F.3d 553, 571 (3d Cir. 1995). The Third Circuit noted that Moench pointed to a precipitous drop in the company's stock price, the impending collapse of the company, and the conflicted status of the fiduciaries as evidence of "changed circumstances to such an extent that the Committee properly could effectuate the purposes of the trust only by deviating from the trust's direction or by contracting out investment decisions to an impartial outsider," even though the plan called for investment primarily in employer stock. Id. at 572. Because the record was incomplete in the case, the Third Circuit remanded to the district court to develop the record and apply the principles of the case. Id.

The Sixth and Seventh Circuits have applied Moench's presumption and abuse of discretion standard to ESOPs in their circuits. See Steinman v. Hicks, 352 F.3d 1101, 1104-06 (7th Cir. 2003) (no abuse of discretion for

failing to diversify holdings of an ESOP plan pending a trust-to-trust

transfer); Kuper v. Iovenko, 66 F.3d 1447, 1459-60 (6th Cir. 1995) (plan

prohibition against diversification not binding under ERISA but no abuse of

discretion for failure to liquidate company stock held in an ESOP).  The First

Circuit has applied Moench, but held that a precipitous drop in stock price

plus concealment of adverse information from shareholders, not necessarily

the imminent collapse of the company, was sufficient to show an abuse of

discretion.  LaLonde v. Textron, 369 F.3d 1, 5-7 (1st Cir. 2004).

The Ninth Circuit held that Moench's "intermediate prudence standard

is difficult to reconcile with ERISA's statutory text, which exempts EIAPs

from the prudence requirement to the extent that it requires diversification."

Wright, 360 F.3d at 1097.  As cited above, the Ninth Circuit stated its concern

that Moench contravened Congress's intent regarding EIAPs.  Id.  Ultimately,

it declined to decide "whether the duty to diversify survives the statutory text

of [29 U.S.C. § 1104(a)]."  Id. at 1097-98.  However, the Ninth Circuit also

noted that even under Moench, "this case does not present a situation where

a company's financial situation is seriously deteriorating and there is a

genuine risk of insider self-dealing."  Id. at 1098 & n.4 (further noting that

"[t]he Moench standard seems problematic to the extent that it inadvertently

encourages corporate officers to utilize inside information for the exclusive

16

benefit of the corporation and its employees"). A significant drop in stock price or "[m]ere stock fluctuations, even those that trend downward significantly" are not enough to rebut <u>Moench</u>'s presumption; something more is required. <u>Id.</u> at 1099. The Eleventh Circuit has not addressed <u>Moench</u>.

Various district courts have ruled both ways on the issue of what is required to overcome the <u>Moench</u> presumption, assuming that it applies. <u>See</u> <u>Hill v. BellSouth Corp.</u>, 313 F. Supp. 2d 1361, 1366-68 (N.D. Ga. 2004) (Forrester, J.) (alleged overstatement of profits, investment in risky Latin American ventures enough to overcome <u>Moench</u> presumption on a motion to dismiss); <u>In re Mutual Funds Inv. Litig.</u>, 403 F. Supp. 2d 434, 449-50 (D. Md. 2005) (not necessary to plead dire circumstances or imminent collapse to rebut <u>Moench</u> presumption); <u>In re Sprint Corp. ERISA Litig.</u>, 388 F. Supp. 2d 1207, 1224-25 (D. Kan. 2004) (allegation of impending collapse not required); <u>In re Syncor ERISA Litig.</u>, 351 F. Supp. 2d 970, 981-83 (C.D. Cal. 2004) (allegation of serious mismanagement resulting in stock price drop overcomes <u>Moench</u> presumption); <u>but see and cf.</u> <u>In re Duke Energy ERISA Litig.</u>, 281 F. Supp. 2d 786, 794-95 (W.D.N.C. 2003) (complaint not viable where dire circumstances or impending collapse not alleged); <u>In re McKesson</u>, 391 F. Supp. 2d at 829-33 (allegations of inequitable conduct without brink of collapse insufficient to withstand motion to dismiss); <u>In re Calpine Corp.</u>

17

ERISA Litig., No. 03-1685, 2005 WL 1431506, at \*4-\*6 (N.D. Cal. Mar. 31,
2005) (allegation of seriously deteriorating financial condition and genuine
risk of inside self-dealing required to state claim); In re Reliant Energy, 2006
WL 148898, at \*2-\*3 (where plan required that employer stock be offered as
one investment option and that matching funds be invested in employer
stock, fiduciary had no discretion to do otherwise and complaint subject to
dismissal notwithstanding allegation of nonpublic information which
artificially inflated value of employer stock).

    In the absence of Eleventh Circuit authority on the issue and no clear
trend among district courts, the Court finds Wright, Duke Energy, McKesson,
and Reliant Energy, as well as Judge Evans's well-reasoned decisions in
Smith and Pedraza v. Coca-Cola Co., 456 F. Supp. 2d 1262, 1274-76 (N.D. Ga.
2006) (Evans, J.), more persuasive than cases taking the contrary view. The
Moench analysis potentially conflicts with ERISA's text. See Wright, 360
F.3d at 1097; In re McKesson, 391 F. Supp. 2d at 825-29. In the event a
company is truly on the brink of collapse and plan participants are unable to
sell their company stock in the plan, Moench's approach is more tenable. See,
e.g., Restatement (Second) of Trusts § 167 cmts. g, h, illus. 24 (fiduciary liable
to beneficiary where due to "a change of circumstances the shares become
highly speculative and it is probable as the [fiduciary] realizes that they will

18

ultimately become worthless" and the fiduciary fails to sell the shares).

However, holding fiduciaries liable based on amorphous allegations of

mismanagement leaves fiduciaries

> with no meaningful guidance as to when they should, or should
> not, ignore an ERISA plan's requirement to offer company stock.
> A fiduciary who decides to scrap the ESOP is just as apt to be
> sued as he would be if he enforced the plan provisions. This
> uncertainty fosters expensive, speculative litigation. It could also
> cause employers to be hesitant to offer the benefits of an ESOP to
> its employees.

Pedraza, 456 F. Supp. 2d at 1276; see also In re McKesson, 391 F. Supp. 2d at

828 ("Moench['s approach] places ESOP fiduciaries in an unenviable position.

On the one hand, fiduciaries will face liability if they incorrectly adhere to the

ESOP during an economic downturn. At the same time, fiduciaries will face

liability if they unnecessarily deviate from the ESOP."). The Seventh Circuit

has held that

> determining the "right" point, or even range of "right" points, for
> an ESOP fiduciary to break the plan and start diversifying may
> be beyond the practical capacity of the courts to determine. The
> Department of Labor pamphlet that we cited earlier states that a
> directed trustee may have a duty to sell "where there are clear
> and compelling public indicators, as evidenced by an 8-K filing
> with the Securities and Exchange Commission (SEC), a
> bankruptcy filing or similar public indicator, that call into serious
> question a company's viability as a going concern." That is not an
> administrable standard; note the hedge in "may" and the fact that
> selling when bankruptcy is declared will almost certainly be too
> late.

Summers v. State Street Bank & Trust Co., 453 F.3d 404, 411 (7th Cir. 2006) (citation omitted).

Assuming arguendo that the Eleventh Circuit adopts Moench, the Court finds that Plaintiff has not alleged sufficient facts to overcome the presumption of prudence. Plaintiff's allegations, taken as true, that Defendants were aware of the unauthorized access to ChoicePoint records and the 17% decline in stock price over the last three weeks of the Class Period are not enough to justify a decision by Defendants to deviate from the Plan's provisions and discontinue offering the Stock Fund and ChoicePoint stock as an investment option, stop providing matching contributions in the Stock Fund or ChoicePoint stock, and possibly sell off ChoicePoint stock in the Stock Fund. See Pedraza, 456 F. Supp. 2d at 1276 (undisclosed deceptive business practice, downturns in international business, $21.1 million settlement and SEC investigation, and 38% decline in stock price during the class period insufficient to overcome presumption). Plaintiff has not alleged ChoicePoint's impending collapse, and Defendants point out that ChoicePoint had substantial revenue over the Class Period. (See Defs.' Mot. to Dismiss, Exh. D at press release (detailing revenue of $1.1 billion in 2005, a 15% increase over 2004)).

Therefore, Plaintiff cannot allege any facts based on the conduct

described in the Complaint that would impose liability on Defendants.

Accordingly, the Court **GRANTS** Defendants' motion to dismiss on this count.

    D.    Count II - Failure to Monitor the Benefits Committee and Plan
            Defendants and Provide Them with Accurate Information

Plaintiff claims that the Defendants failed to monitor the Benefits

Committee and the Plan Defendants regarding the Plan's investment in

ChoicePoint stock and disclose relevant financial information regarding

ChoicePoint stock, such as its alleged artificial inflation, to the Benefits

Committee and Plan Defendants. Defendants do not dispute that the power

to appoint a fiduciary is itself a fiduciary function and that the power to

appoint a fiduciary carries with it a duty to monitor the appointee's

performance. Defendants contend that the duty to monitor does not

encompass a duty to examine every action taken by an appointee, but rather

it involves taking prudent and reasonable action to determine whether the

appointees were fulfilling their fiduciary obligations. Defendants also argue

that there can be no liability for a failure to monitor because Plaintiff's claim

of failure to prudently manage the Plan fails as a matter of law.

The text of ERISA does not set out an appointing official's duty to

monitor fiduciary appointees. One regulation provides:

> At reasonable intervals the performance of trustees and other
> fiduciaries should be reviewed by the appointing fiduciary in such

21

manner as may be reasonably expected to ensure that their
performance has been in compliance with the terms of the plan
and statutory standards, and satisfies the needs of the plan.

29 C.F.R. § 2509.75-8 at FR-17. A number of courts have held that the duty

to monitor under ERISA is consistent with the regulation. See, e.g., Coyne &

Delany Co. v. Selman, 98 F.3d 1457, 1465-66 & n.10 (4th Cir. 1996) (noting

that "courts have properly taken a restrictive view of the scope of this duty

and its attendant potential for liability"); In re Reliant Energy ERISA Litig.,

336 F. Supp. 2d 646, 657 n.13 (S.D. Tex. 2004) ("Liability based on a failure to

monitor does not arise unless the appointing fiduciary failed to periodically

monitor the performance of each of the appointed members of the REI

Benefits Committee."). A plaintiff must "allege that the corporate defendants

failed to remove any specific appointees for incompetence, breach of fiduciary

duty, or any other wrongdoing" or "that the corporate defendants had notice

that any specific appointees were incompetent or otherwise subject to

replacement for cause." In re Dynegy, Inc. ERISA Litig., 309 F. Supp. 2d 861,

904 (S.D. Tex. 2004); see also Newton v. Van Otterloo, 756 F. Supp. 1121,

1132 (N.D. Ill. 1991) (directors have duties to monitor plan fiduciaries whom

they appoint but do not breach duties absent "notice of possible misadventure

by their appointees").

Because the Court found that Plaintiff cannot allege facts to show that

Defendants acted imprudently with regard to the offering of the Stock Fund, Plaintiff cannot maintain a claim of failure to monitor. See Pedraza, 456 F. Supp. 2d at 1278; Smith, 422 F. Supp. 2d at 1333. Further, Plaintiff failed in his summary judgment response to cite to the Amended Complaint or any authority regarding whether he pled that Defendants had notice of their appointees' misconduct. Instead, Plaintiff argues that the Amended Complaint alleges that all the Plan's fiduciaries should have been removed for misconduct and that Defendants failed to ensure that their fiduciaries had sufficient information and otherwise acted properly with respect to the Plan's investments. Thus, Plaintiff has not alleged that Defendants had notice of any appointee conduct that would warrant removal.[8] See In re Dynegy, 309 F. Supp. 2d at 904; Newton, 756 F. Supp. at 1132. Accordingly, the Court need not address any duty to inform and **GRANTS** Defendants' motion to dismiss on this count.

    E.    Count III - Failure to Provide Complete and Accurate Information to Plan Participants and Beneficiaries

Plaintiff claims that Defendants failed to provide Plan participants

---

[8]At best, Plaintiff alleges that Defendants failed "to remove fiduciaries whom it [sic] knew or should have known were either: (i) not qualified to loyally and prudently manage the Plan's assets; or (ii) suffered under conflicts of interest because their compensation was tied to the price of Company stock." (Am. Compl. ¶ 172.)

with complete and accurate information regarding ChoicePoint, specifically

ChoicePoint's account verification procedures, account security, and illegal

data access, and the soundness and prudence of investing retirement

contributions in ChoicePoint stock. Plaintiff alleges that Defendants made

misleading statements in SEC filings, which were incorporated by reference

in Plan documents distributed to participants, such as the Summary Plan

Description, as well as in company annual reports, press releases, and other

public statements. Defendants respond that they did not act as ERISA

fiduciaries when they promulgated the statements and that ERISA does not

require them to disclose the information alleged in Plaintiff's claim.

The initial question for a claim of breach of fiduciary duty is "whether

that person was acting as a fiduciary (that is, was performing a fiduciary

function) when taking the action subject to complaint." Pegram v. Herdrich,

530 U.S. 211, 226, 120 S. Ct. 2143, 2153 (2000). Generally, communications

with plan participants are fiduciary in nature only if the statements are

"intentionally connected" to benefits. See Varity Corp. v. Howe, 516 U.S. 489,

505, 116 S. Ct. 1065, 1074 (1996). None of the statements, which include

annual reports, press releases, information posted on ChoicePoint's website,

and other communications to shareholders, regulators, investors, and

customers, are "intentionally connected" to or otherwise relate to the

24

provision of Plan benefits. (See Am. Compl. ¶¶ 92-107 (statements relating to

ChoicePoint's data security and protection of consumer data)). Thus,

Defendants did not act in an ERISA fiduciary capacity when they made most

of the statements.

Nevertheless, ERISA requires certain disclosures, set forth in 29 U.S.C.

§§ 1021-31 and 29 C.F.R. §§ 2520.101-2520.107-1, which include such items

as the summary plan description, an annual report for the ERISA plan, and a

financial statement. Plaintiff claims that Defendants created allegedly

misleading SEC filings which were distributed to shareholders and

incorporated by reference in Plan documents. Creating SEC filings is not

governed by ERISA because it does not "involve discretionary acts regarding

plan administration." Sutton v. BellSouth Telecomms., Inc., 189 F.3d 1318,

1321 (11th Cir. 1999); Local Union 2134, United Mine Workers of Am. v.

Powhatan Fuel, Inc., 828 F.2d 710, 713-14 (11th Cir. 1987) ("One assumes

fiduciary status 'only when and to the extent' that they function in their

capacity as health plan fiduciaries, not when they conduct business that is

not regulated by ERISA"). "Those who prepare and sign SEC filings do not

become ERISA fiduciaries through those acts, and consequently, do not

violate ERISA, if the filings contain misrepresentations." In re WorldCom,

Inc., 263 F. Supp. 2d 745, 766 (S.D.N.Y. 2003).[9]

Some courts have determined that including SEC filings in plan documents is a fiduciary act because it involved a discretionary decision by plan fiduciaries charged with communicating with participants about the plan. See, e.g., Pedraza, 456 F. Supp. 2d at 1279; In re Sprint, 388 F. Supp. 2d at 1227-28; In re AEP ERISA Litig., 327 F. Supp. 2d 812, 825 (S.D. Ohio 2004); In re Dynegy, 309 F. Supp. 2d at 879, 888. A number of circuit courts, however, have refused to expand disclosure obligations beyond those explicitly imposed by ERISA. See Baker v. Kingsley, 387 F.3d 649, 662 (7th Cir. 2004); Sprague v. Gen. Motors Corp., 133 F.3d 388, 405 (6th Cir. 1998) (en banc) ("It would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure

---

[9]SEC filings are generated to comply with the federal securities laws. ERISA does not regulate the creation of SEC filings, and Defendants, in creating the filings, did not act as fiduciaries of the Plan. Defendants, including ChoicePoint itself, are fully responsible for any misleading statements or omissions in SEC filings under the federal securities laws. Because Plan participants are all shareholders, any participant, or possibly the Plan itself, may seek redress pursuant to the those laws. Notably, the Court recently denied a motion to dismiss a consolidated class action complaint based primarily on the same factual allegations regarding ChoicePoint's verification procedures, account security, and illegal data access. See In re ChoicePoint Sec. Litig., No. 1:05-CV-686 (N.D. Ga. Nov. 21, 2006) (Camp, J.). At least one pair of commentators has suggested that the securities laws should be the sole federal remedy for the relief Plaintiff seeks in this suit. See generally Mark Casciari & Ian Morrison, Should the Securities Exchange Act Be the Sole Federal Remedy for an ERISA Fiduciary Misrepresentation of the Value of Public Employer Stock?, 39 J. Marshall L. Rev. 637 (2006).

provisions do not require to be disclosed."); Bd. of Trs. of the CWA/ITU
Negotiated Pension Plan v. Weinstein, 107 F.3d 139, 147 (2d Cir. 1997) ("it
[is] inappropriate to infer an unlimited disclosure obligation on the basis of
general [ERISA fiduciary duty] provisions that say nothing about
disclosure."); Faircloth v. Lundy Packing Co., 91 F.3d 648, 657 (4th Cir. 1996)
("To accept the argument . . . we would have to hold that ERISA's general
fiduciary duty provision . . . requires plan fiduciaries to furnish documents to
participants and beneficiaries in addition to the documents that ERISA's
specific disclosure provision . . . requires the plan administrator to furnish.
Such a holding would conflict with the principle that specific statutes govern
general statutes.").

Several district courts have found that the disclosure to plan
participants of material non-public information, such as the illegal data
access, is not required by ERISA or that such a disclosure would run afoul of
the securities laws. See, e.g., In re McKesson, 391 F. Supp. 2d at 836-37; In
re Calpine, 2005 WL 1431506, at *7; In re Tyco Int'l, Ltd. Multidistrict Litig.,
No. MDL 02-1335-PB, 02-1357-PB, 2004 WL 2903889, at *5-*6 (D.N.H. Dec.
2, 2004); Pa. Fed'n v. Norfolk S. Corp. Thoroughbred Ret. Inv. Plan, No. Civ.
A. 02-9049, 2004 WL 228685, at *5-*6 (E.D. Pa. Feb. 4, 2004); Stein v. Smith,
270 F. Supp. 2d 157, 172-73 (D. Mass. 2003). Other district courts have found

27

that disclosure of non-public information or false information to participants is an ERISA fiduciary duty and does not violates the securities laws. <u>See, e.g.</u>, <u>In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.</u>, 312 F. Supp. 2d 1165, 1181-82 (D. Minn. 2004); <u>In re CMS Energy ERISA Litig.</u>, 312 F. Supp. 2d 898, 914-15 (E.D. Mich. 2004); <u>In re WorldCom</u>, 263 F. Supp. 2d at 766-67.

The Court finds that Plaintiff's claim fails as a matter of law because there is no general fiduciary duty of disclosure under ERISA. The Court agrees with the circuit courts that have addressed the issue of ERISA disclosure: ERISA's fiduciary duty standards should not be expanded to include disclosure of information that is not explicitly required under ERISA. <u>See Sprague</u>, 133 F.3d at 405; <u>Weinstein</u>, 107 F.3d at 147; <u>Faircloth</u>, 91 F.3d at 657. To the extent an affirmative duty of disclosure exists, it is limited to the disclosure of information about the plan, plan benefits, or plan expenses. The preparation of SEC filings, even if misleading and incorporated by reference in required ERISA disclosures, is not a fiduciary act under ERISA. SEC filings are created pursuant to the securities laws and are distributed to the investing public as well as Plan participants. Should the filings be false or misleading, the securities laws provide for relief, which is available to the Plan and Plan participants. <u>See In re McKesson</u>, 391 F. Supp. 2d at 837

("participants do not need a remedy under ERISA to obtain relief for a fiduciary's false statements or omissions; indeed, they can invoke the securities laws"). Further, as mentioned above, the allegedly misleading statements in this case do not relate to Plan benefits or finances, ChoicePoint's performance or future performance, or investment in ChoicePoint stock and, thus, were not made in a fiduciary capacity. See Varity, 516 U.S. at 505, 116 S. Ct. at 1074; see also In re Calpine, 2005 WL 1431506, at *7 ("An affirmative duty of disclosure arises under ERISA only when a fiduciary responds to inquiries from plan participants or promises to keep participants updated on future developments affecting the plan"). Accordingly, the Court **GRANTS** Defendants' motion to dismiss on this count.

F.    Count IV - Breach of Duty to Avoid Conflicts of Interest

Plaintiff claims that Defendants operated under a conflict of interest by continuing to allow ChoicePoint stock as an investment during the Class Period and failing to engage independent fiduciaries or advisors regarding investment in ChoicePoint stock and the information provided to participants and beneficiaries concerning ChoicePoint stock. (Am. Compl. ¶ 193.) Specifically, Plaintiff alleges that because the Defendants' compensation was tied to the performance of or rendered in ChoicePoint stock, they had an incentive to have the Plan continue investing in the stock. (Id. ¶¶ 147-49.)

29

Although the Amended Complaint details the sale of ChoicePoint stock by the
company's Chairman, Derek Smith, and President, Douglas Curling, two non-
parties to this suit, (Am. Compl. ¶¶ 123-26), it does not specify how any
Defendants may have benefitted from the supposed conflict of interest.

ERISA imposes a duty of loyalty, requiring fiduciaries to avoid conflicts
of interest and act "solely in the interest of the participants and
beneficiaries." 29 U.S.C. § 1104(a). However, ERISA authorizes officers,
employees, and agents of an employer to act as fiduciaries while receiving
compensation from the employer. Id. § 1108(c)(3). The Supreme Court has
held that an ERISA fiduciary "may have financial interests adverse to
beneficiaries" and may "take actions to the disadvantage of employee
beneficiaries, when they act as" employers or plan sponsors. Pegram, 530
U.S. at 225, 120 S. Ct. at 2152.

The plaintiff in In re Dynegy brought conflict of interest allegations
almost identical to Plaintiff's. In re Dynegy, 309 F. Supp. 2d at 896. There,
the court found that

> [b]ecause plaintiff has not alleged either an identifiable conflict or
> harm, and has similarly failed to allege either that the committee
> defendants benefitted from that conflict or, if so, how they
> benefitted, and has not cited the court to any case that has
> recognized allegations like those asserted in Count VII as
> actionable, the court concludes that plaintiff has failed to state a
> conflict of interest claim because she has failed to allege an

30

> identifiable conflict that either benefitted the defendants or
> caused an identifiable harm to the Plan.

Id. at 897-88; see also In re Polaroid ERISA Litig., 362 F. Supp. 2d 461, 479

(S.D.N.Y. 2005) (complaint failed to allege stock ownership by individual

defendants and that the conflict of interest impeded the defendants' prudent

decision making with respect to the plan); In re WorldCom, 263 F. Supp. 2d at

768 ("Plaintiffs do not allege that [the defendant's] personal investments

caused him to take or fail to take any actions detrimental to the Plan while he

was wearing his 'fiduciary hat.'").

Here, Plaintiff failed to point to any specific conflict or harm or any

benefit realized by Defendants as a result of the conflict. The Amended

Complaint is speculative and conclusory on this claim: (1) after alleging that

Defendants were compensated with or based on the performance of

ChoicePoint stock, the Amended Complaint theorizes that removal of the

stock as an investment option would have "potentially reduced demand" for

ChoicePoint stock in the market and (2) as a result, these unnamed conflicts

caused unspecified Defendants to have to choose between their own interests

as employees and the interests of the Plan participants. (Am. Compl. ¶¶ 147-

50.) The Court is not required to accept these conclusory allegations as true,

and the allegations fail to state a claim for the same reasons the allegations

31

in <u>Dynegy</u>, <u>Polaroid</u>, and <u>WorldCom</u> failed.  Accordingly, the Court **GRANTS** Defendants' motion to dismiss on this count.

## III.    Conclusion

For the reasons above, the Court **GRANTS** Defendants' motions to dismiss [#33, 34] and **DISMISSES** Plaintiff's Amended Complaint [#24].  The Clerk is **DIRECTED** to **CLOSE** the case.

SO ORDERED, this  6th  day of March, 2007.

JACK T. CAMP
UNITED STATES DISTRICT JUDGE